BRIAN M. BOYNTON
Acting Assistant Attorney General

CHRISTOPHER R. HALL
CARLOTTA P. WELLS
BRAD P. ROSENBERG
Assistant Directors

STEVEN A. MYERS
Senior Trial Counsel
JOSEPH J. DEMOTT (Va. Bar #93981)
R. CHARLIE MERRITT
KEVIN J. WYNOSKY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-3367
Email: joseph.demott@usdoj.gov

*Attorneys for Federal Government Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brnovich, *et al.*, | No. 2:21-cv-01568-MTL |
| Plaintiffs, | |
| v. | **FEDERAL DEFENDANTS'** |
| | **OPPOSITION TO PLAINTIFFS'** |
| Joseph R. Biden, *et al.*, | **THIRD MOTION FOR A** |
| | **PRELIMINARY INJUNCTION** |
| Defendants. | **(ECF NO. 72)** |

1

**TABLE OF CONTENTS**

2   **INTRODUCTION** ...................................................................................................... 1

3   **ADDITIONAL BACKGROUND** ............................................................................. 2

4
5   **I.**   Executive Order No. 14042 ................................................................... 2

6   **II.**   **The Task Force Guidance and the Acting OMB Director's Economy and Efficiency Determination** ..................................................................... 3

7
8   **III.**   **The FAR Council's Interim Guidance** ............................................... 4

9   **ARGUMENT** ............................................................................................................ 5

10   **I.**   **Plaintiffs Fail to Establish This Court's Jurisdiction.** ........................... 5

11
12   A.   The State Lacks Article III Standing to Challenge the Vaccination Requirement for Covered Federal Contractors. ...................................... 5

13
14   B.   Counts I, II, and VIII Fail to Identify an APA Cause of Action Over Which This Court Would Have Jurisdiction, and Non-Statutory Review Is Unavailable. ........................................ 8

15   **II.**   **Plaintiffs Are Unlikely to Succeed on the Merits.** ............................... 10

16   A.   EO 14042 Is Within the President's Procurement Act Authority.................... 10

17
18   1.   The Procurement Act Gives the President Broad-Ranging Authority to Pursue Efficient and Economic Contracting Policies. ..................... 11

19
20   2.   The OMB Determination Is Sufficiently Related to Economy and Efficiency and Is Neither Arbitrary Nor Capricious.............................. 13

21   B.   Requiring Contractor Vaccination is Constitutional............................................ 15

22   C.   Plaintiffs' § 1707 Claims Are Meritless.................................................. 16

23
24   1.   Section 1707 Does Not Apply to the Acting OMB Director's Determination and, in Any Event, She Complied with It. ................... 17

25
26   2.   Section 1707 Does Not Apply to the Task Force Guidance or to the FAR Memo.......................................................................... 19

27   **III.**   **Any Relief Should Be Narrowly Tailored.**........................................... 20

28   **CONCLUSION**............................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) .................................................................................... *passim*

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   141 S. Ct. 2485 (2021) ................................................................................................ 12

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block,*
   655 F.2d 1153 (D.C. Cir. 1981) .................................................................................. 18

*Am. Fed'n of Gov't Emps., AFL-CIO v. Carmen,*
   669 F.2d 815 (D.C. Cir. 1981) .................................................................................... 15

*Arbitraje Casa de Cambio, S.A. de CV. v. United States,*
   79 Fed. Cl. 235 (2007) ............................................................................................... 11

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...................................................................................................... 8

*Biden v. Sierra Club,*
   --- S. Ct. ---, No. 20-138, 2021 WL 2742775 (U.S. July 2, 2021) ........................ 9, 10

*BST Holdings, LLC v. Occupational Safety & Health Administration,*
   No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6 2021) ................................... 12, 13

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ..................................................................................... 10

*Chamber of Com. of U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ........................................................................... 9, 10, 11

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
   467 U.S. 837 (1984) ..................................................................................................... 11

*Crickon v. Thomas,*
   579 F.3d 978 (9th Cir. 2009) ..................................................................................... 15

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) ...................................................................................................... 5

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ................................................................................................ 15

*Detroit Int'l Bridge Co. v. Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) ............................ 17

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................................ 11

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ............................................................................................ 20

*Griffith v. Fed. Labor Rels. Auth.*,
   842 F.2d 487 (D.C. Cir. 1988) ................................................................................. 9

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir.), *vacated and remanded*, 138 S. Ct. 377, 199 L. Ed. 2d
   275 (2017) ........................................................................................................... 7

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ............................................................................. 18

*Kania v. United States*,
   650 F.2d 264 (1981) .............................................................................................. 11

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ................................................................................................ 9

*Liberty Mut. Ins. Co. v. Friedman*,
   639 F.2d 164 (4th Cir. 1981) ................................................................................. 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................ 7

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................. 5, 9

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ............................................................................... 8

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*,
   658 F. Supp. 2d 105 (D.D.C. 2009) ..................................................................... 8, 17

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................................................. 9

iii

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ................................................................................................ 16

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) .............................................................................................. 9

*Perkins v. Lukens Steel Co.,*
310 U.S. 113 (1940) .............................................................................. 2, 5, 9, 13

*Printz v. United States,*
521 U.S. 898 (1997) ............................................................................................ 16

*Rattlesnake Coal. v. EPA,*
509 F.3d 1095 (9th Cir. 2007) ........................................................................... 8

*Rodden v. Fauci,*
No. 3:21-cv-317, 2021 WL 5545234 (S. D. Tex. Nov. 27, 2021) ............................. 8

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) ........................................................................................... 18

*Sacora v. Thomas,*
628 F.3d 1059 (9th Cir. 2010) ....................................................................... 14, 15

*Sierra Club v. Trump,*
963 F.3d 874 (9th Cir. 2020) ............................................................................. 9

*South Dakota v. Dole,*
483 U.S. 203 (1987) ............................................................................................ 16

*Speech First, Inc. v. Killeen,*
968 F.3d 628 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) ...... 5

*Terveer v. Billington,*
34 F. Supp. 3d 100 (D.D.C. 2014) ...................................................................... 9

*Town of Chester. v. Laroe Ests., Inc.,*
137 S. Ct. 1645 (2017) ........................................................................................ 5

*Transp. Workers Union of Am., AFL-CIO v. TSA,*
492 F.3d 471 (D.C. Cir. 2007) ........................................................................... 9

*Trump v. Sierra Club,*
140 S. Ct. 1 (2019) ............................................................................................. 10

*UAW-Labor Emp. & Training Corp. v. Chao,*
  325 F.3d 360 (D.C. Cir. 2003) ................................................................................10, 11, 13, 14

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) .......................................................................................... 7

**Statutes**

3 U.S.C. § 301 ................................................................................................................. 8, 12, 17

3 U.S.C. § 302 ........................................................................................................................ 12

40 U.S.C. § 121 ............................................................................................................... 9, 11, 12

40 U.S.C. §§ 101–1315 ........................................................................................................... 11

41 U.S.C. § 133 ...................................................................................................................... 17

41 U.S.C. § 1303 ..................................................................................................................... 12

41 U.S.C. § 1707 ............................................................................................................... *passim*

41 U.S.C. § 6701–6707 ............................................................................................................ 3

42 U.S.C. § 2000e ................................................................................................................... 6

42 U.S.C. § 2000e-2 ................................................................................................................ 6

Ariz. Rev. Stat. § 23-206 ......................................................................................................... 6

**Regulations**

29 C.F.R. § 4.133 ..................................................................................................................... 3

48 C.F.R. § 1.101 ................................................................................................................... 19

48 C.F.R. § 1.402 .................................................................................................................... 8

48 C.F.R. § 1.404 ................................................................................................................... 19

48 C.F.R. § 1.501-1 ............................................................................................................... 19

48 C.F.R. § 2.101 .................................................................................................................... 3

Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and
Costs Relating to Legal and Other Proceedings,
66 Fed. Reg. 17,754 (Apr. 3, 2001).............................................................. 18

Federal Acquisition Regulation: Non-Retaliation for Disclosure of Compensation
Information,
81 Fed. Reg. 67,732 (Sept. 30 2016)........................................................... 18

**Other Authorities**

CDC, COVID-19: Key Things to Know (updated Nov. 30, 2021),
https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html ............ 13

Chris Isidore, *Biden's Vaccine Mandate Is on Hold, But Companies Are Moving Ahead
Anyway* (Nov. 17, 2021),
https://www.cnn.com/2021/11/17/economy/employer-vaccine-mandates/
index.html................................................................................................ 14

Determination of the OMB Director Regarding the Revised Safer Federal Workforce Task
Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis,
86 Fed. Reg. 63,418 (Nov. 16, 2021) ....................................................*passim*

Equal Employment Opportunity Commission, Compliance Manual on Religious
Discrimination (Jan. 15, 2021),
https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination ...................... 6

Exec. Order No. 14042,
86 Fed. Reg. 50,985 (Sept. 14, 2021).....................................................*passim*

Executive Order No. 14043,
86 Fed. Reg. 50,989 (Sept. 9 2021)........................................................... 1, 5

Memorandum from Lesley A. Field, et al. (Sept. 30, 2021),
https://perma.cc/77L7-8TM8 ....................................................................... 4

Open FAR Cases Report 2 (Nov. 1, 2021),
https://perma.cc/ZQ4Y-8Y9W ..................................................................... 4

Safer Federal Workforce, Federal Contractor FAQs, Compliance,
https://perma.cc/RGR9-ZTES...................................................................... 20

White House, Fact Sheet: Biden Administration Announces Details of Two Major
Vaccination Policies (Nov. 4, 2021),
https://perma.cc/7FPV-PA2N...................................................................... 15

**INTRODUCTION**

In Plaintiffs' third motion for preliminary injunction, the State of Arizona renews its challenge to Executive Order No. 14042 and the order's implementation by the federal government.[1]  *See* Exec. Order No. 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021) ("Executive Order" or "EO 14042").  Arizona again asks this Court to exercise its extraordinary emergency powers to issue "a nationwide injunction" against the Executive Order.  Pls.' Third Mot. for Prelim. Inj. 17, ECF No. 72 ("Mot.").  The Court should again deny Arizona's request.

The Executive Order is not a regulation of the general public but rather an exercise of the President's authority to direct federal contracting in his capacity as Chief Executive Officer of the Executive Branch as a market participant.  With respect to certain government contracts, EO 14042 and its implementing guidance directs federal agencies to include a clause requiring certain COVID-19 safety protocols in "any new contract," "new solicitation for a contract," "extension or renewal of an existing contract," and "exercise of an option on an existing contract."  EO 14042 § 5.  Those safety protocols currently require covered contractor employees to be vaccinated unless granted a medical or religious exception.

Despite amending its complaint for a second time, Arizona still fails to explain how it will be imminently harmed by the requirement, much less irreparably harmed.  The State cannot show any sovereign injury, as the federal government's regulation of its own contractual affairs does not impinge on the state's police power or its interest in enacting and enforcing its own laws.  The State fails to show any economic injury because it provides no evidence that it has lost, or imminently will lose, any federal contract; and its generalized fears of economic disruptions are too speculative to satisfy Article III.  Further, even if Arizona had standing, this Court would lack jurisdiction because Plaintiffs fail to properly invoke the Administrative Procedure Act ("APA") and the narrow doctrine of non-statutory review is unavailable.  For these threshold reasons alone, the renewed motion should be denied.

---

[1] Plaintiffs also renew their challenge to Executive Order No. 14043, but only by incorporating their prior briefing by reference.  *See* Pls.' Third Mot. for Prelim. Inj. 1 & n.1, ECF No. 72.  This response correspondingly incorporates Defendants' prior briefing by reference and addresses only Plaintiffs' latest brief, which is focused solely on EO 14042.

If this Court reaches the merits, it should reject Plaintiffs' argument that the President exceeded his broad authority to direct federal contracting—an argument that conflicts with more than 50 years of precedent.  Again, this case does not involve regulatory action but rather the Executive Branch acting as a market participant, and the challenged vaccination requirement plainly has the requisite nexus to promoting economy and efficiency in federal contracting.  The procedural requirements of the APA and 41 U.S.C. § 1707 are not applicable here, and in any event, the Acting Director of the Office of Management and Budget ("OMB") complied with these requirements in her determination that the relevant COVID-19 safety protocols will promote economy and efficiency in federal procurement.  And Plaintiffs' constitutional arguments have been considered and rejected by courts many times over.

When COVID-19 first emerged in the United States, it ravaged the economy and severely compromised the federal government's operations.  Just like private entities, the federal government suffered when its contractors' employees became infected and missed work—and, in some cases, died.  The federal government has therefore made a decision, in its capacity as a market participant, to contract primarily with entities that take precautions to prevent the spread of this contagious, deadly disease.  "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."  *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).  "Those wishing to do business with the Government must meet the Government's terms; others need not."  *AFL-CIO v. Kahn*, 618 F.2d 784, 794 (D.C. Cir. 1979) (en banc).  The Court should reject Plaintiffs' novel, unduly restrictive view of the federal government's ability to set the terms of its own contracts, especially in the midst of unprecedented economic upheaval.

## ADDITIONAL BACKGROUND

### I.    Executive Order No. 14042

As discussed in prior briefing, Executive Order 14042 directs federal departments and agencies to include a COVID-19 safety clause in certain federal contracts "to the extent permitted by law."  *See* Defs.' Opp'n to Mot. for Prelim Inj. 7–9, ECF No. 52 ("Opp'n").

Specifically, the clause must be included in new contracts, new solicitations for a contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract, if the contract falls into one of the following categories:

- a procurement contract for services, construction, or a leasehold interest in real property;

- a contract for services covered by the Service Contract Act, 41 U.S.C. § 6701–6707;

- a contract for concessions, including any concessions contract excluded by Department of Labor regulations at 29 C.F.R. § 4.133(b); or

- a contract entered into with the federal government in connection with federal property or lands and related to offering services for federal employees, their dependents, or the general public.

EO 14042 § 5(a) (collectively, "covered contracts"). The Executive Order does not extend to grants, or to most contracts for procurement of goods (as opposed to services). *See id.* § 5(a)(i), (b)(i), (b)(v). Nor does it apply to contracts "whose value is equal to or less than the simplified acquisition threshold," which is essentially $250,000. *Id.* § 5(a)(iii); *see also* 48 C.F.R. § 2.101. And, although "agencies are strongly encouraged" to incorporate COVID-19 safety protocols into existing contracts, the EO itself does not require (or even give authority for) agencies to unilaterally insert the COVID-19 safety clause into existing contracts. EO 14042 § 6(c).

## II.    The Task Force Guidance and the Acting OMB Director's Economy and Efficiency Determination

Under EO 14042, the COVID-19 safety clause in covered contracts must "specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force"—but only if the Director of the Office of Management and Budget, exercising authority delegated by the President, "approves the Task Force Guidance and determines that the Guidance, if adhered to by contractors or subcontractors, will promote economy and efficiency in Federal contracting." *Id.* § 2(a).

On November 10, 2021, the Task Force issued updated contractor guidance and Acting OMB Director Shalanda Young made the statutorily required determination that the Task

1   Force guidance will promote economy and efficiency in federal contracting. *See* Determination
2   of the OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance
3   for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418,
4   63,418–21 (Nov. 16, 2021).  This determination included the full text of the updated guidance
5   and a detailed economic analysis spelling out how the guidance promotes economy and
6   efficiency in federal procurement. *See id.*  The determination explained that 41 U.S.C. § 1707
7   is inapplicable but nevertheless complied with its notice-and-comment requirement for good
8   measure, opening a public comment period through December 16, 2021. *Id.*

9   **III.    The FAR Council's Interim Guidance**

10          The Executive Order tasks the Federal Acquisition Regulatory Council with amending
11   the Federal Acquisition Regulation ("FAR") to provide for inclusion of the COVID-19 safety
12   clause in future covered contracts. *See* EO 14042 § 3(a).  On September 29, 2021, the FAR
13   Council initiated the appropriate rulemaking process. *See* Open FAR Cases Report 2 (Nov. 1,
14   2021), https://perma.cc/ZQ4Y-8Y9W (Case No. 2021-021, Ensuring Adequate COVID-19
15   Safety Protocols for Federal Contractors).  Because this process takes time, EO 14042 also
16   directs agencies to exercise their authority to deviate from the FAR to incorporate COVID-
17   19 safety clauses into covered contracts under the EO, until the FAR amendment can take
18   effect. *See* EO 14042 § 3(b).  EO 14042 directs the FAR Council to issue interim guidance
19   suggesting how agencies may accomplish this. *See id.* § 3(a).

20          On September 30, 2021, the FAR Council issued a memo "provid[ing] agencies . . .
21   with initial direction" on implementing "all guidance" the Task Force may issue and on
22   "meeting the applicability requirements and deadlines set forth in" EO 14042. *See*
23   Memorandum from Lesley A. Field, et al., 1–2 (Sept. 30, 2021), https://perma.cc/77L7-8TM8
24   ("FAR Memo").  The memo "encourage[s]" agencies to use their independent authority to
25   temporarily deviate from the FAR and "support[s]" those efforts by offering a sample
26   COVID-19 safety clause that agencies might use, subject to agency- and contract-specific
27   deviations. *Id.* at 2–5.

28

4

**ARGUMENT**

**I.    Plaintiffs Fail to Establish This Court's Jurisdiction.**

In this case, the third time is not the charm: notwithstanding its most recent attempt to amend its complaint, Arizona still fails to establish standing to challenge the vaccination requirement for covered federal contractors.  And even if the State had standing, Counts I, II, and VIII fail at the threshold because Plaintiffs fail to establish an APA cause of action and the narrow doctrine of non-statutory review does not apply here.

**A.    The State Lacks Article III Standing to Challenge the Vaccination Requirement for Covered Federal Contractors.**

A plaintiff's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020).  Further, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Arizona fails to demonstrate standing to bring claims challenging the vaccination requirement for covered contractors—much less standing to obtain "a nationwide injunction" regarding that requirement, Mot. at 17.

*Sovereign interests.*  First, Arizona argues that requiring federal contractor vaccination "invades the State's sovereignty by regulating a matter that the U.S. Constitution reserves to the States."  Mot. at 5–6.  This argument fails because EO 14042 does not "regulat[e]" public health at all; it is instead an exercise of the federal government's "unrestricted power" to "determine those with whom it will deal, and to fix the terms and conditions upon which it will" enter into contracts.  *Perkins*, 310 U.S. at 127.  The federal government does not infringe on state sovereignty by exercising this long-recognized authority.  *See* Opp'n at 34–35.  Indeed, the State's argument proves too much: it would permit any state to challenge not only EO 14042 but also EO 14043 and any other federal measure related to COVID-19.

Relatedly, Arizona asserts harm to its "interest in enforcing its own laws and its own

religious-liberty protections." Mot. at 6. But the State cites no authority for the dubious proposition that the mere possibility of preemption amounts to an Article III injury. Further, the State fails to explain how EO 14042 will prevent it from enforcing any of its laws. Arizona cites state constitutional provisions and statutes protecting religious liberty, but it overlooks that application of the contractor vaccination requirement is subject to virtually identical protections. *Compare* 42 U.S.C. §§ 2000e(j), 2000e-2 (relevant provisions from Title VII of the Civil Rights Act of 1964), *and* Equal Employment Opportunity Commission, Compliance Manual on Religious Discrimination, https://perma.cc/65GW-DHET (Jan. 15, 2021) (explaining that Title VII requires an employer to "reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement"); *with* A.R.S. § 23-206 (requiring an employer to "provide a reasonable accommodation" for an "employee's sincerely held religious beliefs, practices, or observances"). The asserted conflict between the vaccination requirement and Arizona Executive Order 2021-19 is also illusory. *Contra* Second Am. Compl. ¶ 58, ECF No. 70. Arizona and its subdivisions are free to decline to contract with the United States if they object to workplace vaccination requirements, but they may not turn our federal system on its head by compelling the United States to contract with them on terms of their own choosing.

*Proprietary interests.* Next, Arizona asserts that it is "a federal contractor subject to the Contractor Mandate." Mot. at 6. It identifies a handful of existing contracts between various Arizona entities and parts of the federal government, Second Am. Compl. Exs. 6–9, ECF Nos. 70-6 through 70-9, and notes that the federal government has requested that a COVID-19 safety clause be added to these contracts through "bilateral modification." *See, e.g.*, *id.* Exs. 6-A & 8-A. But merely asking for a modification to a contract is not a legally cognizable injury. Arizona is free to reject these requests, as at least one State agency recently did. *See* Ex. A, Decl. of Chad Latawiec (authenticating and attaching November 15, 2021 letter from counsel for Arizona State Retirement System). This illustrates that Arizona is not "an object" of federal *regulation* here. *Contra* Mot. at 7. Any dispute over a specific federal contract is therefore premature, and in any event cannot be raised in this forum. *See* Opp'n at 17–18.

Arizona also asserts a generalized fear of "economic disruption" arising from EO 14042, Mot. at 6–7, but this fear is too conjectural and hypothetical to confer standing. A plaintiff seeking a preliminary injunction cannot rest on "mere allegations," but rather must "set forth by affidavit or other evidence specific facts" establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). Here, Arizona fails to support its various predictions of "lost workers," "increased unemployment," "supply chain issues," and other "costs to the State." *Compare* Mot. at 6–7 (unsupported speculation), *with* 86 Fed. Reg. at 63,421–23 (evidence-based analysis indicating that the challenged federal policy will have a positive economic impact).

The Court should decline to follow the standing analysis in *Kentucky v. Biden*, No. 21-cv-00055 (E.D. Ky. Nov. 30, 2021), which Plaintiffs cite in a notice of supplemental authority, ECF No. 101, because it is based on the incorrect premise that "States are permitted 'to litigate as *parens patriae*'" in suits against the federal government. *Compare* ECF No. 101-1 at 6, *with* Opp'n at 14–15. Further, there is zero evidence that any State entities risk being "blacklisted from future contracting opportunities," as the *Kentucky* court opined, ECF No. 101-1 at 8.

*University operations.* With just two sentences of explanation, Arizona asserts that "federal policies affecting a state's public universities confer standing on the state," Mot. at 7. This assertion is far too broad and is not supported by either of the cases Arizona cites. In *Hawaii v. Trump*, the state established standing by detailing a state university's efforts to recruit foreign students and faculty and providing exact counts of how many foreign students and faculty were injured by the challenged policy. *See* 859 F.3d at 763–65; *see also Washington v. Trump*, 847 F.3d 1151, 1159–61 (9th Cir. 2017) (similarly finding standing based on evidence of injuries to students and faculty). Here, Arizona has not made anything close to that evidentiary showing. Indeed, it has not even shown that any of its public universities object to EO 14042; the declaration from Arizona Board of Regents Executive Director John Arnold indicates that the universities are "actively" requiring their employees to become vaccinated. Second Am. Compl. Ex. 5 ¶ 4, ECF No. 70-5. It is therefore far from clear that any of the universities has an injury, much less one that would be redressed by the requested injunction.

### B. Counts I, II, and VIII Fail to Identify an APA Cause of Action Over Which This Court Would Have Jurisdiction, and Non-Statutory Review Is Unavailable.

The second amended complaint purports to challenge the federal contractor vaccination requirement under the APA.  But Plaintiffs fail to challenge a discrete, final action by a federal agency, which is a jurisdictional threshold for an APA claim in this Circuit.  *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007).

Plaintiffs cannot challenge EO 14042 itself because—as they have conceded—"there is no APA cause of action against the President." Tr. of Oral Arg. at 15:13–17, ECF No. 69. Plaintiffs do seek APA review of the Acting OMB Director's economy-and-efficiency determination. *See* Second Am. Compl. ¶¶ 160–161, 164, 198–210.  As previously explained, however, the Acting OMB Director's determination "cannot be subject to judicial review under the APA" because it was an exercise of presidential authority delegated under 3 U.S.C. § 301.  Opp'n at 22–23 (quoting *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 & n.5, 111 (D.D.C. 2009)).  Plaintiffs concede this point as well by failing to address it in either their reply brief or their third motion for preliminary injunction.

Nor does the APA permit review of the Task Force's contractor guidance or the FAR Memo (including the sample COVID-19 safety clause).  *Contra* Second Am. Compl. ¶¶ 160–164, 193–197.  Final agency action (1) "must mark the consummation of [an] *agency's* decisionmaking process" and (2) must determine legal "rights or obligations" or have other "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted) (emphasis added).  The Task Force is not an agency but rather an advisory body lacking "substantial independent authority."  *Rodden v. Fauci*, No. 3:21-cv-317, 2021 WL 5545234, at *3 (S. D. Tex. Nov. 27, 2021) (quoting *Meyer v. Bush*, 981 F.2d 1288, 1297 (D.C. Cir. 1993)). Moreover, Task Force guidance is not legally binding on its own; it becomes binding only if and when it is approved by the OMB Director.  *See* EO 14042 § 2(a).  Likewise, the FAR Memo has no standalone legal force.  It merely suggests a sample clause that agencies might use to implement the EO; it does not bind agencies with respect to how they include a COVID-19 safety clause in their contracts. *See* FAR § 1.402 ("[D]eviations from the FAR may

be granted . . . when necessary to meet the specific needs and requirements of each agency."); *accord Kentucky*, ECF No. 101-1 at 21 (holding that the FAR Memo "is not final agency action").[2]  In sum, Plaintiffs fail to carry their burden of identifying a "circumscribed, discrete agency action[]" challengeable under the APA.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004); *see also, e.g.*, *Lujan*, 497 U.S. at 891.

With the APA unavailable, Plaintiffs attempt to bring Counts I and II under a "non-statutory cause of action."  Second Am. Compl. at 53, 55.  While courts have recognized an equitable cause of action to enjoin *ultra vires* official conduct in certain circumstances, this is a "doctrine[] of last resort" that is "intended to be of extremely limited scope."  *Terveer v. Billington*, 34 F. Supp. 3d 100, 123 (D.D.C. 2014) (quoting *Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

The "modern cases make clear" that an officer may be said to act *ultra vires* "only when he acts 'without any authority whatever.'"  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (citation omitted); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (suit must allege that official is "not doing the business which the sovereign has empowered him to do," not just that the official acted illegally).  Here, Plaintiffs are challenging an executive order regarding the terms and conditions on which the federal government will enter into contracts.  The "business" of the "sovereign" certainly encompasses issuing that kind of directive, *see* 40 U.S.C. § 121(a); *see also Perkins*, 310 U.S. at 127 ("[T]he Government enjoys the unrestricted power . . . to determine those with whom it will deal.").  Therefore, this is not the rare case in which a nonstatutory cause of action is available to enjoin *ultra vires* conduct.

Plaintiffs' reliance on *Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020), and *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), is misplaced.  *Sierra Club* was subsequently vacated and therefore has no precedential value.  *See Biden v. Sierra Club*, ---

---

[2] Indeed, Plaintiffs lack Article III standing to challenge the Task Force guidance or the FAR Memo.  *See Transp. Workers Union of Am., AFL-CIO v. TSA*, 492 F.3d 471, 477 (D.C. Cir. 2007) (no injury from guidance that "cause[s] nothing" to happen to the plaintiff).

9

S. Ct. ---, 2021 WL 2742775 (U.S. July 2, 2021) (Mem.).  What is more, the Supreme Court stayed the injunction in that case based on the federal government's "showing . . . that the plaintiffs ha[d] no cause of action." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (Mem.).  And Arizona reads *Reich* far too broadly; that case involved an "anomalous situation" in which (1) there was no other avenue for judicial review; and (2) an executive order issued under the Procurement Act was in "palpable violation of" another statute (the National Labor Relations Act).  *See* 74 F.3d at 1326–27, 1330.  The D.C. Circuit reasoned that a nonstatutory cause of action was available to prevent the President from using his Procurement Act authority to violate other federal statutes.  *See id.* at 1332.  Here, by contrast, (1) if a concrete, particularized dispute between Arizona and the federal government were to arise, Arizona could obtain judicial review under the CDA, *see* Opp'n at 17–18; and (2) EO 14042 is not a "palpable violation" of any other statute.

**II.    Plaintiffs Are Unlikely to Succeed on the Merits.**

The Ninth Circuit considers a plaintiff's "[l]ikelihood of success on the merits" to be "'the most important' factor" when considering requests for preliminary relief. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citation omitted).  If this Court reaches the merits, none of Plaintiffs' various theories establish a substantial likelihood of success.

**A.    EO 14042 Is Within the President's Procurement Act Authority.**

Plaintiffs incorrectly characterize the federal contractor vaccination requirement as "usurp[ing] broad power not conferred" by Congress.  Mot. at 11.  Not so: as numerous cases explain, the Procurement Act gives the President "broad-ranging authority" to adopt government-wide policies that have a "nexus to the government's interest in efficient and economical contracting." *E.g.*, *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362, 366 (D.C. Cir. 2003).  Plaintiffs further err in claiming that the challenged requirement lacks the requisite nexus with economy and efficiency.  *See* Mot. at 9–11.  OMB's economy-and-efficiency determination explains, in far more detail than the Procurement Act requires, why including a COVID-19 safety clause in federal contracts "will promote economy and efficiency in Federal Government procurement."  86 Fed. Reg. at 63,423.

1.      **The Procurement Act Gives the President Broad-Ranging Authority to Pursue Efficient and Economic Contracting Policies.**

The Procurement Act, 40 U.S.C. §§ 101–1315, expressly empowers the President to "prescribe policies and directives that the President considers necessary to carry out" the Act's provisions.  40 U.S.C. § 121(a).  As detailed in prior briefing, *see* Opp'n at 23–27, decades of presidential action, judicial affirmation, and congressional acceptance confirm that the Procurement Act gives the President both "necessary flexibility and 'broad-ranging authority'" to promote economy and efficiency in federal contracting.  *Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 789).

This precedent from all three branches of our constitutional system confirms that EO 14042 is not an "elephant" changing the balance of federal–state authority or pushing the constitutional envelope.  Rather than directly regulating anyone, EO 14042 merely sets terms on which the government will do business—something private-sector businesses do all the time.  *Cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240-41 (2007) (noting that when contracting with other parties, the government engages "as private parties, individuals or corporations also engage in among themselves") (quoting *Kania v. United States*, 650 F.2d 264, 268 (1981)).  Moreover, the Procurement Act is no "mousehole": even the cases on which Plaintiffs rely confirm that the statute "does vest broad discretion in the President." *Reich*, 74 F.3d at 1330–33 (observing that "[t]he President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept of efficiency and economy in procurement," and collecting examples).[3]  Plaintiffs' position—and the recent merits holding in *Kentucky*—cannot be squared with these longstanding interpretations of the Procurement Act.  Indeed, the *Kentucky* court's Procurement Act holding is hard to reconcile

_____

[3] Accordingly, the State errs in suggesting that EO 14042 implicates the "Major Questions Doctrine," ECF No. 102 at 2.  That doctrine is a proviso to ordinary *Chevron* deference presuming that Congress does not *sub silentio* give unelected agency heads power to regulate on questions of major public significance.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 147 (2000) (discussing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)).  EO 14042 does not implicate the doctrine because it is an exercise of presidential authority, Congress explicitly gave the President broad authority to manage federal contracting, and Defendants are not seeking *Chevron* deference.

1    with its subsequent conclusion that "OMB Determination provided ample support for the

2    premise that a vaccine mandate will improve procurement efficiency," ECF No. 101-1 at 26.

3        Arizona also errs in asserting that EO 14042 unlawfully "delegat[es] to OMB and the

4    [Task Force] the power to make a government-wide procurement regulation when that power

5    belongs to the FAR Council alone," Mot. at 11–12.  Arizona relies on 41 U.S.C. § 1303, but

6    that statute neither states nor implies that that the FAR Council's authority to issue

7    government-wide regulations regarding procurement is *exclusive*.   As noted above, the

8    Procurement Act (specifically 40 U.S.C. § 121(a)), as well as decades of judicial affirmation and

9    congressional acceptance, confirms that the President has independent authority to direct

10   federal procurement—an unsurprising conclusion given that the President is the Chief

11   Executive for the Executive Branch.   And here, because OMB is acting pursuant to an

12   undisputedly valid delegation of the President's authority under 3 U.S.C. 301, OMB acted

13   lawfully in directing federal procurement.  *See also* 3 U.S.C. § 302 (permitting delegation of

14   presidential authorities so long as the relevant law—here, the Procurement Act—"does not

15   affirmatively prohibit" the delegation or "specifically designate the officer or officers to whom

16   it may be delegated").  The Task Force, meanwhile, does not direct federal procurement, as its

17   guidance is not binding absent the OMB determination.[4]

18       Finally, *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S.

19   Ct. 2485 (2021), *BST Holdings, LLC v. Occupational Safety & Health Administration*, No. 21-60845,

20   2021 WL 5166656 (5th Cir. Nov. 6 2021), and the two Medicare/Medicaid cases for which

21   Plaintiffs submitted notices of supplemental authority, *see* ECF Nos. 100, 102, are not on point.

22   Those cases involve different standards from different statutes.   None of them concern the

23   Procurement Act, which gives the President "broad-ranging authority." *Kahn*, 618 F.2d at 789.

24   And unlike the regulatory actions challenged in those cases, EO 14042 concerns the

25

26       [4] There is also no merit to Arizona's assertion that EO 14042 "putatively confers on
     the FAR Council the authority to circumvent traditional procedural requirements," Mot. at 12.
27   As noted above, the FAR Council is currently engaged in a rulemaking that will amend the
     Federal Acquisition Regulation ("FAR") to provide for inclusion of the COVID-19 safety
28   clause in future covered contracts.

government's role as a market participant, where the government enjoys "unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127.  In sum, the Executive Branch's wide latitude to contract, and to define its relationship to those with whom it contracts, places this case on vastly different footing than *Realtors*, *BST Holdings*, and the Medicare/Medicaid cases.

### 2. The OMB Determination Is Sufficiently Related to Economy and Efficiency and Is Neither Arbitrary Nor Capricious.

As explained in Defendants' prior brief, the Procurement Act provides a "lenient" test for assessing whether an executive order has a sufficient nexus to economy and efficiency. Opp'n at 23 (citing *Chao*, 325 F.3d at 367).  To the extent that the APA's arbitrary-and-capricious test applies, that highly deferential standard is also satisfied.

Economy-and-efficiency determinations under the Procurement Act can pass judicial muster with a single sentence explaining how a policy "reasonably relate[s]" to promoting economy and efficiency in federal contracting.  *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981); *accord Kahn*, 618 F.2d at 793 n.49.  And, out of deference to the Executive Branch's authority to manage its own economic affairs, courts uphold executive orders under the Procurement Act even when the link to economy and efficiency "seem[s] attenuated," *Chao*, 325 F.3d at 366.

The OMB determination clears the applicable, "lenient" standard with plenty of room to spare.  *Id.* at 367.  COVID-19 hobbled the economy for months and continues to disrupt American life.  Federal procurement is no exception.  The President, as the ultimate manager of federal procurement operations, determined that slowing COVID-19's spread promotes economy and efficiency because federal procurement—like any business endeavor—suffers when people contracting with the federal government get sick and miss work (or worse).[5]  To

---

[5] Remarkably, Arizona argues against the economy-and-efficiency nexus by suggesting that COVID-19 vaccination does not lead to "reductions in infection."  Mot. at 10.  It is well established that vaccination "reduce[s] the risk of people spreading the virus that causes COVID-19."  *E.g.*, CDC, COVID-19: Key Things to Know (updated Nov. 30, 2021), https://perma.cc/9SRL-RTP5.

anyone who has lived through the past two years of the pandemic and resulting economic turmoil, the nexus between reducing the spread of COVID-19 and promoting economy and efficiency in contracting requires no extended explication—something that cannot be said for Plaintiffs' far-fetched hypotheticals about a sugar ban or "stomach-stapling mandate," Mot. at 11. Indeed, numerous private companies have imposed similar vaccination requirements in their own workplaces, underscoring that many private businesses agree that the challenged federal requirement promotes economy and efficiency. *See* 86 Fed. Reg. at 63,422 & n. 13 (citing "a wide and growing swath of private companies" with workplace vaccination requirements); *see also, e.g.*, Chris Isidore, *Biden's Vaccine Mandate Is on Hold, But Companies Are Moving Ahead Anyway*, CNN Business (Nov. 17, 2021), https://perma.cc/ZR8D-DQYT.

Plaintiffs argue that the OMB determination is incorrect, and that requiring contractor vaccination will actually "cause massive economic disruption for federal contractors and for the economy at large." Mot. at 10–11. They offer little evidence to support this prediction.[6] In any event, courts have repeatedly upheld executive orders where one could "with a straight face advance an argument claiming opposite effects [on economy and efficiency] or no effects at all." *Chao*, 325 F.3d at 366–67 (citing *Kahn*). Further, the D.C. Circuit has applied rational-basis review to the Executive Branch's conclusion that a given policy will promote economy and efficiency in federal contracting. *See Kahn*, 618 F.2d at 793 n.49. This is, again, consistent with the underlying principle that the President is acting as Chief Executive, and thus is entitled to the analogous deference awarded in commercial contexts (*e.g.*, the business-judgment rule).

Even if the APA applied and required something beyond the Procurement Act's lenient standard, the OMB determination's painstaking economy-and-efficiency analysis would plainly satisfy arbitrary-and-capricious review, which is "highly deferential." *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010) (quoting *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009)).

---

[6] Plaintiffs' "evidence," Mot. at 10, consists of a September 2021 survey of active Society for Human Resource Management members and a "predict[ion]" by "a leading trade publication covering the construction industry." First Am. Compl. ¶ 83, ECF No. 14. This is a far cry from "'systematic evidence' that imposing the Contractor Mandate [will] likely lead to loss of employees." *Contra* Mot. at 10 (citing First Am. Compl. ¶ 83).

Under that standard, a court must "presum[e] the agency action to be valid and affirm[] the agency action if a reasonable basis exists for its decision."  *Id.* (quoting *Crickon*, 579 F.3d at 982).  The OMB determination includes a "thorough and robust economy-and-efficiency analysis" that "provide[s] ample support for the premise that a vaccine mandate will improve procurement efficiency."  *Kentucky*, ECF No. 101-1 at 25–26 (rejecting similar APA challenge).  The OMB determination spends several paragraphs reviewing scientific and case studies and parsing economic data before reaching its conclusion, and it specifically addresses and rebuts concerns that requiring COVID-19 safety protocols could lead to a potential labor shortage and potential costs to covered contractors.  *See* 86 Fed. Reg. at 63,421–23.

Finally, the economy-and-efficiency analysis is not "pretextual," Mot. at 10.[7]  To be sure, EO 14042 is consistent with the Administration's overarching goal of "getting more people vaccinated and decreas[ing] the spread of COVID-19."  FAR Memo at 3.  But a presidential exercise of Procurement Act authority does not "become[] illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Carmen*, 669 F.2d 815, 821 (D.C. Cir. 1981) (citing several illustrative cases).  As the *Kentucky* court recently held in rejecting an identical assertion of pretext, OMB "provided ample support" for its economy-and-efficiency rationale, and "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."  ECF No. 101-1 at 26 (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019)).

**B.    Requiring Contractor Vaccination is Constitutional.**

Plaintiffs also invoke the Tenth Amendment and the Spending Clause.   Neither

---

[7] Plaintiffs' related assertion that OMB acted in "bad faith," Mot. at 14, is baseless.  There was nothing remotely improper about the Task Force issuing updated contractor guidance that aligned the vaccination deadline for federal contractors with the vaccination deadline for private companies subject to regulatory actions.  *See* White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021), https://perma.cc/7FPV-PA2N (announcing this change).  It was also entirely proper for the Acting OMB Director to determine whether the updated guidance would promote economy and efficiency, as contemplated by the Executive Order.  *See* EO 14042 § 2(a).

1 argument succeeds.

2 *Tenth Amendment*.  The federal contractor vaccination requirement does not violate the

3 Tenth Amendment's anti-commandeering doctrine.  If anything, the main case cited by

4 Plaintiffs—*Printz v. United States*, 521 U.S. 898 (1997)—supports Defendants' position.  In

5 *Printz*, Congress conscripted state officials to perform certain duties related to firearm

6 background checks.  *See id.* at 903–04.  Although the Court concluded that conscription

7 violated the Tenth Amendment, in the same breath it noted that had Congress *contracted* with

8 state officials, there would have been no constitutional concern.  *See id.* at 916; *see also id.* at 936

9 (O'Connor, J., concurring) ("Congress is also free to amend the interim program to provide

10 for its continuance on a contractual basis with the States if it wishes, as it does with a number

11 of other federal programs.").  Indeed, Plaintiffs' view of the anti-commandeering doctrine

12 would apparently render all contracts between federal and state governments unconstitutional.

13 *Spending Clause*.  Plaintiffs' Spending Clause argument fares no better.  Plaintiffs fail to

14 identify a single case subjecting a federal procurement policy or contract to the Spending

15 Clause's requirement to "unambiguously" impose any "condition[s on] the States' receipt of

16 federal funds."  *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).  Nor is there any support

17 for Plaintiffs' suggestion that "[o]nly Congress can impose conditions" on federal contracts,

18 and "any conditions must be unambiguous in the statutory text," Mot. at 11—onerous

19 restrictions that would make federal contracting utterly unworkable.  In any event, federal

20 contractors are not "unaware" of the COVID-19 safety clause or "unable to ascertain what is

21 expected of them."[8]  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also*

22 *Kentucky*, ECF No. 101-1 at 14-15 n.9 (rejecting similar Spending Clause argument).

23 **C.   Plaintiffs' § 1707 Claims Are Meritless.**

24 Finally, Plaintiffs assert that the OMB determination, the Task Force guidance, and the

25 FAR Memo failed to comply with 41 U.S.C. § 1707.  But § 1707 does not apply to exercises

---

26 [8] There is also no merit to Arizona's suggestion that the COVID-19 safety clause is

27 unfair because the Task Force can "change the vaccine mandate whenever it wishes," Mot. at 12.  Dynamic clauses are not uncommon in contracts, and it is appropriate that COVID-19

28 safety protocols may be modified in response to the evolving COVID-19 pandemic.

of presidential authority like the OMB determination, and in any event the determination complied with the statute's procedural requirements.  Nor does § 1707 apply to nonbinding guidance like the Task Force guidelines or the FAR Memo.

### 1.    Section 1707 Does Not Apply to the Acting OMB Director's Determination and, in Any Event, She Complied with It.

The procedural requirements of § 1707 apply only to an "executive agency," as that term is defined in the statute.  41 U.S.C. § 133.  The statutory definition does not include the President.  *See id.*  As Defendants have previously explained, the Acting OMB Director exercised presidential authority delegated under 3 U.S.C. § 301, so the procedural requirements of § 1707 do not apply to her determination.  *See* Opp'n at 22, 27–28 (citing *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017); *Nat. Res. Def. Council*, 658 F. Supp. 2d at 109).  Plaintiffs fail to rebut this argument.

Where the procedural requirements of § 1707 do apply, they "may be waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable."  41 U.S.C. § 1707(d).  Invoking this exception does not permanently exempt a procurement policy from notice-and-comment.  *See id.* § 1707(e).  It merely allows the policy to be "effective on a temporary basis," with a thirty-day public comment period.  *Id.*

Even assuming that § 1707 applies to the OMB determination, the Acting OMB Director properly waived its procedures as impracticable.  *See* 86 Fed. Reg. at 63,423–25.  For one thing, waiting sixty days for the revised Task Force guidance to take effect would render its revised January 18, 2022 deadline illusory; the original guidance's December 8, 2021 deadline would arrive before the revised guidance could kick in.  *See id.* at 63,424.  For another, waiting sixty days would cause regulatory uncertainty, as contractors would not know whether, at the conclusion of the sixty days, they would be facing a fairly imminent vaccination deadline or, as a result of the comment process, a delayed deadline.  *See id.*  Given the many weeks required to meet a vaccination deadline, federal contractors would have struggled significantly with how to protect themselves from being found out of compliance.

17

In addition, COVID-19 has caused "a once in a generation pandemic" that has killed hundreds of thousands of Americans, hospitalized millions, and infected dozens of millions more. *See id.* at 63,423; *see also* Opp'n at 1, 4 (noting 68,000 new cases of COVID-19 per day and high levels of community transmission across most of the United States as of November 4, 2021). COVID-19 safety protocols are urgently needed "to slow the spread of COVID-19 among Federal contractors and subcontractors—which is critical to avoiding worker absence and unnecessary labor costs that could hinder the efficiency of federal contracting." 86 Fed. Reg. at 63,423; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest.").

While there is little (if any) case law interpreting § 1707(d), an agency may invoke the APA's exception to notice-and-comment "where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). That standard is met here. Moreover, courts are more willing to permit exceptions for "temporary" measures enacted "pending public notice-and-comment procedures"—like the OMB Director's determination—than for "permanent regulations." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157–58 (D.C. Cir. 1981). The OMB Director's invocation of § 1707(d)'s waiver provision also comports with the Executive Branch's historical practice regarding such waivers. *See, e.g.*, 81 Fed. Reg. 67,732, 67,733 (Sept. 30 2016) (FAR amendment invoking § 1707(d)'s waiver in order to harmonize deadlines across regulatory actions and to clarify compliance obligations); 66 Fed. Reg. 17,754, 17,755 (Apr. 3, 2001) (FAR council invoking § 1707(d)'s waiver to immediate stay a FAR rule because "otherwise the rule imposes burdens that the Government and contractors are not prepared to meet"). Accordingly, if the Court reaches the issue, it should uphold the Acting OMB Director's finding that "notice-and-comment rulemaking and a delayed effective date would [have been] impracticable" under the circumstances.[9] *Id.* at 63,425.

---

[9] Nor did the Acting OMB Director's economy-and-efficiency determination "violate[] § 1707 by omitting two-thirds of the controlling [Task Force] guidance," *i.e.*, the Task Force FAQs regarding contractor vaccination. Mot. at 14. These FAQs are not "controlling"; they only take on legal force if approved by the OMB Director, and none is currently Director-

## 2. Section 1707 Does Not Apply to the Task Force Guidance or to the FAR Memo.

Section 1707 does not apply to the Task Force guidance either.  For the reasons explained above, the Task Force guidance is not a binding "policy, regulation, procedure, or form" by itself, *i.e.*, without the accompanying OMB economy-and-efficiency determination. *Cf.* 41 U.S.C. § 1707(a).  So there is no basis for concluding that the guidance itself is subject to § 1707's procedural requirements.

Nor does § 1707 apply to the FAR Memo (including its sample COVID-19 safety clause).  The FAR Memo does not constitute a "procurement regulation," as Plaintiffs claim, Mot. at 15.  It appears nowhere in the Code of Federal Regulations ("CFR") or the FAR, which is a subset of the CFR.[10]  *See* 48 C.F.R. § 1.101; *see generally* C.F.R., title 48.  And it does not direct an agency to take any specific action; it merely points contracting officers to "the direction[s] . . . issued by their respective agencies" for how to utilize the memo's guidance. FAR Memo at 2.  Put differently, the memo binds no one unless and until an agency exercises its own discretion to either revise the suggested clause or incorporate the suggested clause into a procurement contract.[11]  The memo is not the FAR Council's final word on COVID-19 safety clauses, either: it only "provide[s] agencies that award contracts under the [FAR] with *initial* direction" to incorporate COVID-19 safety clauses into new contracts.  FAR Memo at 1 (emphasis added).  The completion of the FAR Council's decisionmaking process—the forthcoming FAR Amendment including a COVID-19 safety clause "in Federal procurement solicitations and contracts" subject to the EO—has yet to occur.  EO 14042 § 3(a); *see* FAR Memo at 3.  Thus, none of Plaintiffs' FAR-related arguments has merit.

---

approved.  *See supra* Background, Part II.  The FAR Memo's sample COVID-19 safety clause does not alter this conclusion; it, too, is nonbinding, and in any event it requires only that contractors comply with Director-approved FAQs.  *See supra* Background Part III.

[10] Because the FAR Memo is not part of the FAR, it cannot possibly represent a "revision" to the FAR.  48 C.F.R. § 1.501-1.  *Contra* Mot. at 15.

[11] Relatedly, the FAR Council is not improperly "enforcing" its sample COVID-19 safety clause "as a purported FAR class deviation," Mot. at 16.  The FAR Council does not authorize—or "enforce"—FAR class deviations; agency heads do.  48 C.F.R. § 1.404.

## III.    Any Relief Should Be Narrowly Tailored.

In the event that the Court rules for Arizona, any relief must be "tailored to redress [Arizona]'s particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also* Opp'n at 41 (explaining why the requested nationwide injunction is inappropriate); *accord Kentucky*, ECF No. 101-1 at 28 (injunction against contractor requirement "properly limited to the parties before the Court"). Any injunction[12] should only block enforcement—not inclusion—of a COVID-19 safety clause in contracts between the federal government and the State and its entities or subdivisions. *See* Opp'n at 14–15 (explaining that Arizona has no capacity to assert the rights of private contractors who do business within the State). Allowing COVID-19 safety clauses to be included in federal contracts, but not enforced during the pendency of this litigation, would mean that contractors within its scope would not have to require their employees to be vaccinated. But if EO 14042 and its implementing guidance are ultimately upheld, it would allow the requirement to be put into effect without further delay.[13]

## CONCLUSION

For the foregoing reasons, Plaintiffs' preliminary injunction motion should be denied.

Respectfully submitted this 3rd day of December,

BRIAN M. BOYNTON
Acting Assistant Attorney General

---

[12] If the Court were to consolidate adjudication of the merits with adjudication of the preliminary injunction, as Plaintiffs request, *see* ECF No. 73, and to accept Plaintiffs' argument that the procedures of 41 U.S.C. § 1707 are applicable and were not adhered to, the proper remedy would not be a permanent injunction but rather temporary vacatur of the relevant procurement policy, pending compliance with the relevant procedures.

[13] Allowing COVID-19 safety clauses to be included but not enforced will not precipitate layoffs or a rush to vaccination if the injunction is dissolved. Covered contractor employers have flexibility to "determine the appropriate means of enforcement" and to craft "polic[ies] that encourage[] compliance." Safer Federal Workforce, Federal Contractor FAQs, Compliance, https://perma.cc/RGR9-ZTES. In other words, covered contractors would not need to immediately discharge unvaccinated employees if the injunction is dissolved. Rather, covered contractors should provide for a "period of counseling and education, followed by additional disciplinary measures if necessary," before terminating employees. *Id.*

20

CHRISTOPHER R. HALL
CARLOTTA P. WELLS
BRAD P. ROSENBERG
Assistant Directors

*/s/ Joseph J. DeMott*
STEVEN A. MYERS
Senior Trial Counsel
JOSEPH J. DEMOTT (Va. Bar #93981)
R. CHARLIE MERRITT
KEVIN J. WYNOSKY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-3367
Email: joseph.demott@usdoj.gov

*Attorneys for Federal Government Defendants*