1   BRIAN M. BOYNTON
    Acting Assistant Attorney General
2   Civil Division
    WILLIAM C. PEACHEY
3   Director
    Office of Immigration Litigation
4   District Court Section
    EREZ REUVENI
5   Assistant Director
6   ELISSA FUDIM
    Trial Attorney
7   P.O. Box 868, Ben Franklin Station
8   Washington, D.C. 20044
    Tel.: (202) 598-6073
9   Email: elissa.p.fudim@usdoj.gov
10

11

12  *Attorneys for Defendants*

13

14              **UNITED STATES DISTRICT COURT**

15                 **DISTRICT OF ARIZONA**

16      _____

17  Mark Brnovich, in his official capacity as
    Attorney General of Arizona, *et. al*,
18
                    *Plaintiffs*,
19
20  v.

21
22  Joseph R. Biden in his official capacity as       Civil Action No. 2:21-CV-1568-MTL
    President of the United States, *et. al*
23
              *Defendants*.
24

25      _____

26          **MEMORANDUM IN SUPPORT**
27           **OF DEFENDANTS' MOTION**
            **TO DISMISS THE COMPLAINT**
28

The "federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Because immigration policy has complex effects, Congress constructed an immigration enforcement system whose "principal feature" is the "broad discretion exercised by immigration officials." *Id*. at 395-96. This reflects the reality—embodied in every Presidential administration's policies for decades—that officials must deploy limited resources according to priorities set by policymakers.

Consistent with that reality, U.S. Customs and Border Protection (CBP), the component of the Department of Homeland Security (DHS) responsible for enforcing immigration laws at ports of entry and between ports of entry, authorized immigration officers to take certain enforcement actions in specific circumstances to relieve overcrowding in its congregate settings, to better protect its workforce and noncitizens in CBP custody, and to prioritize its limited enforcement resources.

Plaintiffs, Mark Brnovich, in his official capacity as Attorney General of Arizona, and the State of Arizona (Plaintiffs or Arizona), ask the Court to supervise the Executive's prosecutorial discretion and border enforcement decisions and curtail its discretion to charge, detain, and/or release inadmissible noncitizens arriving at the Southwest border. Arizona maintains that 8 U.S.C. § 1225(b) requires the government to initiate removal proceedings against every noncitizen arriving at the southwest border and to detain them for those proceedings, without exception. Arizona alleges that any contrary actions violate the Administrative Procedure Act (APA), the Immigration and Nationality Act (INA), and the Constitution, including the Separation of Powers Doctrine and the Take Care Clause.

Arizona misreads the law, which does not require DHS to detain all inadmissible noncitizens arriving or encountered at the border or to limit its discretion to institute removal proceedings. The INA demonstrates Congress's intent to allow the Executive to exercise its enforcement discretion in deciding what removal proceedings to initiate and whom to detain for those proceedings. Nothing in the INA prohibits DHS from "declin[ing] to institute proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm*. (*AADC*), 525 U.S. 471, 484 (1999). Likewise, the INA grants DHS broad discretion to release such

individuals "temporarily … on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5).

Arizona's claims are non-justiciable and without merit. Arizona's claims must be dismissed because Arizona lacks standing, some of its claims are moot, and the actions it challenges are committed to agency discretion, not final agency action, and precluded from review by statute. Arizona also lacks a cognizable cause of action to enforce the INA, and its immigration claims fail on the merits. The Court should dismiss counts 9 to 13 of the Third Amended Complaint (TAC) pursuant to Rule 12(b)(1), and 12(b)(6).

## BACKGROUND

Legal Background. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); **Error! Bookmark not defined.***see e.g.* 6 U.S.C. § 202(5), 8 U.S.C § 1103(a)(3). For decades, the Executive has exercised its discretionary authority to determine who to prioritize for removal and through what type of proceedings.

Congress has provided DHS with various overlapping tools, including authority in 8 U.S.C. § 1225(b)(1) to initiate expedited removal proceedings against certain applicants for admission.[1] The Secretary may also place a noncitizen seeking admission into full removal proceedings held before an immigration judge under 8 U.S.C. § 1229a if the noncitizen is not "clearly and beyond a doubt entitled to be admitted," *id.* § 1225(b)(2)(A), by filing a "Notice to Appear" (NTA), the charging document that initiates removal proceedings under section 1229a. The statute leaves to DHS's discretion whether to use expedited or full removal proceedings for noncitizens amenable to both. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011). Settled law also authorizes DHS to decline to initiate proceedings for individuals. *Reno*, 525 U.S. at 484. Further, within

---

[1] References to the Attorney General in § 1225 now mean the DHS Secretary. 6 U.S.C. §§ 251, 552(d). "Noncitizen" is the equivalent of the statutory term "alien." *Nasrallah v. Barr,* 140 S. Ct. 1683, 1689 n.2 (2020).

certain limits, DHS may either detain or release applicants for admission pending their removal proceedings. 8 U.S.C. §§ 1182(d)(5), 1225(b)(2)(A), 1226(a).[2] DHS may at its "discretion parole noncitizens into the United States temporarily". . . "on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.* § 1182(d)(5). DHS may also release on bond or conditional parole certain noncitizens arrested within the United States. 8 U.S.C. § 1226(a).

Procedural Background. Beginning in March 2021, CBP temporarily authorized the use of "notices to report" (NTRs) to relieve overcrowding in congregate settings and to better protect its workforce and noncitizens in CBP custody "when [noncitizen] encounters were consistently high, operational capacity strained, and COVID-19 acute." Ex. A, Parole Plus Alternatives to Detention (Nov. 2, 2021), available at 3:21-cv-01066, ECF No. 62, at 1.[3] CBP authorized issuance of NTRs to individuals and family units who were processed at operationally strained border sectors on a case-by-case basis after initial processing and biometric screening. *Id.* NTRs were permitted in place of NTAs, the issuance of which are considerably more time consuming due to the necessary interagency coordination for initiating removal proceedings and creating an administrative record for the proceeding. *Id.* Substituting NTRs for NTAs decreased processing time substantially, especially for family units. *Id.* And, ICE later issued NTAs to those noncitizens who initially received NTRs.[4] *Id.*

---

[2] An applicant for admission is a noncitizen "present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1).

[3] Factual challenges to subject-matter jurisdiction may rely upon material outside the pleadings. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court can therefore consider Exhibit A in connection with the government's challenge to subject matter jurisdiction. The Court can also consider Exhibit A in connection with the government's motion to dismiss under Rule 12(b)(6) without converting the motion into one for summary judgment because it is a public document and is incorporated by reference in the complaint as Plaintiff challenges the policy set forth in this document. *See infra*, FN 8.

[4] DHS commences removal proceedings against non-citizens who received NTRs or were released under Parole Plus. Under the current policy, those non-citizens must still report to ICE within fifteen days to be issued NTAs, *see* Ex. A, and under the prior policy by a date certain. The decision whether to commence removal proceedings, as well as the

On November 2, 2021, CBP issued a memorandum ceasing the use of NTRs, *id.* stating that, "[g]oing forward, CBP will prioritize resources to issue NTAs to noncitizens who are processed for release". *Id.* The memorandum outlines a narrow set of circumstances, applying exclusively to family units processed at the Del Rio or Rio Grande Valley sectors, in which alternative processing may be permitted by using parole in connection with ICE's Alternatives to Detention (ATD) program. *Id.* at 2. The availability of this process is triggered when (a) "the temporary staffing support to the sector is maximized, [(b)] the seven-day average of encounters is greater than the sector's Fiscal Year 2019 May daily average," (c) the number of subjects who were taken into custody in the last 48 hours exceeds the number of individuals booked out in the same period, and (d) at least one of the following is true: (1) the average time in custody in the sector exceeds 72 hours or (2) the sector exceeds 100% of the total non-COVID detention capacity. *Id.* Under this process, a U.S. Border Patrol agent may exercise discretion to release a family unit on parole prior to the issuance of an NTA, enroll them in ICE ATD, and, as a condition of their parole, require them to report to ICE within 15 days for issuing an NTA. *Id.* at 1-2. This alternative processing is not available to individuals determined to be a national security risk or public safety threat, or covered by the U.S. Centers for Disease Control and Prevention's Title 42 Order. *Id.* at 3.

<u>This Lawsuit.</u> Arizona alleges that CBP's use of NTRs, and its release on parole of noncitizens on a case-by-case basis violate the APA (Counts 9-12) and the Constitution (Count 13). TAC at ¶¶ 216-234. Plaintiffs ask the Court to hold unlawful and set aside Defendants' alleged "policy of releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings" and permanently enjoin Defendants "from releasing arriving aliens subject to mandatory detention, [] paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and [] failing to serve charging documents

timing of such proceedings, are covered by Section 1252(g).

4

or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States." TAC at 68-69, ¶¶ F, I.

ARGUMENT

The Court should dismiss claims 9 to 13 under Rule 12(b)(1) because the NTR allegations are moot, Arizona lacks standing, the APA's threshold requirements are not satisfied, and the INA precludes jurisdiction. Alternatively, they should be dismissed under Rule 12(b)(6) because none of Plaintiffs' claims states a plausible claim for relief.[5]

## I.   Arizona's Challenges to NTRs are Moot.

Plaintiffs' challenge to CBP's use of NTRs is moot because CBP has ended the use of NTRs. Ex. A; *U.S. v. Alder Creek Water Co.*, 823 F.2d 343, 345 (9th Cir. 1987) ("A case becomes moot when interim relief or events have deprived the court of the ability to redress the party's injuries."). CBP's November 2021 memorandum superseded the NTR guidance, such that any decision on the merits regarding NTRs "would be an impermissible advisory opinion." *Akina v. Hawaii*, 835 F.3d 1003, 1011 (9th Cir. 2016).

## II.   Arizona Lacks Standing.

Claims 9 to 13 fail because Arizona cannot demonstrate any actual or imminent injury caused by the challenged policies. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Although Arizona fails to identify any specific challenged policy, the complaint addresses: (1) the now-discontinued use of NTRs; and (2) the current limited use of parole for recent entrants, including such use based on capacity and resource constraints. *See* TAC at ¶¶ 133-143. Despite the narrowness of those challenged actions, Arizona alleges that they result in generalized harms. *Id.* at ¶¶ 147-149. But no one has a legally protected interest in the prosecution of another. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Further, the law already permits (and, in some instances, requires) the release of these

---

[5] If the Court does not dismiss claims 9 to 13, all defendants except CBP should be dismissed because claims 9 to 13 do not raise allegations against any of the other components of DHS, which are not involved in making admission and release determinations of noncitizens apprehended and inspected at or near the border.

individuals from immigration detention. Thus, none of the harms alleged is fairly traceable to challenged policies, nor are they capable of being remedied by an order by this Court.

Arizona cannot show any actual or imminent harm from DHS's discontinued practice of issuing NTRs. Even assuming Arizona's challenge were not moot, all previously issued NTRs have expired and all individuals issued NTRs have been directed to report for processing. Ex. A at 1. Thus, any alleged impact on Arizona caused by noncitizens released on NTRs stems not from the policy but from individual noncompliance, for which standing is "substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). And Arizona has not alleged any facts to show that the use of an NTR, rather than an NTA, meaningfully impacted an individual's decision whether to abscond. *See Arpaio v. Obama*, 797 F.3d 11, 15-20 (D.C. Cir. 2015) (rejecting injury as too attenuated where policy did not apply to current and future entrants).

Nor can Arizona plausibly allege any harm from DHS's limited practice of using parole, at times in tandem with ICE's ATD program, for certain family units. Despite calling detention under section 1225(b) "mandatory," Arizona concedes that DHS has the authority to release individuals on parole on a case-by-case basis. TAC at ¶ 116. Indeed, DHS is obligated by a longstanding court order to release noncitizen minors "without unnecessary delay" or, in the case of an emergency or influx, if not released, to transfer them to a licensed program "as expeditiously as possible." *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (confirming settlement agreement applies to accompanied minors); *Flores* Settlement Agreement ¶¶ 12.A, 14).

If Arizona is contending that individuals are paroled too often, this claim is similarly non-justiciable. Simply alleging that a state provides social benefits to state residents who are paroled—here, medical care (SAC at ¶¶ 148-149)—and speculating that costs will increase if the population increases is insufficient to satisfy Article III standing, which requires Plaintiffs show a "concrete and particularized" injury that is "fairly traceable" to the challenged government action. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167 (2000); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015)

(merely alleging that a particular policy increases immigration, which will require the state to spend money on social benefits does not confer Article III standing).

Plaintiffs allege that the policy will increase its noncitizen population, and that Arizona will expend more resources on noncitizens than they otherwise would. TAC at ¶¶ 146-149 (alleging costs associated with law enforcement activity and emergency medical care). But a state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11. Such an injury is a generalized grievance; to accept it "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests." *Id.* "[S]uch a 'generalized grievance,' no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573-74).

Regardless, any costs that Arizona might incur as a result of the alleged criminal acts of third parties are not fairly traceable to the challenged conduct, but rather would be the consequence of the "unfettered choices made by independent actors." *Lujan*, 504 U.S. at 562. Although standing may sometimes be found where the challenged conduct has a "determinative or coercive effect upon" those choices (*Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009)), here, the conduct Plaintiffs challenge—the issuance of NTRs and the use of parole—do not encourage or cause any noncitizen to perform an illegal act. *See Arpaio*, 797 F.3d at 15-20. Similarly, even if Arizona incurs increased medical expenses caring for noncitizens, this expense would be the result of events unrelated to the challenged policies, including noncitizens needing medical care, noncitizens not paying for that care, healthcare providers requesting the Arizona to pay, and Arizona paying without federal reimbursement. *Cf. Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 43 (1976). Arizona therefore lacks standing.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III. Claims 9 To 13 Are Not Reviewable Under the APA.**

Claims 9 to 13 are barred by the APA and INA. The challenged policies are committed to agency discretion, do not constitute final agency action, are precluded by the INA, and do not fall within the INA's zone of interests.

    A.  <u>Claims 9 to 13 Are Subject to Dismissal Because the Challenged Conduct Is Committed to Agency Discretion.</u>

"[T]he APA does not apply to permit judicial review or permit a reviewing court to compel agency action where 'agency action is committed to agency discretion by law.'" *United States v. Arizona*, CV-10-1413-PHX-SRB, 2011 WL 13137062, at *9 (D. Ariz. Oct. 21, 2011) (quoting 5 U.S.C. § 701(a)(2)). As this Court recognized in an earlier action by Arizona challenging what Arizona thought to be inadequate enforcement of immigration laws, "enforcement decisions, including the decisions to prioritize agency resources and act on agency determined priorities, are committed to the discretion of" the Executive. *Id.* at *9 n.6; *see California v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997) ("While Arizona may disagree with the established enforcement priorities, Arizona's allegations do not give rise to a claim that the Counter-defendants have abdicated their statutory responsibilities."); *Arizona v. United States Dep't of Homeland Sec.*, No. CV-21-00186-PHX-SRB, 2021 U.S. Dist. LEXIS 125687, at *29, *31, FN 15 (D. Ariz. June 30, 2021) (concluding that guidance concerning enforcement priorities, based on resource constraints, is committed to agency discretion):

> The Court does not read the use of a naked 'shall' in § 1231(a)(1)(A) as stripping the Government of its discretion to prioritize the removal of certain noncitizens over others ....Plaintiffs argue that the Interim Guidance 'is not mere prioritization/allocation of scarce resources, but rather a substantive rule....The Court does not agree....[The Government] is prioritizing the removal of some noncitizens over others. While Plaintiffs may not agree with this prioritization scheme", "the Court finds that it is barred from conducting judicial review of the Interim Guidance as agency action committed to agency discretion by law. *Id.* (internal citations omitted).

*see also Morales de Soto v. Lynch*, 824 F.3d 822, 827 (9th Cir. 2016). Both alleged activities Arizona challenges in this lawsuit fall under this exception.

First, the decision whether to commence a removal proceeding or to release instead with an NTR is committed to agency discretion. The choice to refrain from pursuing particular enforcement actions is "generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action." *Id.*

Arizona does not dispute that the presumption against reviewability applies to enforcement decisions, but contends only that Congress imposed statutory duties on DHS through 8 U.S.C. § 1225. TAC, *in passim*. The statute, however, imposes no unconditional duty on DHS. *See infra* pp. 18-24. In brief, Congress has not displaced the power inherent to the Executive to exercise prosecutorial discretion—a power the Supreme Court has held is "greatly magnified" in the immigration context, *AADC*, 525 U.S. at 490, as immigration policy may also "affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws," and the "nation's foreign policy." *Arizona v. United States*, 567 U.S. 387, 395, 397 (2012). Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005); see, *e.g.*, *Richbourg Motor Co.* v. *United States*, 281 U.S. 528, 534 (1930) ("Undoubtedly, 'shall' is sometimes the equivalent of 'may' when used in a statute prospectively affecting government action."). Thus, a state law instructing that officers "shall arrest" an individual who violates a restraining order did not "truly ma[k]e enforcement of [such] orders *mandatory*," because "'insufficient resources'"

and "'sheer physical impossibility,'" among other factors, required enforcement discretion. *Castle Rock*, 545 U.S. at 760 (citation omitted). *See also Arizona*, 2021 U.S. Dist. LEXIS 125687, at *27 (a blanket 'shall' does not automatically constitute a statutory mandate, especially when it concerns the enforcement of laws").

The justification for dismissal is further bolstered by examination of section 1225. Enforcement discretion encompasses not just choices about whether to enforce, but also choices about *how* to enforce. *Arizona*, 567 U.S. at 396 (DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all."). DHS must consider a host of issues, such as the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397. Accordingly, DHS may "decline to institute proceedings" in the first instance. *AADC*, 525 U.S. at 484; *see also Crane*, 783 F.3d at 249 ("[Section 1225] does not limit the authority of DHS to determine whether to pursue the removal of the immigrant."). Congress has not required that DHS initiate removal proceedings and detain every inadmissible noncitizen it encounters at or near the border, and therefore CBP's policy prioritizing when and how to issue NTAs at crowded border patrol stations, particularly during the pandemic, is committed to agency discretion by law. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017) ("the federal statutory and regulatory scheme, as well as federal case law, vest the Executive with very broad discretion to determine enforcement priorities.");[6] *Morales de Soto*, 824 F.3d at 827 (enforcement priorities are committed to agency discretion by law); *Arizona*, 2021 WL 2787930, at *9-11 (same). In fact, "the Department of Homeland Security only has funding annually to remove a few hundred thousand of the 11.3 million undocumented aliens living in the United States. Constrained by these limited resources, the Department of Homeland

---

[6] "[T]he Department of Homeland Security only has funding annually to remove a few hundred thousand of the 11.3 million undocumented aliens living in the United States. Constrained by these limited resources, [DHS] must make difficult decisions about whom to prioritize for removal." *Dream Act Coal., 855 F.3d at 976*.

Security must make difficult decisions about whom to prioritize for removal." *Ariz. Dream Act Coal*, 855 F.3d at *976*.

Second, "[s]ection 1182(d)(5)(A) gives the government broad parole discretion, without mentioning any threshold standard that the government must meet or the timing of when a decision as to admissibility must be made." *Romero v. Garland*, 999 F.3d 656, 664 (9th Cir. 2021); *see also Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985) ("Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole."). Accordingly, the parole statute provides that the Secretary "*may. . . in his discretion* parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission," 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Courts lack jurisdiction to review the discretionary decision whether to parole an individual under 8 U.S.C. § 1252(a)(2)(B)(ii). *See e.g. Padilla v. ICE*, 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021) ("parole decisions are solely in the discretion of the Secretary of DHS and are not judicially reviewable"); *Torres v. Barr*, 976 F.3d 918, 931 (9th Cir. 2020) (similar); *Lopez v. DHS*, No. 20-cv-1063, 2021 WL 2079840, at *3 (D. Ariz. Jan. 28, 2021) (similar); *see also Hassan v. Chertoff*, 593 F. 3d 785 (9th Cir. 2010) (affirming district court decision that court lacked jurisdiction to consider the revocation of advance parole because the revocation, like the grant of advance parole, is discretionary).

More generally, the decision to release an individual on parole involves the same "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler*, 470 U.S. at 831. Indeed, parole determinations encompass, among other things, "the possibility that [a noncitizen] may abscond to avoid being returned to his or her home country," "priorities for the use of limited detention space," whether detention is in the public interest, and of course, the statutorily undefined requirements that parole be for "urgent humanitarian reasons or significant public benefit." *Jeanty v. Bulger*, 204 F.

Supp. 2d 1366, 1377, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003); 8 U.S.C. § 1182(d)(5); *accord Padilla,* 953 F.3d at 1145 (describing ICE policy allowing parole "in light of available detention resources"). Because the parole decision involves a complicated balancing of factors that are not well suited to judicial supervision, that decision has long been committed to agency discretion and not subject to judicial review.

Finally, Arizona essentially maintains that section 1225 requires CPB to pursue a policy of "absolute" enforcement. But Congress has said otherwise, authorizing DHS and its components to establish "immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "issue such instructions" and "perform such other acts as he deems necessary for carrying out [DHS's] authority" under the INA, 8 U.S.C. § 1103(a)(3). Indeed, DHS has unreviewable "discretion regarding when and whether to initiate deportation proceedings." *Cortez-Felipe v. INS*, 245 F.3d 1054, 1057 (9th Cir. 2001).

A. Because There Is No Final Agency Action, Claims 9-13 Must Be Dismissed.

Plaintiffs' challenge to Defendants' alleged parole and NTR policies do not challenge "final agency action" subject to judicial review. 5 U.S.C. § 704. Agency action is final if it determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The actions that Arizona challenges are not in fact "policies," but are a set of individual enforcement decisions taken by CBP officers, but even if they did constitute general policies, they are not final agency action, because they do not finally determine legal rights or obligations. A nonfinal agency order is one that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action". *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939).

Neither the NTR nor the alleged parole "policies" satisfy this rule. As to the NTR guidance and its replacement, "Parole Plus," neither creates legal rights nor imposes legal obligations. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014). Indeed, the agency retains the discretion to alter or revoke the guidance at will, so the guidance is nonfinal notwithstanding any expectation that rank-and-file officers will comply with the guidance while it is in effect. *Cf. Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir.

2006). Nor does the NTR and Parole Plus guidance require CBP officers to take any specific action in any specific circumstance. Under the policy, CBP officers retained discretion on a "case-by-case basis" to release an individual on an NTR, now on Parole Plus, or to take any other enforcement action authorized by statute. Ex. A at 1-2. And the INA "makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion" of DHS, *Kwai Fun Wong v. United States INS*, 373 F.3d 952, 968 (9th Cir. 2004), such that the NTR and Parole Plus guidance do not constitute final agency action. Prioritization guidelines "are not statutes and do not have the status of law as they constitute a prioritization and not a prohibition of enforcement". *Florida v. United States*, No. 8:21-cv-541-CEH-SPF, 2021 U.S. Dist. LEXIS 94083, at *28-29 (M.D. Fla. May 18, 2021). Prioritization schemes which "do not change anyone's legal status nor [] prohibit the enforcement of any law or detention of any noncitizen" do "not constitute final agency action reviewable under the APA." *Id.*

Second, Arizona has not identified any parole "policy" that exists generally. Instead, Arizona challenges an amalgam of parole decisions made by DHS at the Southwest border. But as explained, parole is an individual discretionary decision made on a "case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). Accordingly, Plaintiffs cannot establish a unified "policy" to challenge. *Cf. Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences" but rather, Plaintiffs must first identify the 'policy or custom' they contend violates the" law).

A particular noncitizen's parole decision may be a final agency action with respect to that individual, as that decision has direct consequences for his/her personal legal status regarding detention versus release. *See Nat'l Min. Ass'n*, 758 F.3d at 253. But an individual noncitizen's decision is not final with respect to Arizona, because it does not create "direct and appreciable legal" consequences to satisfy the APA's finality inquiry requires. *Bennett*, 520 U.S. at 178. Regardless, even if Defendants' had a general "parole" policy, it would not constitute final agency action for the same reasons. Parole by its nature requires a case-

by-case assessment, and Plaintiffs have identified nothing that *requires* DHS officers to take a specific action with respect to parole in any specific case. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 212.5. No identified policy prevents DHS officials from granting or denying parole in any specific case.

Arizona asserts that it will shoulder the burden of increased social service costs caused by the possible increase in migration to Arizona. It further argues that this influx of immigrants to Arizona is due to Defendants' parole practices. Accordingly, Arizona argues, Defendants' parole practices have determined rights and obligations, rendering them "final agency action". Arizona's argument fails. Defendants' alleged guidance to enforcement officers on how to use their discretion regarding release of noncitizens does not "require" any State or noncitizen "to do anything," nor does it "prohibit" any State or noncitizen "from doing anything." *Nat'l Mining Ass'n*, 758 F.3d at 252. *If* more noncitizens settle in Arizona because of Defendants' actions, there may be downstream *practical* consequences to Plaintiffs, such as increased expenditures on social services. *See e.g.*, *Louisiana v. U.S. Army Corps of Engineers*, 834 F.3d 574, 583 (5th Cir. 2016) (distinguishing practical consequences from legal consequences). These consequences, however, do not constitute the "direct and appreciable legal" consequences that the APA's finality inquiry requires. *Bennett*, 520 U.S. at 178.

B. Statutes Preclude Judicial Review Of Claims 9 to 13.

Several provisions of the INA also bar Arizona's claims. *See* 5 U.S.C. § 701(a)(1) (no APA review when "statutes preclude judicial review").

Section 1252(g). Arizona's claim that DHS must issue NTAs to each inadmissible noncitizen who is apprehended at or near the border and inspected under section 1225 is barred by section 1252(g). Section 1252(g) bars jurisdiction over any claim "arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Section 1252(g) reflects Congress's desire to "protect[] the Executive's discretion from the courts" in general and

from "attempts to impose judicial constraints upon prosecutorial discretion" in particular. *AADC*, 525 U.S. at 485-86, 485 n.9.

Arizona challenges the NTR policy on the grounds that "the government is also required to initiate removal proceedings against these aliens." TAC at ¶ 125. But DHS does issue notices to appear, just not on the timeline Arizona would prefer as a policy matter. *See supra* 3. Plaintiffs thus challenge Defendants' decision whether and when to "commence proceedings," a claim which falls squarely under the jurisdictional bar of section 1252(g). *See AADC*, 525 U.S. at 487.

Section 1252(a)(2)(b)(ii). Arizona's challenges to Defendants' individual decisions to release noncitizens on parole are barred by section 1252(a)(2)(B)(ii)—which bars review of "decision or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security"—as the parole decision is expressly specified by the INA to be within the Secretary's discretion. 8 U.S.C. § 1182(d)(5)(A); *supra* pp. 10-12.[7] The court would similarly lack jurisdiction over any challenge to a parole policy or procedure. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) ("discretionary judgment regarding the application of parole--including the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints--is not . . . subject to review.") (internal citations omitted).

C. Arizona Does Not Fall Within the Zone of Interests of the Statutes They Invoke.

Arizona's claims also do not fall within the zone of interests of sections 1182(d)(5) or 1225(b). This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action— which Arizona is not—the plaintiff has no right of review as its "interests are so marginally

---

[7] To the extent Arizona challenges the decision not to serve NTAs on noncitizens subject to section 1225(b)(1), i.e., processed for expedited removal but establishing a credible fear of persecution or torture, review of these decisions is separately barred by the INA. *See* 8 U.S.C. § 1252(a)(2)(A)(i), (iv).

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

Nothing in the text, structure, or purpose of the INA generally, or sections 1182(d)(5) or 1225(b) specifically, suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration enforcement policies to contest those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("*FAIR*") ("The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration."). The D.C. Circuit in *FAIR* rejected a similar challenge that the federal government's "scheme for parole" of arriving noncitizens violated statutory limits on parole authority, holding that the plaintiffs were not within the zone of interests because there was nothing in the "language of the statutes on which [plaintiffs] rely" nor the "legislative history that even hints at a concern about regional impact" of immigration. *Id.* at 900-01. So too here.

Indeed, a litigant does not have a "judicially cognizable interest" in another's prosecution, *Linda R.S.*, 410 U.S. at 619, or "in procuring enforcement of the immigration laws" against third parties in particular ways. *Sure-Tan, Inc. v. NLRB*, 457 U.S. 883, 897 (1984). Congress has enacted several provisions aimed at protecting the Executive's discretion from the courts, *AADC*, 525 U.S. at 486–87, making clear that only noncitizens may challenge enforcement decisions, and only certain types of decisions, and only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id*. §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029-31 (9th Cir. 2016) (district courts lack jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity."). A detailed review scheme that allows some parties, but not others, to challenge specific executive action is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S.

439, 448 (1988); *see Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's right to legalization"); *Las Americas Immigrant Advoc. Ctr. v. Biden*, No. 3:19-CV-02051-IM, 2021 WL 5530948, at *5 (D. Or. Nov. 24, 2021) (INA provides only noncitizens with cause of action for enforcement, so other entities lack a cause of action).

## IV.   Plaintiffs Fail to State a Claim for Relief.

The complaint should also be dismissed under Rule 12(b)(6) as each of the five counts fails to state a plausible, cognizable claim for relief.[8]

---

[8] In support of this motion, the government relies upon:

**Exhibit A**, (Parole Plus Alternatives to Detention (Nov. 2, 2021), available at 3:21-cv-01066, ECF No. 62),

**Exhibit B** (Memorandum from Gene McNary, INS Comm'r, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992), 9 Immigration Law Service 2d PSD Selected DHS Document 4110),

**Exhibit C** (Memorandum from John Kelly, Sec'y of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvement Policies* (Feb. 20, 2017), available at https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf),

**Exhibit D** (Memorandum from Matthew T. Albence, Exec. Assoc. Dir., U.S. Immigration and Customs Enf't, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), available at https://www.ice.gov/doclib/foia/eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf),

**Exhibit E** (ICE Policy No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009), available at https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf), and

**Exhibit F** (Memorandum from Victor X. Cerda, Acting Dir., Det. and Removal Operations, U.S. Immigration and Customs Enf't, *ICE Transportation, Detention and Processing Requirements* (Jan. 11, 2005), available at https://www.ice.gov/doclib/foia/dro_policy_memos/icetransportationdetentionandprocessingrequirements.pdf).

Each of these documents is a publically available government document. Exhibit A is also incorporated in to the complaint by reference. Therefore the Court can consider these exhibits without converting this motion into one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003) (in evaluating Rule 12(b)(6) motion, court may consider documents external to the complaint by judicial notice or by incorporation by reference in the complaint); *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992)("Federal courts may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue."); *Collins v. Wells Fargo Bank*, No. CV-12-2284-PHX-LOA, 2013 U.S. Dist. LEXIS 102791, at *20 (D. Ariz. July 22, 2013).

A.  Counts 9 and 12 (Substantive APA Claims)

Counts 9 and 12 assert essentially the same claim: Defendants' practices are "not in accordance with law" or "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C) (Count 9), and are "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (Count 12), because they allegedly violate detention mandates of section 1225(b)(1) and (2) and the parole provision, 8 U.S.C. 1182(d)(5)(A). TAC at ¶¶ 216-221, 231-232. These claims fail as a matter of law because the cited statutes do not support Plaintiffs' theory. Sections 1225(b)(1) and (2) do not require that Defendants initiate removal proceedings or detain every noncitizen encountered at or near the border. First, nothing in sections 1225(b)(1) and (b)(2) overcomes the "deep-rooted nature of law-enforcement discretion." *Town of Castle Rock*, 545 U.S. at 760-61. The fact that § 1225(b) uses the terms "shall ... detain[]" and "shall order" does not constrain the government's longstanding discretion to determine whether commencement of removal proceedings is appropriate. DHS is "invested with the sole discretion to commence [such] removal proceedings," *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690-91 (BIA 2012), and nothing in the statute evinces a "stronger indication" of intent to impose a true mandate on the Executive to mandate removal in every instance. *See Town of Castle Rock*, 545 U.S. at 761; *Arizona*, 2021 U.S. Dist. LEXIS 125687, at *27 (a blanket 'shall' does not automatically constitute a statutory mandate, especially when it concerns the enforcement of laws").

Second, sections 1225(b)(1) and (b)(2) by their terms do not require initiating removal and detention in all cases. Section 1225(b)(1)—which authorizes the expedited removal of certain noncitizens—does not mandate expedited removal. Immigration officers must first make a discretionary determination whether a noncitizen should be processed under § 1225(b)(1) at all. *See Matter of E-R-M-*, 25 I. & N. Dec. at 523 ("DHS has discretion to put aliens in [§ 1229a] removal proceedings even though they may also be subject to expedited removal"). The Board of Immigration Appeals (BIA) has concluded that nothing in the statute compels "DHS to exercise its prosecutorial discretion to initiate expedited removal proceedings." *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. 168, 172

(BIA 2017). The BIA's longstanding position that DHS has discretion not to apply section 1225(b)(1) in individual cases is entitled to judicial deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-425 (1999).

Next, nothing in section 1225(b)(2)(A) mandates the commencement of removal proceedings under section 1229a against all applicants for admission at the border or physically present in the country. *See, e.g., E-R-M-*, 25 I. & N. Dec. at 523 (noting "broad discretion given to … charging decisions by the Executive Branch, that is, the DHS, in the immigration context"). Rather, section 1225(b)(2)(A) "authorizes the government to detain certain aliens" seeking admission to the United States *if* it decides to remove them through section 1229a removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018). The antecedent decision whether to pursue removal at all is a separate, discretionary decision of the Secretary that is not subject to judicial review—just as prosecutors' decisions whether to bring criminal charges against suspected offenders are not subject to judicial review. *See Arizona*, 567 U.S. at 396; *AADC*, 525 U.S. at 483, 485-86, 485 n.9. Accordingly, even if Section 1225(b)(2)(A) "directs [immigration officers] to detain an alien for the purpose of placing that alien in removal proceedings"—a proposition the government disputes—the provision "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane*, 783 F.3d at 249; *Cortez-Felipe*, 245 F.3d at 1057 (DHS has unreviewable "discretion regarding when and whether to initiate deportation proceedings").

As to Plaintiffs' argument that detention is mandatory once proceedings are initiated, TAC at ¶ 122, nothing in the statute requires DHS to take into custody and detain all eligible noncitizens. Instead, as explained, the INA authorizes DHS to release detained noncitizens in particular circumstances, subject to statutory and regulatory limitations, including through parole, 8 U.S.C. § 1182(d)(5)(A), or "bond" and "conditional parole," 8 U.S.C. § 1226(a)(2)(A)-(B). And, the decision whether to release is a complex decision

that considers many factors, and is not subject to judicial review. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); 1226(e); *Loa-Herrera*; 231 F.3d at 991.[9]

Finally, the federal government has exercised discretionary release authority for as long as it has been regulating immigration. *See, e.g.*, *Nishimura Ekiu v. U.S.*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same). Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice." *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958). DHS has long interpreted section 1182(d)(5) to authorize parole of noncitizens who "present neither a security risk or a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5). It is the agency, not the court, that determines what undefined statutory terms like "significant public benefit" warranting parole may include, *see* 8 U.S.C. §§ 1103(a)(1), 1182(d)(5), and that determination has always encompassed resource constraints. *See e.g.*, *Padilla*, 953 F.3d at 1145, *vacated on other grounds*, 141 S. Ct. 1041 (2021) (describing ICE policy allowing parole "in light of available detention resources"); *Jeanty*, 204 F. Supp. 2d at 1377 (parole decision may take into consideration "priorities for the use of limited detention space").

Multiple presidential administrations have construed section 1182(d)(5) this way. For example, in 1992, the former Immigration and Naturalization Service (INS), expanding upon a pilot project conducted in May 1990 to October 1991, issued guidelines on releasing, through parole, asylum seekers from INS detention. In the memorandum, INS explained that it "has limited detention space" and that by adopting the parole project it would "be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space." Ex. B, Memorandum from Gene McNary, INS Comm'r, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992), 9 Immigration

---

[9] Section 1252(f)(1) bars this Court from issuing an injunction placing requirements and limitations on Defendants' authority to charge and detain or release noncitizens under section 1225, *see AADC*, 525 U.S. at 481-82; *Hamama v. Adducci*, 912 F.3d 869, 880 (6th Cir. 2018), and so Arizona's claims for such injunctive relief must be dismissed.

Law Service 2d PSD Selected DHS Document 4110, at 1. Likewise, in February 2017, then-Secretary John Kelly issued a policy memorandum stating that "[a]s the Department works to expand detention capabilities, detention of all [individuals described in section 1225] may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual [noncitizen] is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3." Ex. C, Memorandum from John Kelly, Sec'y of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvement Policies* (Feb. 20, 2017), available athttps://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf, at 3. ICE similarly issued policy guidance stating that "[p]arole or other release, with all available safeguards, may also be warranted where detention capacity limits the agency's ability to detain the [noncitizen] consistent with legal requirements, including court orders and settlement agreements." Ex. D, Memorandum from Matthew T. Albence, Exec. Assoc. Dir., U.S. Immigration and Customs Enf't, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), available at https://www.ice.gov/doclib/foia/eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf, at 3.[10]

And, in July 2019, following legal decisions addressing whether certain noncitizens were entitled to bond hearings before an immigration judge, (*see Padilla v. ICE*, 387 F. Supp. 3d 1219 (W.D. Wash. 2019); *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019)), ICE issued interim guidance to its workforce specifically noting that it lacked the detention capacity to detain all noncitizens to whom the immigration law detention provisions apply, that the agency accordingly needed to appropriately prioritize the use of this limited

---

[10] *See also* Ex. E, ICE Policy No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009), available at https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

detention capacity, and that the public interest favored maintaining custody of noncitizens posing the greater potential danger to public safety or risk of flight. *See Interim Guidance for Implementation of Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture.[11]

Courts have long acknowledged and upheld this practice. *See e.g Padilla*, 953 F.3d at 1145 (describing ICE policy allowing parole "in light of available detention resources"); *Jeanty*, 204 F. Supp. 2d at 1377 (parole decision may take into consideration "priorities for the use of limited detention space"); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 324 (D.D.C. 2018) (describing DHS's "Parole Directive," effective since 2009); *see also New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1214 (D.N.M. 2020) ("[8 U.S.C. § 1182(d)(5)(A)] grants the Attorney General the discretion to parole asylum seekers for 'significant public benefit.' [] This vague standard conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the United States.").

Yet, the Fifth Circuit recently concluded that that DHS may not parole noncitizens "*en masse*" under Section 1182(d)(5) based on insufficient detention capacity, because doing so would be an abdication of the case-by-case adjudication required by Section 1182(d)(5). *Texas v. Biden*, No. 21-10806, 2021 U.S. App. LEXIS 36689, *142 (5th Cir. Dec. 13, 2021) (emphasis in original). That decision is incorrect and should not be

---

[11] Guidance from both ICE and the former INS has long recognized the need to release individuals in light of limited detention capacity. For example, in 2005, ICE issued guidance indicating that noncitizens subject to mandatory detention or a high priority for detention should be released at the time of processing only "when national bed space population is at capacity." Ex. F, Memorandum from Victor X. Cerda, Acting Dir., Det. and Removal Operations, U.S. Immigration and Customs Enf't, *ICE Transportation, Detention and Processing Requirements* (Jan. 11, 2005), available at https://www.ice.gov/doclib/foia/dro_policy_memos/icetransportationdetentionandprocess ingrequirements.pdf, at 2. *See also Matter of Garvin-Noble*, 21 I. & N. Dec. 672, 674–75 (BIA 1997) (noting that insufficient INS detention capacity motivated the enactment of the Transition Period Custody Rules); U.S. Gov't Accountability Off., GAO-92-85, Immigration Control: Immigration Policies Affect INS Detention Efforts 27–28, 54–55 (1992) (discussing the 18-month parole pilot program ending in October 1991 through which asylum seekers were released based on detention capacity).

followed. Moreover, it is inapplicable to this case, which does not involve any practice of paroling "en masse."[12]

First, Congress charged *the Secretary* with determining, "in his discretion," whether the parole of specific persons —such as those whom DHS cannot detain due to insufficient appropriations and who do not pose a danger or a flight risk—would be a "significant public benefit." 8 U.S.C. 1182(d)(5)(A).

Second, *Texas* fails to acknowledge the longstanding practice across multiple administrations—which is entitled to deference—of relying in part on detention capacity as a factor in case-by-case parole determinations. Indeed, without addressing the many policies discussed here, the Fifth Circuit simply assumed that the government *must* be releasing individuals without addressing their individual factors case-by-case. But the fact that a particular factor such as lack of detention capacity might be implicated in many cases does not mean that DHS has abdicated case-by-case review or is paroling "en masse." *Id.* at * 91. To the contrary, as the guidance discussed earlier implementing section 1182(d)(5) demonstrates, DHS's parole regulations require "case-by-case" decisions, including a threshold determination that a noncitizen "presents neither a security risk nor a risk of absconding" and a further determination that parole is appropriate, including because "continued detention is not in the public interest." 8 C.F.R. 212.5(b). In making those determinations, DHS must of course account for its actual detention capacity. But that does not make its decisions any less case-by-case.

Third, the Fifth Circuit ignored the government's argument that detention capacity must be a factor in parole decisions because Congress has not appropriated enough funds

---

[12] *Texas* involved a challenge to DHS's termination of the Migrant Protection Protocols, which implemented DHS's statutory authority permitting the return of certain noncitizens to Mexico pending the disposition of their removal proceedings. *See* 8 U.S.C. 1225(b)(2)(C) (authorizing Secretary to return certain noncitizens arriving by land to contiguous territory). The Fifth Circuit concluded that the government is required by 8 U.S.C. §1225 to detain all such noncitizen applicants for admission who are not returned to contiguous territories—except for those paroled into the United States based on case-by-case humanitarian considerations—and that parole of such individuals is not permitted based on capacity limitations. *Id.* at *7-8, *141-142. The government filed a Petition for a Writ of Certiorari on December 29, 2021. *See Texas v. Biden*, No. 21-954.

to detain everyone potentially subject to detention under Section 1225. Instead, the Court perfunctorily noted that "Section 1225(b)(2)(C) authorizes contiguous-territory return as an alternative" to parole. *Id*. at 140-141. But contiguous-territory return was employed principally on a limited, ad hoc basis for over two decades after Section 1225(b)(2)(C) was enacted, and yet Congress never amended the statute to require greater use of contiguous territory return. Nor did Congress amend Section 1182(d)(5) at any time since 1996 to limit consideration of detention capacity or appropriate sufficient additional funds to increase capacity when amending the INA, despite the agency's longstanding practice. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Moreover, contiguous-territory return is not an alternative option for many individuals potentially subject to detention under Section 1225, as it is limited to noncitizens who *arrive by land* via Mexico or Canada. It cannot be used for noncitizens who arrive by boat or by plane. But under the Fifth Circuit's reasoning, all such individuals must be detained, and cannot be paroled even if DHS lacks any means of detaining them. *Texas*, 2021 U.S. App. LEXIS 36689 at *94, 138. That contravenes settled law that Congress does not intend for statutory provisions like Sections 1225 and 1182 to mean different things for different people in different circumstances. *Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each category [of person it applied to] would be to invent a statute rather than interpret one."). In sum, Defendants' parole practices are fully consistent with the discretionary authority vested in DHS by the statute under longstanding interpretation by the agency and courts.

B. Count 10 (APA Arbitrary and Capricious Claim)

Count 10 alleges that "Defendants' policy is arbitrary and capricious for several reasons," including its alleged failure to consider costs to States and their reliance interests, alternatives to parole, and the agency's purported departure from prior practice. Plaintiffs also allege that the agency's reliance on resource constraints is pre-textual. TAC at ¶¶ 222-223. Plaintiffs' argument fails at the threshold because it presumes Defendants' release

practices are spelled out in a policy document. But the only "policy" addressed in such a document at issue here are NTRs, and the policy document has *ended* that practice, Ex. A, mooting Plaintiffs' challenge to it.

As to Arizona's general "parole" and "release" allegations, no such "policy" exists and the Third Amended Complaint does not identify any specific policy, but reveals that the parole "policy" at issue is Plaintiffs' undeveloped speculation that the release of a certain threshold number of noncitizens means the government must not be adhering to the criteria permitting parole under the statute and regulation. *See* TAC at ¶ 132 ("*If* they are, instead, paroling each of these individuals, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit.") (emphasis added). Plaintiffs' mere conjecture fails to plausibly allege the existence of any cohesive policy addressing the conduct at issue. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Lightfoot*, 273 F.R.D. at 326 (cannot allege a "policy" by looking at disparate individual actions). Indeed, Arizona appears to be challenging as a "policy" merely an amalgam of individual release decisions issued under the parole statute and regulation that it disagrees with. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 212.5. However, the APA may not be invoked to demand "day-to-day agency management" of agency decisions *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 67 (2004). And as explained, the Court lacks jurisdiction to review these expressly discretionary individual determinations. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *supra* pp. 15-17.

Further, the APA's limitation of review to "agency action" does not permit this "kind of broad programmatic attack" seeking "*wholesale* improvement of [a] program by court decree.'" *Norton,* 542 U.S. at 64. "Under the terms of the APA, [Plaintiffs] must direct its attack against some particular 'agency action' that causes it harm." *Lujan*, 497 U.S. at 891. The APA does not provide a cause of action for Plaintiffs to promote their view of how parole determinations generally must be decided. *See id.*; *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) ("The discreteness limitation precludes using broad statutory mandates to attack agency policy[.]"). Plaintiffs thus fail

1  to allege a cognizable "agency action" that could even be scrutinized under the APA for

2  arbitrary and capricious reasoning.

3      C.  <u>Count 11 (APA Notice and Comment)</u>

4      Count 11 alleges that Defendants violated 5 U.S.C. § 553, arguing "[e]ven assuming

5  Defendants have discretion to depart from the clear requirements of the INA with respect

6  to arriving aliens, a sea change of this magnitude required notice and comment." TAC at

7  ¶ 230. First, this claim suffers the same deficiency as Count 10. The APA requires notice

8  and comment only for "rule making." 5 U.S.C. § 533; *see id.* § 551(4)–(5) (defining "rule"

9  and "rule making"). Plaintiffs have not identified any "rule" that they challenge regarding

10  parole, but merely what they view as unlawful decisions in aggregate of individual

11  discretionary determinations. These individual determinations based on the facts of

12  specific cases are best described as "adjudications," not "rules," and are not bound by

13  notice-and-comment rulemaking. *See* 5 U.S.C. § 551(6)–(7); *United States v. Florida E.*

14  *Coast Ry.*, 410 U.S. 224, 244–45 (1973).

15      Second, regarding the NTR guidance and Defendants' alleged general parole

16  policy—assuming one exists—both are "general statements of policy," 5 U.S.C.

17  § 553(b)(3)(A), that "advise the public prospectively of the manner in which the agency

18  proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993),

19  and not subject to notice-and-comment rulemaking. "The critical factor to determine

20  whether a directive announcing a new policy constitutes a rule or a general statement of

21  policy is the extent to which the challenged directive leaves the agency, or its implementing

22  official, free to exercise discretion to follow, or not to follow, the announced policy in an

23  individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (cleaned

24  up).The policy document ending the NTR practice and providing for Parole Plus instead

25  offered guidelines, but no requirements, for when agency officers "may consider" such

26  release mechanisms, and provided that these discretionary decisions must still be assessed

27  "on a case-by-case basis." Ex. A at 1-2. The policy thus "leaves the agency, or its

28

implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case." *Mada-Luna*, 813 F.2d at 1013.

Similarly, while Plaintiffs do not allege that Defendants have made any relevant policy statement regarding parole, past policy statements regarding parole have historically left discretion in the hands of the line officer adjudicators. *See* ICE, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens," June 17, 2011, *available at* https://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf; ICE Policy Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture," Dec. 8, 2009, *available at* https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf, § 4.4 ("Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion."). The alleged "policies," to the extent they even exist, "do[] not negate the discretionary nature of" the determination regarding release and "each case receives individual consideration" indicating that such policies "do[] not establish a 'binding norm'" and "need not be promulgated as a rule under the APA." *Bulger*, 204 F. Supp. 2d at 1383. Count eleven should be dismissed.

D.  Count 13 (INA and Constitution Claim)

Count 13 alleges that "the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count VII." TAC at ¶ 234. This Count fails to state a cognizable claim for relief.

First, Arizona offers no factual allegations to support this claim, and its one-sentence, conclusory, legal assertion is insufficient to plead a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, even if Arizona had offered factual allegations, sections 1225(b) and 1182(d), as explained above, do not override the government's

discretion to decide whether to initiate proceedings or to release noncitizens on parole or otherwise. *Supra* pp. 8-12.

Third, separation of powers principles, to the extent they are implicated at all, defeat Plaintiffs' legal theory. Both the Constitution, and Congress in the INA, vest the Executive with authority over decisions regarding detention and removal of noncitizens. *See, e.g., Knauff*, 338 U.S. at 543; *United States v. Velasquez*, 524 F.3d 1248, 1253 (11th Cir. 2008) (holding that Executive, not judiciary, has the authority to decide to detain noncitizens).[13]

Finally, Plaintiffs' Take Care Clause argument fails as it is merely a conclusory legal assertion, *see id.*, and lacks a cause of action. No court has ever found that the Take Care Clause provides a private right of action. *Las Americas Immigrant Advocacy Center v. Biden*, No. 3:19-cv-02051-IM, 2021 U.S. Dist. LEXIS 226730, at *8 (D. Or. Nov. 24, 2021) (collecting cases); *see, e.g., City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020) ("No court in this circuit, or any other circuit, has definitively found that the "Take Care Clause" provides a private cause of action which a Plaintiff may bring against the President of the United States or his administration."); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985) (similar)). The Supreme Court has cautioned courts against "creat[ing] new causes of action" under the Constitution. *See Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020). Plaintiffs' conclusory invocation of this Clause offers no basis for this Court to be the first to break with the caution that has deterred all other courts from recognizing a private right of action.

Even were the Court to recognize such a cause of action, Plaintiffs' claim still fails. The Supreme Court has distinguished between duties that are ministerial and that are "executive and political," explaining that court lacked authority to order the Executive to

---

[13] *See also United States v. Litton Indus., Inc.*, 462 F.2d 14, 18 (9th Cir. 1972); *Dalton v. Specter*, 511 U.S. 462, 474 (1994) (holding that claims that executive branch actions are inconsistent with carrying out their "statutory authority are not 'constitutional' claims" but rather statutory claims, and that the "distinction between claims that an official exceeded his statutory authority, on one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration").

take certain action in the latter case but possibly could for ministerial duties, because "nothing was left to discretion. There was no room for the exercise of judgment." *State of Mississippi v. Johnson*, 71 U.S. 475, 498, 18 L. Ed. 437 (1866); *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974). Ordering the Executive to take action involving discretion and political judgment would violate separation of powers "and the general principles which forbid judicial interference with the exercise of Executive discretion." *Johnson*, 71 U.S. at 499.

Here, Plaintiffs request an injunction requiring Defendants to take action under sections 1225(b) and 1182(d) that is not purely ministerial, but political, in that it involves inherently discretionary duties—requiring that the government charge and detain noncitizens for removal and deny parole. Plaintiffs' claim falls squarely under the longstanding bar on judicial interference with the exercise of Executive discretion, *see id.*, and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court must dismiss Counts 9 through 13 of the Third Amended Complaint.

Date: January 3, 2022

Respectfully submitted,

BRIAN M. BOYNTON

Acting Assistant Attorney General
WILLIAM C. PEACHEY

Director
EREZ REUVENI
Assistant Director
*/s/ Elissa Fudim*
ELISSA FUDIM
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

*Counsel for Defendants*