1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9    Mark Brnovich, et al.,                    No. CV-21-01568-PHX-MTL

10              Plaintiffs,                     **ORDER**

11    v.

12    Joseph R Biden, et al.,

13              Defendants.

14

15          Plaintiffs the State of Arizona and Arizona Attorney General Mark Brnovich

16    (collectively, the "State"); Al Reble, an employee of the U.S. Marshals Service, a

17    component of the Department of Justice; the Phoenix Law Enforcement Association

18    ("PLEA"); and United Phoenix Firefighters Association Local 493 ("Local 493"), seek to

19    enjoin Defendants, the United States; various federal officials and entities; and the City of

20    Phoenix, from enforcing two federal vaccination policies: one relating to federal

21    contractors and subcontractors (the "Contractor Mandate"), and one relating to federal

22    employees (the "Employee Mandate").

23          For the reasons that follow, the Court will grant Plaintiffs' Motion for Preliminary

24    Injunction (Doc. 72) in part, deny it in part, and enter an injunction against the federal

25    Defendants.

26    ///

27    ///

28    ///

I.      **BACKGROUND**

     A.      **Factual Background**

          1.      **Contractor Mandate**

On January 20, 2021, President Joseph Biden's first day in office, he issued Executive Order ("EO") 13991, Protecting the Federal Workforce and Requiring Mask-Wearing, which established the Safer Federal Workforce Task Force ("SFWTF") and charged it with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. 7,045, 7,046. EO 13991 provided that the SFWTF would be headed by three co-chairs: (1) the Director of the Office of Personnnel Management ("OPM") (Defendant Ahuja); (2) the Administrator of the General Services Administration ("GSA") (Defendant Carnahan); and (3) the COVID–19 Response Coordinator (Defendant Zients). *Id.*

Nine months later, on September 9, 2021, President Biden announced "a new plan to require more Americans to be vaccinated." *See* President Joseph Biden, Remarks on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/. This plan would include several "new vaccination requirements." *Id.* First, it would "require all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week." *Id.* Second, it would "require vaccinations" of "those who work in hospitals, home healthcare facilities, or other medical facilities—a total of 17 million healthcare workers." *Id.* Third, President Biden stated that "I will sign an executive order that will now require all executive branch federal employees to be vaccinated — all. And I've signed another executive order that will require federal contractors to do the same." *Id.* And finally, the President announced that he would "require all of nearly 300,000 educators in the federal paid program, Head Start program," to be vaccinated. *Id.* The instant action challenges two of these vaccination requirements: those relating to federal

1   employees (the "Employee Mandate") and federal contractor employees (the "Contractor

2   Mandate").

3         The same day he announced his new vaccination plan, President Biden signed EO

4   14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg.

5   50,985 (Sept. 14, 2021). Therein, President Biden stated that the order was promulgated

6   pursuant to "the authority vested in me as President by the Constitution and the laws of the

7   United States of America, including the Federal Property and Administrative Services

8   Act." *Id.* at 50,985. The order was intended to "promote[] economy and efficiency in

9   Federal procurement by ensuring that the parties that contract with the Federal Government

10   provide adequate COVID-19 safeguards to their workers performing on or in connection

11   with a Federal Government contract or contract-like instrument." *Id.* Compliance with

12   these safeguards, the order reasoned, "will decrease worker absence, reduce labor costs,

13   and improve the efficiency of contractors and subcontractors at sites where they are

14   performing work for the Federal Government." *Id.*

15         The order directed executive agencies subject to the Federal Property and

16   Administrative Services Act (the "Procurement Act"), 40 U.S.C. § 101 et seq., to include,

17   in qualifying federal contracts and contract-like instruments, a clause requiring contractors

18   and subcontractors to comply with guidance that would subsequently be issued by the

19   SFWTF.[1] *Id.* The order further directed the Federal Acquisition Regulation ("FAR")

20   Council to make corresponding amendments to the FAR and, in the interim, to issue

21   guidance to federal agencies on how to use their existing authority to include the new clause

22

---

23   [1] The EO required the clause to be included in new contracts, new solicitations for a

24   contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract, if the contract falls into one of the following categories: a procurement contract for services, construction, or a leasehold interest in real property; a contract for

25   services covered by the Service Contract Act, 41 U.S.C. §§ 6701–6707; a contract for concessions, including any concessions contract excluded by Department of Labor

26   regulations at 29 C.F.R. § 4.133(b); or a contract entered into with the federal government in connection with federal property or lands and related to offering services for federal

27   employees, their dependents, or the general public. 86 Fed. Reg. at 50,986–87. The EO does not extend to grants or to most contracts for the procurement of goods (as opposed to

28   services). *Id.* Nor does it extend to contracts "whose value is equal to or less than the simplified acquisition threshold," which is essentially $250,000. *Id.* at 50,986; *see also* 48 C.F.R. § 2.101.

1   in covered contracts. *Id.* at 50,986. Such guidance was to be issued by October 8, 2021 and

2   was to include a sample clause that agencies might incorporate into their contracts and

3   solicitations. *Id.*

4       The order instructed the SFWTF to issue its guidance by September 24, 2021 and

5   provided that prior to the guidance's issuance, the Director of the Office of Management

6   and Budget ("OMB") "shall, as an exercise of the delegation of my authority under the

7   Federal Property and Administrative Services Act, *see* 3 U.S.C. 301, determine whether

8   such Guidance will promote economy and efficiency in Federal contracting if adhered to

9   by Government contractors and subcontractors." *Id.* at 50,985–86.

10      Consistent with the President's direction, the SFWTF issued its initial guidance for

11  federal contractor and subcontractor work locations on September 24, 2021. Safer Federal

12  Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors

13  and Subcontractors (Sept. 24, 2021), https://www.saferfederalworkforce.gov/downloads/

14  Draft%20contractor%20guidance%20doc_20210922.pdf. The guidance states, in part:

15  > Covered contractors must ensure that all covered contractor
16  > employees are fully vaccinated for COVID-19, unless the
    > employee is legally entitled to an accommodation. Covered
17  > contractor employees must be fully vaccinated no later than
    > December 8, 2021. After that date, all covered contractor
18  > employees must be fully vaccinated by the first day of the
    > period of performance on a newly awarded covered contract,
19  > and by the first day of the period of performance on an
    > exercised option or extended or renewed contract when the
20  > clause has been incorporated into the covered contract.

21  *Id.* at 5. The guidance defines the term "covered contractor employee" to mean "any full-

22  time or part-time employee of a covered contractor working on or in connection with a

23  covered contract or working at a covered contractor workplace[,] . . . includ[ing]

24  employees of covered contractors who are not themselves working on or in connection

25  with a covered contract." *Id.* at 3–4. This means that even employees of contractors and

26  subcontractors who are not themselves working on federal contracts are subject to the

27  Contractor Mandate. The guidance further provides that the vaccine mandate applies to

28  contractor employees who have already been infected with COVID-19, to workplace

locations that are outdoors, and to contractor employees who are working remotely full time. *Id.* at 10–11. The guidance also clarifies that "[p]eople are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a two-dose series, or two weeks after they have received a single-dose vaccine."[2] *Id.* at 4. And, finally, the guidance states that it is promulgated pursuant to federal law and thus supersedes any contrary state or local law or ordinance. *Id.* at 13.

On September 28, 2021, Shalanda Young, Acting Director of OMB, published a notice in the Federal Register that she had "determined that compliance by Federal contractors and subcontractors with the COVID-19 workplace safety protocols detailed in [the SFWTF guidance] will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691, 53,692 (Sept. 28, 2021). The notice did not provide analysis or evidence supporting Acting Director Young's determination and was not subject to public comment. Nor did the notice claim that urgent and compelling circumstances merited forgoing the notice-and-comment procedures set forth in the Office of Federal Procurement Policy Act (the "Procurement Policy Act"), 41 U.S.C. § 1707(d).

The next day, September 29, 2021, the FAR Council initiated the rulemaking process to amend the FAR. *See* Open FAR Cases Report 2 (Nov. 1, 2021), https://www.acq.osd.mil/dpap/dars/opencases/farcasenum/far.pdf (Case No. 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors). EO 14042 directed the FAR Council to issue *interim* guidance assisting agencies in exercising their authority to deviate from the FAR by incorporating vaccination clauses into qualifying contracts. *See* 86 Fed. Reg. at 50,986. Consistent with that directive, on September 30, 2021, the FAR Council issued a memorandum "provid[ing] agencies . . . with initial

---

[2] Thus, the initial guidance *de facto* required that contractor employees receive their final vaccination dose no later than November 24, 2021 to meet the December 8, 2021 deadline to be fully vaccinated.

direction" for implementing the SFWTF guidance and for "meeting the applicability requirements and deadlines set forth in" EO 14042. *See* Memorandum from Lesley A. Field et al., 1–2 (Sept. 30, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf ("FAR Memorandum"). The memorandum includes a sample vaccination clause that reads, in part: "The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force." *Id.* at 5. The memorandum also encourages agencies "to make their deviations effective until the FAR is amended or the deviation is otherwise rescinded by the agency." *Id.* at 3.

In November, the SFWTF issued revised contractor guidance and Acting OMB Director Young issued a revised determination that the guidance would promote economy and efficiency in federal contracting. Acting Director Young's revised determination was published the Federal Register on November 16, 2021. Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418. Among other things, the revised determination includes the full text of the revised SFWTF contractor guidance. The revised guidance changes the deadline for federal contractor employees to be fully vaccinated from December 8, 2021 to January 18, 2022.[3] The revised guidance also omits the FAQs section from the initial guidance document and instead provided a link to a contractor FAQ page on the SFWTF website ("Contractor FAQs"). *See* Federal Contractors, FAQs, Safer Federal Workforce, https://www.saferfederalworkforce.gov/faq/contractors/ (last visited Jan. 25, 2022). The revised determination also includes a section stating, in far more detail than the initial determination, the manner in which the guidance is expected to promote economy and

---

[3] That deadline nominally remains in place. But given the injunctions that have been entered in other cases challenging the Contractor Mandate, *see infra* Section I.B., the mandate is not currently being enforced.

efficiency in federal procurement. Further, the revised determination disclaims the applicability of the notice-and-comment procedures set forth in the Procurement Policy Act, 41 U.S.C. § 1707(d), and provides that even if that statute is applicable, "urgent and compelling circumstances" justify departing from the requirements of § 1707 in this case. 86 Fed. Reg. at 63,423.

### 2.     Employee Mandate

The same day President Biden issued EO 14042, he also signed EO 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees. 86 Fed. Reg. 50,989 (Sept. 14, 2021). EO 14043 stated President Biden's determination "that to promote the health and safety of the Federal workforce and the efficiency of the civil service, it is necessary to require COVID-19 vaccination for all Federal employees." *Id.* at 50,989. Pursuant to that determination, the order directed each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law." *Id.* at 50,990. The order further directed the SFWTF to "issue guidance within 7 days of this order on agency implementation of this requirement for all agencies covered by this order." *Id.*

On September 16, 2021, the SFWTF updated the "Frequently Asked Questions" page on its website in order to carry out the President's directive ("Employee FAQs"). *See* Vaccinations, FAQs, Safer Federal Workforce, https://www.saferfederalworkforce.gov/ faq/vaccinations/ (last visited Jan. 25, 2022). The Employee FAQs initially provided a deadline of November 22, 2021 for all federal employees to be fully vaccinated. *Id.* The FAQs, like the contractor guidance, also provide that federal employees will be considered fully vaccinated two weeks after they received the final dose of an approved vaccine. *Id.* The FAQs further provide that the vaccine mandate applies to federal employees who have already been infected with COVID-19 and to those that are working remotely full time. *Id.* To date, Defendants have neither issued a formal guidance document nor published a notice in the Federal Register with respect to the Employee Mandate.

### B.   Procedural Background

On September 14, 2021, the State initiated this action. (Doc. 1.) The State's initial Complaint contained only a single claim for relief, based on the Constitution's Equal Protection Clause.[4] (Doc. 1 at 13–14 ¶¶ 39–45.) After the scope of the federal vaccine mandates became clear, however, the State filed a much broader Amended Complaint, containing eleven claims for relief. (Doc. 14 at 43–51 ¶¶ 114–64.) The Amended Complaint was joined by Plaintiff Reble, then proceeding under the pseudonym John Doe, who also filed a Motion to Proceed Pseudonymously. (Doc. 16.) With the Amended Complaint, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 34.) The motion was briefed on an expedited schedule (Docs. 34, 44, 52, 58) and, on November 10, 2021, the Court held oral argument.

At oral argument, Defendants' counsel notified the Court that, earlier that day, the SFWTF had issued revised contractor guidance and Acting OMB Director Young had issued a revised determination that the guidance would promote economy and efficiency in federal contracting. (Doc. 69 at 48–49.) At the conclusion of oral argument, in light of Defendants' revised guidance and determination, and certain deficiencies in Plaintiffs' Amended Complaint, the Court denied the Motion for Temporary Restraining Order and Preliminary Injunction without prejudice and granted Plaintiffs leave to file a second amended complaint. (Doc. 64.)

Plaintiffs filed the Second Amended Complaint (Doc. 70) and the instant Motion for Preliminary Injunction (Doc. 72) on November 19, 2021. The Second Amended Complaint was joined by Plaintiffs PLEA and Local 493, who asserted claims against Defendant the City of Phoenix, a federal contractor, for implementing the federal Defendants' Contractor Mandate.[5]

With their Second Amended Complaint, Plaintiffs filed a Motion to Bifurcate Claims and Consolidate Trial on the Merits. (Doc. 73.) In that motion, Plaintiffs seek to

---

[4] Plaintiffs elected not to include this claim in their Third Amended Complaint. (Doc. 134.)
[5] On November 18, 2021, the City, citing the Contractor Mandate, notified its employees that they would be required to receive the COVID-19 vaccine by January 18, 2022 or face discipline, up to and including termination.

bifurcate Counts I–VIII (the "Vaccine Counts") and Counts IX–XIII (the "Immigration Counts") and consolidate adjudication of the Motion for Preliminary Injunction with a trial on the merits of the Vaccine Counts.[6] Plaintiffs' motion is unopposed; the parties agree that this case presents "almost exclusively legal issues," and that "discovery and trial procedures are unnecessary." (Doc. 127 at 2.) The Court agrees. Bifurcation and consolidation will serve the interest of judicial economy and convenience, will expedite proceedings, and will not prejudice any party. *See* Fed. R. Civ. P. 42(b) (bifurcation may be ordered "[f]or convenience, to avoid prejudice, or to expedite and economize"); Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."). Accordingly, the Court will grant Plaintiffs' motion.

Before the instant Motion for Preliminary Injunction was fully briefed, decisions were handed down in four parallel cases involving states' challenges to the Contractor Mandate: *Kentucky v. Biden*, No. 3:21-cv-00055, — F. Supp. 3d —, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021), *Georgia v. Biden*, No. 1:21-cv-00163, — F. Supp. 3d —, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021), *Missouri v. Biden*, No. 4:21-cv-1300, — F. Supp. 3d —, 2021 WL 5998204 (E.D. Mo. Dec. 20, 2021), and *Florida v. Nelson*, No. 8:21-cv-02524 (M.D. Fla. Dec. 22, 2021). In *Kentucky*, the district court granted plaintiffs' motion for a preliminary injunction and enjoined enforcement of the Contractor Mandate in Kentucky, Ohio, and Tennessee. 2021 WL 5587446, at *14. In *Missouri*, the court likewise granted plaintiffs' request for an injunction, and enjoined enforcement of the Contractor Mandate in Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming. Slip op. at 13. In *Florida*, the court again agreed with Plaintiffs, and enjoined enforcement of the Contractor Mandate in Florida. Slip op. at 38. In *Georgia*, the court again granted plaintiffs' motion for a preliminary injunction, but issued a nationwide injunction barring enforcement of the Contractor Mandate "in any state or territory of the United States of America." 2021 WL 5779939, at *12.

---

[6] Plaintiffs presently seek injunctive relief only on the Vaccine Counts.

1    Shortly after the *Georgia* court issued the nationwide injunction, Defendants moved
2    to stay this action while the injunction was pending. (Doc. 117.) *See Texas v. Biden*, No.
3    3:21-cv-309-JVB (S.D. Tex. Dec. 10, 2021) (granting similar motion to stay). The Court
4    held a Status Conference with the parties on December 14, 2021, to discuss Defendants'
5    Motion to Stay, the scope of Plaintiffs' Second Amended Complaint, Plaintiffs' Motion to
6    Bifurcate Claims and Consolidate Trial on the Merits, and Plaintiff Reble's Motion to
7    Proceed Pseudonymously. (Docs. 111, 114, 117.) After the hearing, the Court denied
8    Defendants' Motion to Stay and Plaintiff Reble's Motion to Proceed Pseudonymously.
9    (Docs. 121, 122.) Plaintiffs then filed a Third Amended Complaint adding Plaintiff
10   Reble's true name. (Doc. 134.)

11   **II.    LEGAL STANDARD**

12   An injunction is an "extraordinary remedy never awarded as of right." *Winter v.*
13   *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "To be entitled to a permanent
14   injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has
15   suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the
16   balance of hardships justify a remedy in equity; and (5) that the public interest would not
17   be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v.*
18   *Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v.*
19   *MerchExch., LLC*, 547 U.S. 388, 391 (2006)); *see also Amoco Prod. Co. v. Village of*
20   *Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is
21   essentially the same as for a permanent injunction with the exception that the plaintiff must
22   show a likelihood of success on the merits rather than actual success."). "The decision to
23   grant or deny permanent injunctive relief is an act of equitable discretion by the district
24   court." *eBay Inc.*, 547 U.S. at 391.

25   **III.   DISCUSSION**

26   Plaintiffs seek a permanent injunction barring Defendants from enforcing the
27   Contractor and Employee Mandates nationwide. (Doc. 72 at 25.) Plaintiffs challenge the
28   Contractor Mandate's legality on numerous grounds. First, Plaintiffs contend that the

Contractor Mandate exceeds the President's statutory authority under the Procurement Act. (Doc. 134 at 54–56 ¶¶ 150–60.) The Procurement Act, they argue, was enacted "to ensure the efficient purchase of goods and services, not to empower the Executive Branch to engage in far-reaching public health programs that are either unrelated to—or outright contrary to—the explicit efficiency rationale." (Doc. 34 at 23.) There is no nexus, in Plaintiffs' view, between the Contractor Mandate and federal procurement and, even if there were, "Defendants have not made any specific administrative findings" establishing such a nexus. (*Id.* at 24–27.) Second, Plaintiffs argue that by failing to publish the contractor guidance in the Federal Register for public comment, Defendants violated the procedural requirements of the Procurement Policy Act. (Doc. 134 at 56–57 ¶¶ 161–66.) Third, Plaintiffs claim that the mandate violates the Tenth Amendment and principles of federalism because "the power to impose vaccine mandates, to the extent that such power exists at all, is part of the police powers reserved to the States." (Docs. 34 at 19; 134 at 58–59 ¶¶ 175–81.) Fourth, Plaintiffs claim, under the Administrative Procedure Act ("APA"), that the mandate is arbitrary and capricious and should have gone through notice-and-comment procedures.[7] (Doc. 134 at 61–64 ¶¶ 192–215.) Fifth, Plaintiffs contend that the mandate violates the anticommandeering doctrine "by requiring agencies and political subdivisions of the State to enforce the Contractor Mandate against its own employees." (*Id.* at 59–60 ¶¶ 182–85.) Finally, Plaintiffs contend that, to the extent the mandate is authorized by statute, the statute violates the nondelegation doctrine.[8] (*Id.* at 60–61 ¶¶ 184–89.)

Plaintiffs challenge *both* the Contractor Mandate and Employee Mandate on two additional grounds. First, they assert that the mandates are unlawful under the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3, because the mandates "strip from all

---

[7] The Court will not address the substance of Plaintiffs' APA claims because those claims have not been adequately briefed. The claims are asserted in Plaintiffs' Third Amended Complaint (*see* Doc. 134 at 61–64 ¶¶ 192–215), but have not been addressed in any subsequent filing. Plaintiffs have therefore failed to demonstrate that they are entitled to relief on those grounds.

[8] The Court addresses Plaintiffs' Tenth Amendment, anticommandeering doctrine, and nondelegation doctrine arguments in conjunction with its analysis of whether the Contractor Mandate violates the Procurement Act. *See infra* Section III.B.1.

1  federal employees, contractors, and subcontractors" the right to refuse to receive a vaccine

2  approved through abbreviated emergency use procedures—an opportunity that, in

3  Plaintiffs' view, the statute provides. (*Id.* at 57–58 ¶¶ 167–71.) Second, Plaintiffs argue

4  that the mandates violate the due process rights of federal and contractor employees to

5  bodily integrity and to refuse medical treatment. (*Id.* at 58 ¶¶ 172–74.)

6  In addition to contesting the substance of Plaintiffs' arguments, Defendants contend

7  that the Court lacks jurisdiction to entertain Plaintiffs' claims. Thus, before addressing the

8  substance of those claims, the Court must determine whether it has jurisdiction.

9  **A.    Jurisdiction**

10  **1.    Justiciability**

11  Article III authorizes the federal courts to resolve only "cases" and "controversies."

12  U.S. Const. art. III, § 2. Federal courts may not issue pronouncements on questions of law

13  arising outside of such "cases and controversies," because doing so would be "inimical to

14  the Constitution's democratic character." *Arizona Christian Sch. Tuition Org. v. Winn*, 563

15  U.S. 125, 133 (2011). This constitutional limitation on federal jurisdiction is enforced

16  through various justiciability doctrines. Defendants assert that Plaintiffs' claims are

17  nonjusticiable under two such doctrines: standing and ripeness.

18  The "irreducible constitutional minimum of standing" consists of three components.

19  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction

20  must prove that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized

21  and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable

22  to the challenged action of the defendant; and (3) it is likely, as opposed to merely

23  speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth,*

24  *Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504

25  U.S. at 560–61).

26  Ripeness, on the other hand, is "'peculiarly a question of timing,' designed to

27  'prevent the courts, through avoidance of premature adjudication, from entangling

28  themselves in abstract disagreements.'" *Thomas v. Anchorage Equal Rts. Comm'n*, 220

- 12 -

F.3d 1134, 1138 (9th Cir. 2000) (en banc) (citing *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). Ripeness, like standing, includes both a constitutional and a prudential component. *See In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009). Constitutional ripeness requires that the issues presented be "definite and concrete, not hypothetical or abstract." *Thomas*, 220 F.3d at 1139. In assessing whether a case is ripe for adjudication, the Court must ask "whether the plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the [challenged law's] operation or enforcement,' or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Where a dispute hangs on "contingent future events that may not occur as anticipated, or indeed may not occur at all," *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)), it may be too speculative to present a justiciable controversy. *See In re Coleman*, 560 F.3d at 1005. On the other hand, "a litigant need not 'await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) (emphasis omitted) (quoting *United States v. Streich*, 560 F.3d 926, 931 (9th Cir. 2009)).

Prudential ripeness, on the other hand, requires the Court to assess "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. The Ninth Circuit has held that "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999) (quoting *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989)). To satisfy the hardship requirement, on the other hand, the party invoking federal jurisdiction must show "hardship of a legal kind, or something that imposes a significant practical harm." *Nat. Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004).

1    Ripeness and standing are closely related doctrines. *See Thomas*, 220 F.3d at 1138

2    ("Sorting out where standing ends and ripeness begins is not an easy task."); *see also Susan*

3    *B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) ("The doctrines of standing and

4    ripeness 'originate' from the same Article III limitation."). Indeed, the Ninth Circuit has

5    characterized the ripeness inquiry as "standing on a timeline." *Thomas*, 220 F.3d at 1138.

6    Thus, whether the Court addresses justiciability under the rubric of standing or ripeness,

7    the analysis is materially the same. *See Montana Env't Info. Ctr. v. Stone-Manning*, 766

8    F.3d 1184, 1189 (9th Cir. 2014).

9                              **i.    Reble**

10   Defendants contend that Plaintiff Reble's claims challenging the Employee

11   Mandate are constitutionally and prudentially unripe. (Doc. 52 at 27.) The Court agrees.

12   Reble, a Criminal Investigator with the U.S. Marshals Service, has been a

13   Department of Justice employee for more than 30 years. He works at the federal

14   courthouse in Phoenix, Arizona. (Doc. 134 at 7–8 ¶ 12.) He strongly opposes and has not

15   taken the COVID-19 vaccine. (*Id.*) He does not intend to comply with the Employee

16   Mandate and has requested a medical exemption therefrom.[9] (*Id.*) His exemption request

17   has not yet been granted or denied and instead remains pending with the U.S. Marshals

18   Service. (*Id.*) While his exemption request is pending, Reble is not required to be

19   vaccinated and is not subject to disciplinary action. (*See* Doc. 138 at 2 n.1.) In the event

20   his exemption request is ultimately granted, Reble will not have to be vaccinated. If his

21   exemption request is denied, he will have two weeks from the denial to receive his first (or

22   only) dose of an approved vaccine before being subject to discipline. (Docs. 52 at 28; 138

23   at 2 n.1.)

24   Reble challenges the Employee Mandate on two grounds. First, he argues the

25   mandate is unlawful under § 360bbb-3 because it does not permit him to refuse to receive

26   a vaccine approved through emergency use procedures. (Doc. 134 at 57–58 ¶¶ 167–71.)

27   Second, he argues that the mandate violates his substantive due process rights to "bodily

28   _____

[9] Reble concedes that he does not qualify for a religious exemption to the Employee Mandate. (*See* Doc. 134 at 40–41 ¶ 112.)

integrity" and to "refuse medical treatment." (*Id.* at 58 ¶¶ 172–74.)

Reble's claims are nonjusticiable, because they depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. —, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). While his exemption request is pending with the Marshals Service, Reble is not required to be vaccinated and is not subject to discipline. And, in the event his exemption is eventually granted, he will not have to be vaccinated against COVID-19 at all. In that case, his claimed Article III injuries will never occur—he will not have to receive a vaccine approved through emergency use procedures, and his substantive due process rights will not be violated. *See Church v. Biden*, No. 1:21-cv-2815, 2021 WL 5179215, at *1 (D.D.C. Nov 8, 2021) ("Plaintiffs, therefore, come before this Court complaining of a compulsory inoculation they may never need to take, and of adverse employment actions they may never experience."). In that event, any opinion issued by the Court on the merits of Reble's claims would be rendered merely advisory. *See* 13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3529.1 (3d ed. 1998) ("The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions.").

Reble's arguments in favor of justiciability are unpersuasive. He first contends that, "[g]iven the limited and strict approach Defendants have applied to exemption requests, and reports that nearly all such requests are being denied," it is likely that his exemption request will also be denied. (Doc. 134 at 8 ¶ 12.) But the record is devoid of evidence that nearly all requests are being denied or that Reble's request, in particular, is likely to be denied. Reble likewise provides no evidence that the Marshals Service or Department of Justice will impose sanctions or discipline in the event his request is granted. In fact, Defendants' policies make clear that exemption requests will be considered seriously, and that no discipline will be imposed in the event exemptions are granted. *See, e.g.*, Vaccinations, FAQs, Safer Federal Workforce, https://www.saferfederalworkforce.gov/faq/vaccinations/ (last visited Jan. 25, 2022) ("Determining whether an exception is legally

required will include consideration of factors such as the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations.").

Reble further contends that because his claims involve only legal, and not factual, disputes, the claims are ripe for judicial review, notwithstanding his alleged injury being contingent on future events. (Doc. 144 at 2–3.) He is mistaken. While it is generally true as a matter of *prudential* ripeness that the more an issue presented is purely one of law, the more likely the issue is to be ripe, *see, e.g.*, *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1249 (3d Cir. 1996), the mere potential for future injury, standing alone, is insufficient to render a case justiciable under Article III, even where the issue presented is primarily legal, *see Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 236 (D.C. Cir. 1988).

Reble's claims are therefore unripe. *See Church*, 2021 WL 5179215, at *8–10 (holding federal employees' claims challenging EO 14043 unripe due to pending exception requests); *Rodden v. Fauci*, No. 3:21-cv-317, — F. Supp. 3d. —, 2021 WL 5545234, at *3 (S.D. Tex. Nov. 27, 2021) (same); *McCray v. Biden*, No. 1:21-cv-2882, 2021 WL 5823801, at *8–9 (D.D.C. Dec. 7, 2021) (same); *Donovan v. Vance*, — F. Supp. 3d —, No. 4:21-cv-5148, 2021 WL 5979250, at *4–5 (E.D. Wash. Dec. 17, 2021) (same); *AFGE Local 501 v. Biden*, No. 21-cv-23828, slip op. at 13–18 (S.D. Fla. Dec. 22, 2021) (same).

### ii.     The State

Defendants also contend that the State's claims are nonjusticiable. In particular, Defendants argue that the State: (1) cannot show "sovereign injury" because "the federal government's regulation of its own contractual affairs does not impinge on the state's police power," and (2) cannot show "economic injury" because the State "provides no evidence that it has lost, or imminently will lose, any federal contract; and its generalized fears of economic disruptions are too speculative to satisfy Article III." (Doc. 108 at 8.)

The State advances multiple standing theories in response. First, it alleges that "Defendants' actions directly injure the State's sovereign, quasi-sovereign, and proprietary interests by denying Arizona residents of the benefit of the Due Process Clause." (Doc. 134

at 39 ¶ 105.) Second, the State argues that it has standing in its capacity as a contractor, because: (1) the Contractor Mandate requires the State to either violate the Constitution and federal and state law or face the loss of federal funds and contracts; and (2) the Contractor Mandate will cause State employees to resign, which will cause significant harm to the State's operations given the current labor market. (*Id.* ¶ 106.) Third, "a natural and predictable consequence of the Contractor Mandate is that numerous employees may be fired, retire, or quit their jobs, including employees of businesses within the State. This injures the State's quasi-sovereign interest in the economic well-being of its citizens[, and] injures the State in that it will likely increase the burden on the State's unemployment insurance funds." (*Id.* ¶ 107.) Fourth, "a natural and predictable consequence of the Contractor Mandate is that employers who are critical to the supply chain, and are also federal contractors, will likely lose significant numbers of employees. It is entirely predictable, therefore, that the Contractor Mandate will exacerbate current supply chain issues." (*Id.* at 39–40 ¶ 108.) Fifth, the State contends that "[b]ecause the Contractor Mandate claims to supersede all contrary State law, it injures Arizona's interest in setting its own laws regarding public health and workplace issues that would otherwise apply to contractors within Arizona's borders, as well as preempting State religious-liberty protections under the State Constitution and State statute." (*Id.* at 40 ¶ 109.) Finally, the State contends that because the "Contractor Mandate requires employees to prove vaccination status with documentation," and because "agencies of the State often possess such documentation," "[a] predictable consequence of the Contractor Mandate is . . . to increase the number of people seeking documentation from the [State] regarding vaccination status," which will in turn "increase costs to the State." (*Id.* ¶ 110.)

State standing depends on the capacity in which the state initiates suit. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019); *see also* Erwin Chemerinsky, Federal Jurisdiction 125 (8th ed. 2021) ("[A] distinction must be drawn between a government entity suing to remedy injuries that it has suffered and suing in a representative capacity on behalf of its citizens."). In a direct-injury suit, the state seeks redress for its

own injury. In such a case, the state need only meet the ordinary demands of Article III. That is, it needs to prove only that it has suffered an injury in fact that is fairly traceable to the defendant's conduct and redressable by a favorable ruling. *Bernhardt*, 923 F.3d at 178. In a *parens patriae* suit, on the other hand, the state seeks redress for the injuries of its citizens. State suits as *parens patriae* are permitted because "at a minimum, a State has a quasi-sovereign interest 'in the health and well-being—both physical and economic—of its residents' and 'in not being discriminatorily denied its rightful status within the federal system.'" *Bernhardt*, 922 F.3d at 178 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). To have standing in such a case, the state ordinarily must allege both that its citizens are harmed and that the harm is one that the state, if possible, would likely attempt to address through its lawmaking powers. *See Snapp*, 458 U.S. at 607.

The Supreme Court has long-since held, however, that states lack standing as *parens patriae* to bring suit against the federal government. *See Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue [as *parens patriae*] for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government."). This rule, often referred to as the "*Mellon* bar," is founded on the principle that because the citizens of a state "are also citizens of the United States," *id.* at 485, the federal government is "the ultimate parens patriae of every American citizen." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Thus, Arizona cannot sue Defendants as *parens patriae* to vindicate the rights of its citizens. *Mellon*, 262 U.S. 447. To have standing to challenge the vaccine mandates, then, it must show direct injury.

The State has shown that it is likely to suffer direct injury as a result of the Contractor Mandate. The State and its agencies are federal contractors subject to the mandate. Absent an injunction, the State will be required to choose between forfeiting numerous and significant federal contracts, and requiring its employees to be vaccinated against COVID-19. Although none of the State's current contracts include a vaccination

clause, federal agencies have already demanded that multiple Arizona agencies, including its public universities, implement the Contractor Mandate and require their employees to receive the vaccine. Despite Defendants' assertions, these demands have, on multiple occasions, been phrased as mandatory, rather than permissive, requests for contract modifications. A brief recitation of these demands is warranted.

1.     The Arizona Board of Regents ("ABOR") oversees the management, direction, and governance of Arizona's public universities—Arizona State University, Northern Arizona University, and the University of Arizona. (Doc. 134-5 at 2 ¶ 1.) All three universities are federal contractors. In 2021, their combined federal contracting revenues totaled $1,207,926,800. (*Id.* ¶ 2.) The universities will thus forfeit more than a billion dollars if they do not adhere to the Contractor Mandate. As a result, they are now actively engaged in efforts to comply with the mandate, including communicating the vaccination requirement to current, incoming, and prospective employees; gathering proof of vaccination; and reviewing requests for accommodations from individuals who cannot be vaccinated for medical or religious reasons. (*Id.* at 2–3 ¶¶ 3–4.)

2.     The Arizona State Retirement System ("ASRS"), a State agency that administers benefits for qualified Arizona employees, owns a building in Phoenix, Arizona. ASRS leases space in the building to GSA. (Doc. 48-4 at 3.) On October 18, 2021, GSA sent an email to ASRS stating that GSA was "amending its existing leases" pursuant to EO 14042 and directing ASRS to review and sign an amendment to its current lease requiring ASRS to adhere to the Contractor Mandate. (*Id.* at 7–9.)

3.     The Division of Civil Rights Section ("DCRS") of the Arizona Attorney General's Office ("AGO") works closely with federal agencies, including the Equal Employment Opportunity Commission ("EEOC"), to enforce civil rights laws. Since 2019, DCSC and EEOC have worked under a work-sharing agreement through which EEOC provides significant funding to DCRS to assist it in enforcing Title VII. (Doc. 48-3 at 3–4.) During the week of October 25, 2021, EEOC requested that DCRS extend its workshare agreement and incorporate a vaccination clause. (*Id.* at 4.) EEOC gave DCRS a deadline

of November 2, 2021, to do so. (*Id.*)

4.      The Arizona Department of Transportation ("ADOT") owns a port of entry in Nogales, Arizona, that it leases to GSA for use by the Federal Motor Carrier Safety Administration. (Doc. 134-6 at 4–5.) On October 14, 2021, GSA sent ADOT a letter stating that a contract modification implementing the Contractor Mandate "is ***mandatory*** and your acceptance is required in order to ensure compliance with EO 14042" and that contract "modifications must be finalized by **November 14, 2021**." (*Id.* at 7 (emphasis in original).)

5.      On October 22, 2021, the Center for Disease Control ("CDC") emailed the Arizona Department of Health Services ("ADHS") requesting that ADHS agree to a bilateral contract modification incorporating the Contractor Mandate. (Doc. 134-7 at 4–5.) The email indicated that "**Contractors will sign and return the modification via email to the Contracting Officer of record by November 9, 2021.**" (*Id.* at 11 (emphasis in original).)

6.      The Arizona Department of Public Safety ("DPS") contracts with the National Park Service ("NPS") to provide laboratory testing. On November 2, 2021, NPS sent an email to DPS demanding that DPS sign a contract modification incorporating the Contractor Mandate. (Doc. 134-8 at 4–5.)

7.      The Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") has a contract with the U.S. Forest Service through which Arizona inmates perform work on Forest Service land. (Doc. 134-9 at 4–5.) On September 28, 2021, the Forest Service sent an email to ADCRR stating that anyone performing under the contract would be required to comply with new safeguards, including mandatory vaccine certification. (*Id.* at 7.)

Defendants argue that because many of these contracts will remain in force for several more years, the State's harm is too remote to confer standing. But Defendants are not demanding that Arizona agencies agree to incorporate a vaccination clause when their contracts may be up for renewal; instead, Defendants are requiring State agencies to agree to modify their contracts *now*. Thus, Defendants' demands put the State to an immediate

choice: require its employees to be vaccinated now, or face the loss of consequential federal contracts in the future. *See* President Joseph Biden, Remarks on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/. ("If you want to do business with the federal government, vaccinate your workforce."); *see also Kentucky*, 2021 WL 5587446, at *4 ("[I]f the government is already attempting to require contracts not officially covered by the vaccine mandate to still include such a mandate, it stands to reason that contractors who do not comply will likely be blacklisted from future contracting opportunities if they refuse to comply."). The State's alleged harm is therefore imminent and real.

Relatedly, Defendants argue that the Contractor Mandate does not invade the State's sovereignty at all because it is merely "an exercise of the federal government's 'unrestricted power' to 'determine those with whom it will deal, and to fix the terms and conditions upon which it will' enter into contracts." (Doc. 108 at 12 (citing *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940)).) At first blush, this argument seems to have some salience. After all, a private entity could require parties with whom it contracts to either vaccinate their workforces or risk losing its business. It may seem odd, then, to preclude the federal government from doing what a private corporation could do. But, despite Defendants' arguments to the contrary, the federal government is not simply another contracting entity. It is both a contractor and a regulator, wielding immense coercive power. And although federal contracts provide the mechanism through which the Contractor Mandate is implemented, the mandate is unquestionably both regulatory and policy-making in character.

The D.C. Circuit rejected a similar argument in *Chamber of Commerce v. Reich*. 74 F.3d 1322 (D.C. Cir. 1996). That case involved a challenge to an EO issued by President Clinton prohibiting federal agencies from contracting with employers that hired permanent replacements for lawfully striking employees. *Id.* at 1324. There, as here, the federal government argued that "if a private contractor were permitted to refuse to buy goods from

an employer who permanently replaced strikers—which ordinarily he would be—then so should the federal government." *Id.* at 1336. As the primary support for its argument, the federal government cited a 1993 case in which the Supreme Court held that a Massachusetts agency's decision to require certain non-union contractors to enter into a collective bargaining agreement to be eligible for contracts on the Boston Harbor cleanup project was "not government regulation," because the agency was acting only in its capacity as a contractor. *See Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.* (*Boston Harbor*), 507 U.S. 218, 232 (1993). In rejecting the government's argument, the D.C. Circuit explained:

> In *Boston Harbor*, the Court's analysis of the behavior of [the Massachusetts agency] was based on the premise, stated after its summary of its precedent, that:
>
> "When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant *with no interest in setting policy* . . . . We left open [in *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986)] the question whether a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not '*tantamount to regulation*,' or *policy-making*." [*Boston Harbor*, 507 U.S.] at 229 (emphases added). The premise on which the Court's further analysis rested, then, was that the Massachusetts governmental entity . . . was not seeking to set general policy in the Commonwealth; it was just trying to operate as if it were an ordinary general contractor whose actions were "specifically tailored to one particular job, the Boston Harbor clean-up project." *Id.* at 232. Surely, the result would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law or the Governor had issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements . . . .
>
> It does not seem to us possible to deny that the President's

- 22 -

> Executive Order seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers. The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter.[10]

*Reich*, 74 F.3d at 1336–37.

So too here. It is beyond doubt that the Contractor Mandate "seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers." *Id.* at 1337; *see also* Path Out of the Pandemic: President Biden's COVID-19 Action Plan, The White House, https://www.whitehouse.gov/covidplan/ (last visited Jan. 25, 2022) (describing EO 14042 as a plan "[r]equiring [v]accinations for . . . [m]illions of [c]ontractors"). Workers employed by federal contractors comprise approximately one-fifth of the entire U.S. labor force and federal government spending accounts for more than a quarter of the national economy. (Doc. 134 at 36 ¶ 98, 38 ¶ 104.) *See* History of Executive Order 11246, Office of Contract Compliance Programs, Department of Labor, https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (last visited Jan. 25, 2022). Defendants' argument that the State has no standing because the federal government is merely acting as contractor is thus unpersuasive. The Contractor Mandate regulates the State, and the State has standing to challenge that regulation. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (holding that states are "entitled to special solicitude in the standing analysis").

The State also "ha[s] a legally protected sovereign interest in 'the exercise of sovereign power over individuals and entities within [its] jurisdiction[, which] involves the power to create and enforce a legal code.'" *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (quoting *Snapp*, 458 U.S. at 601); *see also Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 377 (2017) (mem.) (similar); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011)

---

[10] While the D.C. Circuit addressed the government's argument on the merits, the court's reasoning applies with equal force to Defendants' jurisdictional argument.

(collecting cases where state was found to possess sovereign standing on this basis). Thus, because the Contractor Mandate clearly conflicts with Arizona's laws and governance policies, *see infra* Section III.B.1, the State has Article III standing to challenge its legality. *See Oregon v. Trump*, 406 F. Supp. 3d 940, 958 (D. Or. 2019) ("A state or locality has standing to challenge interference with its operational and governance decisions."); *see also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (holding that "there is no question concerning the State's standing" where federal law "diminish[es] . . . [the State's] sovereignty" by interfering with "the State's ability to structure its relationship with its employees" (internal citations omitted)).

The Court agrees with Defendants, however, that the State lacks standing to challenge the Employee Mandate. Neither the State nor its employees are subject to the Employee Mandate. Nor does the Employee Mandate threaten to infringe the State's sovereignty by regulating in an area of traditional state concern or by displacing otherwise valid state law. Instead, it is an exercise of the President's considerable constitutional authority to regulate the internal affairs of the executive branch. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010) ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." (citing James Madison, 1 Annals of Cong. 463 (1789)); *see also Rydie v. Biden*, No. CV DKC 21-2696, 2021 WL 5416545, at *3 (D. Md. Nov. 19, 2021) ("The President derives his authority to regulate the federal workforce from the Constitution, not from Congress's enactments."). Plaintiffs' challenge to the Employee Mandate will therefore be denied, and the remainder of this Order will address only Plaintiffs' claims challenging the Contractor Mandate.

### 2.    The Contract Disputes Act and the Tucker Act

Defendants argue that even if the State has Article III standing, its claims challenging the Contractor Mandate come within the exclusive jurisdiction of the Court of Federal Claims under the Contract Disputes Act ("CDA") and the Tucker Act, such that this Court is not a proper forum. (Doc. 52 at 34–16.)

1   The CDA "established a comprehensive framework for resolving contract disputes

2   between executive branch agencies and government contractors." *Anselma Crossing, L.P.*

3   *v. USPS*, 637 F.3d 238, 240 (3d Cir. 2011) (quoting *Menominee Indian Tribe v. United*

4   *States*, 614 F.3d 519, 521 (D.C. Cir. 2010)). It is "intended to keep government contract

5   disputes out of district courts," and "limits review of the merits of government contract

6   disputes to certain forums" with specialized knowledge and experience in the complex

7   legal area that is government contracting. *Id.* at 240. Under the CDA, breach-of-contract

8   claims against the federal government must first be decided by a contracting officer, and

9   then may be appealed either to a board of contract appeals or to the Court of Federal Claims.

10  *See* 41 U.S.C. §§ 7103–7104.

11  When the CDA applies, it provides the exclusive mechanism for contract dispute

12  resolution. *Tex. Health Choice, L.C. v. OPM*, 400 F.3d 895, 898 (Fed. Cir. 2005). The Act

13  only applies, however, "to claims sounding in contract." *Anselma Crossing*, 637 F.3d at

14  240; *see also* 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of

15  any civil action or claim against the United States *founded upon any express or implied*

16  *contract* with the United States." (emphasis added)). Here, the State's claims do not sound

17  in contract, but in the Constitution and laws of the United States. Such claims fall squarely

18  within the wheelhouse of the Article III courts, and do not require the expertise of the Court

19  of Federal Claims. Thus, this case does not come within that court's exclusive jurisdiction.

20  The Tucker Act likewise does not prevent the Court from exercising jurisdiction in

21  this case. Under that Act, the Court of Federal Claims has exclusive "jurisdiction to render

22  judgment on an action by an interested party objecting to a solicitation by a Federal agency

23  for bids or proposals for a proposed contract or to a proposed award or the award of a

24  contract or any alleged violation of statute or regulation in connection with a procurement

25  or a proposed procurement."[11] 28 U.S.C. § 1491(b)(1). Given this language, Defendants

---

[11] While the text of § 1491(b) provides that the district courts and Court of Federal Claims have concurrent jurisdiction over these matters, the Alternative Dispute Resolution Act of 1996 included a "sunset provision, which terminated federal district court jurisdiction over bid protests on January 1, 2001." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001).

- 25 -

1   contend that any contractor challenging the solicitation requirements for new federal
2   contracts that include a vaccination clause would have to proceed in the Court of Federal
3   Claims, since "[a]ny claim Arizona might be able to bring on behalf of a State
4   agency . . . would not be cognizable in District Court." (Doc. 52 at 35.) But Defendants are
5   mistaken. As the Ninth Circuit has held: "The Tucker Act, by its terms, applies only to
6   claims for money damages. Therefore, it does not preclude review of agency action when
7   the relief sought is other than money damages." *South Delta Water Agency v. U.S. Dep't
8   of Interior*, 767 F.2d 531, 540 (9th Cir. 1985) (quoting *Rowe v. United States*, 633 F.2d
9   799, 802 (9th Cir. 1980)). Thus, because Plaintiffs seek only injunctive relief, the Tucker
10  Act does not bar their claims from proceeding in district court.

11      Moreover, jurisdiction under the Tucker Act depends on the "source of the rights
12  upon which the plaintiff bases its claim." *North Star Alaska v. United States*, 14 F.3d 36,
13  37 (9th Cir. 1994) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).
14  As mentioned above, Plaintiffs do not object to "a solicitation by a Federal agency for bids
15  or proposals for a proposed contract," *see* 28 U.S.C. § 1491(b)(1), and do not ask the Court
16  to interpret contractual language or to decide contractual rights. Instead, Plaintiffs ask the
17  Court to resolve claims based on the Constitution and federal law. Thus, Plaintiffs' claim
18  is "that the government is violating the law," not that "the government is following a
19  different law from the one stated in the contract." *North Star Alaska*, 14 F.3d at 36, 37 n.2.
20  Accordingly, the Tucker Act does not divest the Court of jurisdiction.

21                      **3.      Causes of Action**

22      Finally, Defendants argue that the Court lacks authority to review the Contractor
23  Mandate because Plaintiffs lack the necessary cause of action to pursue their claims under
24  the Procurement Act, the Procurement Policy Act, and the APA. (Doc. 108 at 15–17.)

25      The APA's judicial review provision provides that "[a] person suffering legal wrong
26  because of agency action, or adversely affected or aggrieved by agency action" is entitled
27  to judicial review. 5 U.S.C. § 702. Courts have subject-matter jurisdiction to review only
28  *final* agency action under the APA. *See id.* § 704. Courts will deem agency action final if

- 26 -

"the action . . . mark[s] the 'consummation' of the agency's decisionmaking process," and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

As a general matter, presidential action falls outside the scope of direct review under the APA, because the "President is not an agency within the meaning of the [APA]," *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992), and presidential action is therefore not "*agency* action" reviewable under § 702. *But cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2350–51 (2001) ("It is true that the Supreme Court held in *Franklin v. Massachusetts* that the President is not an 'agency' as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. . . . [But w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern.").

Defendants argue that because the Acting OMB Director's determination "was an exercise of presidential authority delegated under 3 U.S.C. § 301,"[12] the determination "cannot be subject to judicial review under the APA."[13] (Doc. 108 at 15.) Further,

---

[12] 3 U.S.C. § 301 provides, in pertinent part: "The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President: Provided, That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions."

[13] There is rather little case law (and none binding on this Court) addressing whether agency action undertaken pursuant to a presidential delegation under § 301 is insulated from judicial review under the APA. *Compare Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("Several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA."), *and Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111 (D.D.C. 2009) (finding no judicial review under the APA where the President delegated his authority), *and Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) (same), *with Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1156–57 (D. Minn. 2010) (reaching the opposite conclusion), *and Indigenous Envt'l Network v. U.S. Dep't of State*, No. cv-17-29, 2017 WL 5632435, at *6 (D. Mont. Nov. 22,

1    Defendants argue that the SFWTF contractor guidance and the FAR Memorandum are

2    unreviewable under the APA because they have no standalone force and are therefore not

3    final agency action.[14] (*Id.* at 15–16.)

4         While the Court doubts the validity of Defendants' interpretation of the APA and

5    § 301,[15] the Court need not consider whether Plaintiffs claims are reviewable under the

6    APA, because even if this case presents no "final agency action" reviewable under that

7    statute, "courts have also permitted judicial review of presidential orders implemented

8    through the actions of other federal officials. This cause of action, which exists outside of

9    the APA, allows courts to review *ultra vires* actions by the President that go beyond the

10   scope of the President's statutory authority." *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir.

11   2017), *reversed and remanded on other grounds*, 585 U.S. —, 138 S. Ct. 2392 (2018); *see*

12   *also Reich*, 74 F.3d at 1327–28 (collecting cases and holding that plaintiff's challenge to

13   an EO promulgated under the Procurement Act was permissible as a non-statutory review

14   action); *United States v. Bozarov*, 974 F.2d 1037, 1045 (9th Cir. 1992) (similar); *see*

15   *generally* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97

16   Colum. L. Rev. 1612, 1614 (1997). As in the cases cited, non-statutory review of

17   Plaintiffs' claims is appropriate here because Plaintiffs allege that the President, in

18   promulgating EO 14042 and 14043, acted beyond his statutory authority.

19        Moreover, judicial review of Plaintiffs' claims obtains because "review of the

20   legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the

21   officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828

22   2017) (same), *and Protect Our Cmtys. Found. v. Chu*, No. 12-cv-3062, 2014 WL 1289444,
     at *6 (S.D. Cal. Mar. 27, 2014) (same).

23   [14] Defendants are likely right on this point. *See infra* Section III.B.2.ii; *see also Kentucky*,
24   2021 WL 5587446, at *11 ("FAR Council Guidance is not subject to judicial review
     pursuant to the APA because the Guidance does not constitute final agency action.").

25   [15] While the APA is not available to review actions involving the exercise of discretionary
     authority vested in the President for abuse of discretion, *see Detroit Int'l Bridge Co.*, 189
26   F. Supp. 3d at 99, courts *may* review a President's assertion of statutory power to determine
     whether it is authorized by statute, *see Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d
27   1351, 1359 (Fed. Cir. 2003); *see also Reich*, 74 F.3d at 1331–32 & n.5 ("[The Court's]
     holding [in *Dalton v. Specter*, 511 U.S. 462 (1994)] merely stands for the proposition that
28   when a statute entrusts a discrete specific decision to the President and contains no
     limitations on the President's exercise of that authority, judicial review of an abuse of
     discretion claim is not available.").

(Scalia, J., concurring in part and concurring in the judgment). Here, Plaintiffs seek to enjoin not only the President, but also the officers and entities charged with carrying out his instructions. *See Hawaii*, 878 F.3d at 680–81. The Contractor Mandate is not self-executing; it involves a substantial number of officials and entities within the executive apparatus that are unquestionably subject to this Court's equitable jurisdiction. Thus, that Plaintiffs' claims implicate presidential action and raise questions regarding presidential authority does not preclude judicial review.[16] *See Reich*, 74 F.3d at 1326 ("That the 'executive's' action here is essentially that of the President does not insulate the entire executive branch from judicial review."); *see also* Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 555–56 (2005) ("In almost all cases of presidential orders, it will be possible to identify a defendant other than the president himself that acts upon the order. Indeed, this mode of review has a long history: it was the basis for review of the validity of executive action in *Marbury v. Madison*, *Youngstown Sheet & Tube Co. v. Sawyer*, and *Dames & Moore v. Regan*.").

Accordingly, the Court has jurisdiction to resolve Plaintiffs' claims challenging the Contractor Mandate. The Court will now turn to the merits of those claims.

**B.    Actual Success on the Merits**

**1.    Procurement Act**

The Procurement Act, 40 U.S.C. § 101 et seq., was enacted in 1949 to "provide the Federal Government with an economical and efficient system" for the procurement and management of federal property. *Id.* § 101. The Act was passed in response to the Hoover Commission's recommendation that the federal government streamline and modernize its procurement and property management processes. *See AFL-CIO v. Kahn*, 618 F.2d 784, 787–88 (D.C. Cir. 1979). Among other things, the Hoover Commission recommended that an agency be created to oversee government acquisitions and that it be placed within the Executive Office of the President. *Id.* at 788. "Congress, however, was reluctant to saddle

---

[16] Nor does sovereign immunity bar Plaintiffs' claims. The APA, 5 U.S.C. § 702, waives sovereign immunity with respect to suits against federal actors for injunctive relief, even where the suit does not proceed under the APA. *See Reich*, 74 F.3d at 1328 ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not.").

the relatively small Executive Office with such a vast administrative burden, so it set up the General Services Administration as an independent agency. But in response to the Hoover Commission's concern that the strength of the presidency support the new agency, Congress added Section [121(a)] . . . ." *Id.*

Section 121(a) grants the President authority to "prescribe such policies and directives that the President considers necessary to carry out [the Act]." 40 U.S.C. § 121(a). This statutory grant of authority, while broad, is not unqualified. Rather, the President's policies "must be consistent with [the Act]." *Id.* This means that there must be a nexus between policies enacted pursuant to § 121(a) and the Procurement Act's purpose to promote economy and efficiency in federal procurement and property management. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979) ("[I]t is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress."); *see also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981) (finding that executive branch policies "must be reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement . . . in order to lie within the statutory grant").[17]

In conducting this "nexus" inquiry, courts have defined "economy" and "efficiency" broadly. *See, e.g., Kahn*, 618 F.2d at 789 ("'Economy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions."); *Reich*, 74 F.3d at 1333 ("The President's authority to pursue 'efficient and economic' procurement . . . has been interpreted to permit such broad-ranging Executive Orders as [those] guaranteeing equal employment opportunities, and restricting wage increases on the part of government contractors—measures which certainly reach beyond any narrow concept of efficiency and economy in procurement."). As a result, a broad range of executive branch policies issued under § 121(a) have been upheld as valid. *See, e.g., Kahn*, 618 F.2d at 790–91 & n.32 (collecting cases regarding use of the Procurement Act to impose "a series of

---

[17] The Ninth Circuit has not yet addressed the scope of the President's authority under the Procurement Act.

antidiscrimination requirements for Government contractors"); *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) (urban renewal); *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003) (promoting rights of union members); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during oil crisis). Other executive branch policies, however, have been invalidated as exceeding the President's authority under the Act. *See, e.g.*, *Reich*, 74 F.3d 1322 (order disqualifying employers who hire replacement workers during lawful strike from certain federal contracts); *Liberty Mut.*, 639 F.2d 164 (order requiring federal contractors and subcontractors to comply with certain anti-discrimination and affirmative action measures).

In an attempt to establish the requisite nexus, EO 14042 instructed the OMB Director, "as an exercise of the delegation of my authority under the Federal Property and Administrative Services Act," to "determine whether [the SFWTF contractor guidance] will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." 86 Fed. Reg. at 50,985–86. Acting Director Young issued a responsive determination on September 28, 2021. 86 Fed. Reg. 53,691. The initial determination made only the conclusory statement that Young had "determined that compliance by Federal contractors and subcontractors with COVID-19 workplace safety protocols detailed in [the SFWTF contractor guidance] will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." *Id.* at 53,692. The determination included neither findings nor evidence to support Young's conclusion.

Perhaps realizing the determination's deficiencies, Acting Director Young published a revised determination to the Federal Register on November 16, 2021. 86 Fed. Reg. 63,418. The revised determination again attempts to establish the requisite nexus between the Contractor Mandate and the purposes of the Procurement Act. The revised determination states, *inter alia*, that "the overall effect of enacting these protocols for

Federal contractors and subcontractors will be to decrease the spread of COVID-19, which will in turn decrease worker absence, save labor costs on net, and thereby improve efficiency in Federal contracting." *Id.* at 63,421.

Defendants argue that the revised determination "easily satisfies [the] 'lenient' [nexus] standard" and in fact provides "far more detail than the Procurement Act requires." (Docs. 52 at 40; 108 at 17.) Plaintiffs disagree. In their view, the revised determination "makes only a pretextual attempt to establish a nexus with economy and efficiency. Indeed, before it makes any mention of economy and efficiency, or even of procurement at all, it explicitly states that its actual main objective is to achieve public health goals, specifically, 'to get more people vaccinated.'" (Doc. 72 at 17 (quoting 86 Fed. Reg. at 63,418).)

The Contractor Mandate exceeds the President's authority under the Procurement Act, for several reasons. First, the sheer scope of the President's claimed authority counsels against Defendants' interpretation of § 121(a). *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. —, 141 S. Ct. 2485, 2489 (2021). Defendants' reading of § 121(a) would grant the President "a breathtaking amount of authority." *Id.* Indeed, "[i]t is hard to see what measures [Defendants'] interpretation would place outside" the President's reach. *Id.* As long as the federal government could articulate *some* connection—no matter how tenuous—between the enacted policy and the broad goals of achieving economy and efficiency in federal procurement, the policy would be consistent with the statute. If, for example, the President determined that obesity, diabetes, and other health issues were linked to the consumption of sugary drinks and fast food, and that such health issues led to absenteeism and a lack of productivity in the workplace, he could, on Defendants' reading, issue an executive order requiring all federal contractor employees to refrain from consuming soda or eating fast food. But in reality, the President's authority under the Act is not so broad. *See Kahn*, 618 F.2d at 793 ("[O]ur decision today does not write a blank check for the President to fill in at his will. The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power."). Rather, policies promulgated under the Procurement Act must relate—more than

incidentally—to *procurement*. *See Liberty Mut.*, 639 F.2d at 171 ("[A]n 'exercise of quasi-legislative authority by [the executive branch] must be rooted in a grant of (legislative) power by the Congress,' and lie 'reasonably within the contemplation of that grant of authority.'" (quoting *Chrysler*, 441 U.S. at 302, 306)).

"We expect Congress to speak clearly when authorizing [the executive branch] to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). There is little doubt that the Contractor Mandate qualifies as an exercise of such power. *See NFIB v. OSHA*, 595 U.S. —, 142 S. Ct. 661, 665 (2022). As mentioned previously, federal contractor employees comprise nearly a fifth of the entire U.S. labor force. The mandate covers virtually all such employees, including employees who are not themselves working on federal contracts, have previously been infected with COVID-19, work entirely outdoors, and work remotely full time. Clearly the mandate "is no 'everyday exercise of federal power.'" *Id.* (quoting *In re MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) (Sutton, C.J., dissenting). "The question, then, is whether the Act *plainly* authorizes" the mandate. *Id.* (emphasis added). It does not.

The Act authorizes the President to prescribe policies and directives related to procurement, not public health. *See* 40 U.S.C. §§ 101, 121(a) ("The President may prescribe policies and directives" that are "consistent with" the Act's purpose to "provide the Federal Government with an economical and efficient system" for the procurement and management of federal property). Indeed, no provision of the Act so much as mentions either public health or vaccination.[18] *See NFIB*, 142 S. Ct. at 665; *see also Chrysler*, 441 U.S. at 304 n.34. Such matters fall clearly outside the expertise of the FAR Council and OMB. *See NFIB*, 142 S. Ct. at 665. Nor does the legislative history indicate that Congress intended the President to possess such broad authority under the Act. *See Kahn*, 618 F.2d at 799 (MacKinnon, J., dissenting) ("It is no accident that the majority opinion cannot point to any legislative history . . . for there is not a single passage in that history . . . remotely

---

[18] For this reason, the Contractor Mandate is even more clearly unlawful than the OSHA mandate that was recently stayed by the Supreme Court. *See NFIB*, 142 S. Ct. 661.

supporting the use of the procurement power to achieve nonprocurement objectives."); *see also* Kimberly Egerton, Note, *Presidential Power over Federal Contracts under the Federal Property and Administrative Services Act: The Close Nexus Test of* AFL-CIO v. Kahn, 1980 Duke L.J. 205, 206–08. Nor has the President, in the seventy years since the Procurement Act was enacted, ever used his authority under the Act to effectuate sweeping public health policy. *See NFIB*, 142 S. Ct. at 666. "This 'lack of historical precedent,' coupled with the breadth of authority that the [President] now claims, is a 'telling indication' that the mandate extends beyond the [President's] legitimate reach." *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 505).

While it is of course true that the pandemic will have *some* impact on federal procurement, that alone does not render the Contractor Mandate a *procurement* policy or directive. As the Supreme Court recently explained:

> Although COVID-19 is a risk that occurs in many workplaces, it is not an *occupational* hazard in most. COVID-19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases. Permitting OSHA to regulate the hazards of daily life—simply because most Americans have jobs and face those same risks while on the clock—would significantly expand OSHA's regulatory authority without clear congressional authorization.

*Id.* at 665. The same is true here. That contractor employees, like private sector employees, face 'the hazards of daily life' while on the clock does not grant the President carte blanche to regulate with respect to those hazards. To hold otherwise "would significantly expand [the President's procurement] authority without clear congressional authorization." *Id.*

It is telling that, since the pandemic began, Congress has passed no legislation mandating vaccination despite enacting several other significant pandemic-related measures. *See id.* at 662–63. Indeed, "the most noteworthy action concerning . . . vaccine mandate[s] by either House of Congress has been a majority vote of the Senate disapproving [OSHA regulations requiring vaccine-or-test for certain private employers] on December 8, 2021." *Id.* at 666. This congressional silence, while not dispositive,

counsels against reading § 121(a) as impliedly conferring on the President broad authority to mandate compulsory vaccination.

Contrary to Defendants' assertions, this case is clearly distinct from *Biden v. Missouri*, 595 U.S. —, 142 S. Ct. 647 (2022). In that case, the Supreme Court upheld a regulation promulgated by the Secretary of Health and Human Services ("HHS") that mandates vaccination for certain healthcare workers employed in facilities accepting Medicare and Medicaid funding. *Id.* at 650. As authority for the regulation, the HHS Secretary cited 42 U.S.C. § 1302, which authorizes the Secretary to promulgate regulations "as may be necessary to the efficient administration of the functions with which [he] is charged." As Defendants note, this statutory grant of authority bears some resemblance to the authority granted the President under the Procurement Act. (*See* Doc. 152 at 5.) But these statutory grants also bear a significant, and dispositive, distinction. As the Supreme Court noted, it is "perhaps the most basic" function of the HHS Secretary, "given the Department's core mission," to "ensure that the healthcare providers who care for Medicare and Medicaid patients protect their patients' health and safety." *Missouri*, 142 S. Ct. at 650. Consequently, authority to issue regulations respecting patients' health and safety is inherent in the Secretary's authority to regulate "as may be necessary to the . . . administration of his functions." 42 U.S.C. § 1302. It was for this reason that the Supreme Court determined the vaccination mandate fell "within the authorities that Congress has conferred upon [the HHS Secretary]." *Missouri*, 142 S. Ct. at 652.

> After all, ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the "very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID-19."

*Id.* at 652 (quoting *Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021)).

In the instant case, on the other hand, Defendants argue that the Contractor Mandate is authorized by a statute granting the President authority to issue regulations respecting procurement. Unlike the authority granted the HHS Secretary under 42 U.S.C.

§ 1302, however, the authority granted the President under the Procurement Act includes no inherent authority to regulate with respect to health and safety. Rather, the statute's "most basic" function, *see Missouri*, 142 S. Ct. at 650, is to manage the government's business affairs. *See* 40 U.S.C. § 101. Thus, this case involves a separate, wholly distinct grant of authority that was promulgated for reasons unrelated to the grant of authority at issue in *Missouri*.

Second, the Court agrees with Plaintiffs that Defendants' broad view of the President's authority under § 121(a) raises serious constitutional questions. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. —, 139 S. Ct. 2116, 2123 (2019). Nevertheless, because "Congress simply cannot do its job absent an ability to delegate power under broad general directives," *Mistretta v. United States*, 488 U.S. 361, 372 (1989), statutory delegation is generally permissible, "as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy*, 139 S. Ct. at 2123 (quoting *Mistretta*, 488 U.S. at 372). Although this intelligible-principle standard has historically been undemanding, *see, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943) (upholding delegation to agency to regulate in the "public interest"); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (upholding delegation to agency to issue air quality standards "requisite to protect the public health"), and the Supreme Court has on only two occasions found a delegation excessive, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), several members of the Court have recently indicated a willingness to revisit the contours nondelegation doctrine and inject substance into the intelligible-principle standard. In a recent dissent, for example, Justice Gorsuch, joined by Justice Thomas and Chief Justice Roberts, described the proper intelligible-principle inquiry as follows:

> To determine whether a statute provides an intelligible principle, we must ask: Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And most importantly, did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the Constitution demands.

*Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting); *see also id.* at 2131 (Alito, J., concurring in the judgment) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort."). On this formulation of the nondelegation doctrine, Defendants' reading of the statutory delegation in § 121(a)—the reading that would permit the executive to issue the Contractor Mandate—is perhaps unconstitutional. *See Kentucky*, 2021 WL 5587446, at *9; *see also Kahn*, 618 F.2d at 811 (MacKinnon, J., dissenting) ("[A]ssuming that Congress did indeed intend to grant the President the power to impose mandatory wage and price standards on government contractors, the terms it used to do so do not provide a constitutionally sufficient standard for delegating legislative authority."). The constitutional avoidance doctrine therefore counsels in favor of construing § 121(a) to avoid the nondelegation question. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

Third, the Contractor Mandate intrudes into an area traditionally and principally reserved to the states. *See Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); *see also S. Bay United Pentecostal Church v. Newsom*, 590 U.S. —, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States." (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905))).

The federal government is one of limited, enumerated powers. *See Gregory v.*

*Ashcroft*, 501 U.S. 452, 457 (1991); *see also Printz v. United States*, 521 U.S. 898, 918–19 (1997) ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.'" (quoting The Federalist No. 39, at 245 (J. Madison))). This principle is implicit in both the structure and text of the Constitution and was made express by the Tenth Amendment. *See Printz*, 521 U.S. at 919. That Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.  The "police power" is therefore "inherent in the states" and was "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals.").

This traditional "police power" includes authority over compulsory vaccination. *See Zucht v. King*, 260 U.S. 174, 176 (1922) ("[I]t is within the police power of a state to provide for compulsory vaccination."); *see also Jacobson*, 197 U.S. at 25 ("[T]he police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."); *NFIB*, 142 S. Ct. at 667 (Gorsuch, J., concurring) ("There is no question that state and local authorities possess considerable power to regulate public health."). It also includes, as a general matter, power to prohibit vaccination from being compelled. Consistent with that authority, Arizona has enacted laws prohibiting State and local government entities from imposing vaccine mandates. *See* Arizona Executive Order 2021-19; Arizona Executive Order 2021-18; A.R.S. §§ 36-114, 36-184.

Of course, that the states possess authority over compulsory vaccination does not compel the conclusion that the federal government does not. State and federal governments regularly exercise concurrent regulatory authority. *See Gregory*, 501 U.S. at 457–61. Indeed, "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Id.* at 460. Nevertheless, where

the federal government seeks to preempt state law in an area that "the States have traditionally occupied," there is a strong presumption "that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal citations and quotation marks omitted). Thus, while it may be that Congress has authority to compel vaccination, there is no indication that it intended to do so through the Procurement Act. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("Where an [executive branch] interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result.").

The Contractor Mandate thus exceeds the President's authority under the Procurement Act.

### 2.      Procurement Policy Act

The Procurement Policy Act, 41 U.S.C. §§ 1101–2313, establishes the Office of Federal Procurement Policy ("OFPP") within OMB to "provide overall direction of Government-wide procurement policies, regulations, procedures, and forms for executive agencies." *Id.* § 1101(b)(1). OFPP's Acting Administrator works with the GSA Administrator, the Secretary of Defense, and the NASA Administrator (collectively, the "FAR Council") to "prescribe Government-wide procurement policies" and to issue government-wide procurement regulations, procedures, and forms. *Id.* §§ 1102, 1121(b), (c)(2) & (d); 1303(a)(1). Those government-wide directives are "implemented in a single Government-wide procurement regulation called the Federal Acquisition Regulation." *Id.* §§ 1121(b); 1303(a)(1). Executive agencies must follow the FAR when procuring property or services. *Id.* § 1121(c).

When the FAR Council or agencies prescribe procurement regulations, they must comply with procedural requirements set forth in 41 U.S.C. § 1707. That section requires that agency heads publish a proposed "procurement policy, regulation, procedure, or form" in the Federal Register if the proposal "relates to the expenditure of appropriated funds"

and either "has a significant effect beyond the internal operating procedures of the agency issuing the policy" or "has a significant cost or administrative impact on contractors." *Id.* § 1707(a)(1). Although ordinarily the proposal "may not take effect until 60 days after" its publication, the proposal may take effect immediately on a temporary basis "if urgent and compelling circumstances make compliance with the requirements impracticable." *Id.* § 1707(a), (d). Even then, however, the proposal must be subject to concurrent public comment. *Id.* § 1707(e).

Plaintiffs assert that the SFWTF FAQs, FAR Memorandum, and revised OMB determination are procurement "policies" and "procedures" that "relate to the expenditure of appropriated funds; have a significant effect beyond internal operating procedures; and impose a significant cost and administrative impact on contractors and offerors." (Doc. 134 at 56–57 ¶¶ 162–63.) They are therefore subject, Plaintiffs contend, to the procedural requirements of § 1707. And, because Defendants did not publish them in the Federal Register or otherwise waive the requirements of § 1707, Defendants did not comply with those requirements.

Defendants respond that the strictures of § 1707 do not apply either to exercises of delegated presidential authority like the revised OMB determination or to nonbinding guidance like the FAR Memorandum or SFWTF FAQs. (Doc. 108 at 23–26.) The Court will consider each argument in turn.

### i.     Revised OMB Determination

Whether the revised OMB determination must adhere to the procedures set forth in § 1707 is a novel question. On the one hand, the requirements of § 1707 apply only to "executive agencies." And the statutory definition of "executive agency" does not include the President. *See* 41 U.S.C. § 133; *see also Franklin*, 505 U.S. at 796. Thus, because Acting OMB Director Young issued her determination pursuant to a presidential delegation, the requirements of § 1707 may be inapplicable. *See supra* Section III.A.3 (discussing this issue in the context of judicial review under the APA). The Court, however, need not resolve the question whether § 1707 applies to the revised determination

because, even if it does, Acting Director Young properly invoked the § 1707(d) waiver provision. *See* 86 Fed. Reg. at 63,423–85.

There is precious little case law interpreting § 1707(d).[19] What qualifies as "urgent and compelling" in this context is not well established. Defendants argue that the Court should adopt the standard applied to the good cause exception to the APA's notice and comment procedures. (Doc. 108 at 25.) Under that standard, notice and comment are excused "in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). While Plaintiffs do not suggest an alternative standard, they insist that the circumstances presented here are not "urgent and compelling." (Doc. 72 at 21.) They give several reasons. First, Plaintiffs contend that no urgent and compelling circumstances exist here because "society's interest in slowing the spread of COVID-19 cannot qualify as compelling forever." (*Id.* at 21 (quoting *BST Holdings LLC v. OSHA*, 17 F.4th 604, 611 n.10 (5th Cir. 2021)).) Second, they argue that the revised determination's "assertion that a waiver is now urgent and compelling is facially senseless when the OMB, through the same document, delayed the mandate compliance date from December 8, 2021, to January 14, 2022." (Doc. 72 at 21.) In their view, "a purported 'emergency' that the entire globe has now endured for nearly two years, and which [the government] itself spent . . . months responding to" does not justify invocation of the urgent-and-compelling-circumstances exception. (*Id.* at 21–22.) And finally, Plaintiffs contend that because the revised determination was issued in bad faith, its explanation justifying invocation of § 1707(d) should therefore be disregarded. (*Id.* at 22.)

Plaintiffs' arguments are unavailing. First, though it is undoubtedly true that "society's interest in slowing the spread of COVID-19 cannot qualify as compelling forever," it remains compelling today. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. —, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest."); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th

---

[19] Westlaw, for instance, identifies only seventeen cases that cite § 1707. Of those, only five mention "urgent and compelling," three of which involve challenges to the Contractor Mandate.

1173, 1187 (9th Cir. 2021) (Ikuta, J., dissenting) (same); *see also Does 1–3 v. Mills*, 595 U.S. —, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting) ("I accept that what we said 11 months ago remains true today—that stemming the spread of COVID–19 qualifies as a compelling interest."); *Kentucky*, 2021 WL 5587446, at \*12 ("[T]he Court finds that the FAR Council Guidance and subsequent OMB Determination in this matter did not run afoul of the proper administrative procedures."). As the revised OMB determination states, "[t]his is a once in a generation pandemic, which has already resulted in more than 46,405,253 cases of COVID-19, hospitalized more than 3,283,045 Americans, and taken more than 752,196 American lives. The pandemic continues to present an imminent threat to the health and safety of the American people . . . ."[20] 86 Fed. Reg. at 63,423.

Second, the mere fact of the pandemic's duration does not render its resolution any less urgent or compelling. While it is true that "the entire globe has now endured [COVID-19] for nearly two years," the virus continues to claim American lives, and inhibiting its progress remains vitally important.

Finally, there is no merit to Plaintiffs' contention that the revised OMB determination was issued in bad faith. "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *See Dep't of Comm. v. New York*, 588 U.S. —, 139 S. Ct. 2551, 2573 (2019). A court may inquire into "the mental processes of administrative decisionmakers" only on a "strong showing of bad faith or improper behavior." *Id.* at 2573–74. No such showing has been made here. As evidence of bad faith, Plaintiffs state only that "OMB waited to submit the Second OMB Notice until just minutes before the start of this Court's hearing on Plaintiffs' previous TRO/PI motion." (Doc. 72 at 22.) This observation, without more, comes far short of the "strong showing" necessary to permit the Court to inquire into Defendants' subjective motivations (much less invalidate the revised determination on that basis). *See Missouri*, 142 S. Ct. at 654 ("[W]e cannot say that

---

[20] As of January 25, 2022, the virus had resulted in more than 70,641,725 reported cases and 864,203 deaths. *See* COVID Data Tracker, CDC, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Jan. 25, 2022).

1    in this instance the two months the agency took to prepare a 73-page rule constitutes 'delay'

2    inconsistent with the Secretary's finding of good cause.").

3         The Court is persuaded that "urgent and compelling circumstances" made

4    compliance with ordinary § 1707 procedures impracticable with respect to the revised

5    OMB determination.[21] Therefore, because the revised determination was published in the

6    Federal Register and "solicit[s] comment on all subjects of this determination," 86 Fed.

7    Reg. at 63,424, it complies with § 1707(e) and does not violate the Procurement Policy

8    Act.

9                              ii.      **FAR Memorandum**

10        Plaintiffs contend that the FAR Memorandum is subject to § 1707 and therefore

11   should have been published in the Federal Register and made available for public comment.

12   (Doc. 72 at 23–24.) Defendants respond that the FAR Memorandum is merely nonbinding

13   guidance and is therefore not a "procurement policy, regulation, procedure, or form"

14   subject to § 1707. (Doc. 108 at 26.) *See* 41 U.S.C. § 1707(a)(1).

15        The FAR Memorandum "provide[s] agencies that award contracts under the [FAR]

16   with initial direction for the incorporation of a clause into their solicitations and contracts

17   to implement guidance issued by the [SFWTF] pursuant to [EO 14042]." FAR

18   Memorandum at 1. The memorandum is not binding of its own force. Instead, it

19   "encourage[s]" agencies to use their independent authority to temporarily deviate from the

20   FAR and includes a sample vaccination clause that agencies may use in doing so. *Id.* at 3–

21   5. The memorandum does not compel agencies to take any specific action but rather

22   instructs contracting officers to adhere to "the direction[s] . . . issued by their respective

23   agencies" for implementing the memorandum's guidance. *Id.* at 2. Nor does the

24   memorandum provide the FAR Council's final guidance regarding COVID-19 safety

25   clauses. *See id.* at 3 ("The FAR Council has opened a case . . . to make appropriate

26   amendments in the FAR to reflect the requirements of [EO 14042]. Agencies are

27

28   _____

[21] Generally, courts are more willing to permit procedural exceptions where, as here, the challenged measure is temporary and subject to concurrent public comment. *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157–58 (D.C. Cir. 1981).

1    encouraged to make their deviations effective until the FAR is amended or the deviation is

2    otherwise rescinded by the agency."). The memorandum does not appear in the Code of

3    Federal Regulations or the FAR.

4           Thus, as Defendants note, "the [FAR Memorandum] binds no one unless and until

5    an agency exercises its own discretion to either revise the suggested clause or incorporate

6    the suggested clause into a procurement contract." (Doc. 108 at 26.) The memorandum is

7    therefore not a "procurement policy, regulation, procedure, or form" subject to § 1707.

8                          **iii.      Contractor FAQs**

9           Plaintiffs also contend that the Contractor FAQs are subject to § 1707. (Doc. 134 at

10   57 ¶¶ 164–66.) Plaintiffs are again mistaken. The Contractor FAQs, like the FAR

11   Memorandum, do not independently constitute a binding "policy, regulation, procedure, or

12   form." Rather, the FAQs take on legal force only upon the approval of the Acting OMB

13   Director. (Doc. 108 at 25 n.9.) Moreover, the Contractor FAQs, and the URL address at

14   which they may be found, are explicitly referenced in the revised OMB determination. 86

15   Fed. Reg. at 63,421. Thus, the determination also provides the public with notice of, and

16   the ability to comment on, the Contractor FAQs.

17                   **3.      Emergency Use Authorization Statute**

18          Vaccines—and other medical products—that have not yet been fully approved by

19   the FDA may be approved under an Emergency Use Authorization ("EUA") that is less

20   rigorous than the full approval process. The EUA procedure is set forth in 21 U.S.C.

21   § 360bbb-3. Plaintiffs submit (and the Court assumes, for present purposes) that the

22   vaccines available to federal contractor and subcontractor employees to satisfy the

23   Contractor Mandate are available only under EUAs and are therefore subject to the

24   requirements of 21 U.S.C. § 360bbb-3.[22] That Section provides, in relevant part:

25   _____

26   [22] Only the Pfizer Comirnaty vaccine has been fully approved by the FDA. The other two
     available COVID-19 vaccines—manufactured by Moderna and by Johnson & Johnson—

27   are not fully approved and are only available under EUAs. The Court will assume,
     *arguendo*, that Plaintiffs are correct that Pfizer's EUA and fully approved vaccines are

28   materially distinct, and that only Pfizer's EUA vaccine is currently available in the United
     States. (*See* Doc. 134 at 22 ¶¶ 67–68.) *But see* Vaccine Information Fact Sheet for
     Recipients     and     Caregivers     About     Comirnaty     (Oct.     29,     2021),

The Secretary [of Health and Human Services] may authorize the introduction . . . of a drug, device, or biological product intended for use in an actual or potential emergency . . . .

. . . .

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

. . . .

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed--

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3. Plaintiffs contend that this provision confers on contractor and subcontractor employees, as recipients of vaccines available under EUAs, "the right to accept or refuse administration of the vaccines." (Doc. 134 at 58 ¶ 169.) In Plaintiffs' view, then, because the Contractor Mandate deprives federal contractor and subcontractor employees of the right to refuse to be vaccinated against COVID-19, the mandate is unlawful. (*Id.* ¶¶ 170–71.)

The statute confers no substantive right to refuse a vaccine or other medical product approved under an EUA. At most, it requires only that "individuals to whom the [vaccine] is administered . . . are ***informed*** . . . of the option to accept or refuse administration of the

https://www.fda.gov/media/153716/download (stating that the EUA and fully approved vaccines "can be used interchangeably without presenting any safety or effectiveness concerns"); *Johnson v. Brown*, No. 3:21-cv-01494, — F. Supp. 3d —, 2021 WL 4846060, at *18 (D. Or. Oct. 18, 2021) ("[T]he August FDA [a]pproval of Pfizer-BioNTech's mRNA vaccine was for the chemically and biologically identical vaccine that . . . was given EUA by the FDA in the United States.").

- 45 -

product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii) (emphasis added). The statute is about the provision of information; as long as individuals receiving the vaccine are informed, the statutory requirement is met. *See Pelekai v. Hawaii*, No. 21-cv-00343, 2021 WL 4944804, at *6 n.9 (D. Haw. Oct. 22, 2021); *see generally* Department of Justice, Office of Legal Counsel, Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization, 45 Op. O.L.C. — (July 6, 2021), https://www.justice.gov/olc/file/1415446/download. Moreover, "as other courts have held, [the] conditions [in § 360bbb-3(e)] only relate to those who 'carr[y] out any activity for which the authorization is issued,' which are the medical providers who administer the vaccine, not those who issue vaccine mandates." *Johnson*, 2021 WL 4846060, at *18 (citing *Valdez v. Grisham*, No. 21-cv-783, — F. Supp. 3d —, 2021 WL 4145746, at *4 (D.N.M. Sept. 13, 2021)).

Finally, even if the statute could be read to confer an individual right to refuse administration of an emergency use vaccine, the Contractor Mandate does not abridge that right. A hard choice, for which there may be significant consequences, is still a choice. Contractor and subcontractor employees may choose "either get the vaccine, apply for an exception, or look for employment elsewhere." *Id.* Therefore, the Contractor Mandate does not violate § 360bbb-3.

#### 4.   Due Process Clause

Plaintiffs also bring a due process challenge to the Contractor Mandate. The Due Process Clause of the Fifth Amendment to the Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has held that the Clause includes both a substantive and a procedural component. *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Plaintiffs invoke substantive due process, which "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (internal citations and quotation marks omitted).

Substantive due process analysis "begin[s] with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). In so describing the right, courts should adopt a "narrow definition of the interest at stake," *Raich v. Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007), "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). *Glucksberg* provides a useful illustration of this principle. That case involved a substantive due process challenge to Washington's ban on assisted suicide. In defining the liberty interest at stake, the Supreme Court rejected the plaintiffs' suggestion that the interest was the "right to die," the "right to control of one's final days," or "the right to choose a humane, dignified death." *Id.* at 722. Instead, the Court held that the narrow question presented was whether "the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723.

Once the claimed right has been carefully defined, the court conducting the substantive due process analysis must then determine whether the right is "fundamental" in the sense that it is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Id.* at 720–21 (citations omitted). If the court determines that the right *is* fundamental, "substantive due process forbids the infringement of that right 'at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Witt v. Dep't of Air Force*, 527 F.3d 806, 817 (9th Cir. 2008) (quoting *Flores*, 507 U.S. at 301–02).

In applying these principles to the instant case, the Court concludes that Plaintiffs' claim fails. Plaintiffs contend that the Contractor Mandate violates contractor employees' fundamental "rights to bodily integrity and to refuse medical treatment." (Doc. 134 at 18 ¶¶ 57–58.) This definition of the alleged liberty interest at stake is far too broad. Properly construed, this case raises only the much narrower question whether there is a substantive due process right to refuse vaccination while an employee of a federal contractor. That question is easily answered in the negative. There is no such right, at least under prevailing Supreme Court precedent. *See Jacobson*, 197 U.S. 11 (holding that Massachusetts may

1    require all members of the public to be vaccinated against smallpox); *see also, e.g.*, *Prince*

2    *v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (citing *Jacobson* and holding that there is

3    no "freedom from compulsory vaccination"); *Zucht*, 260 U.S. at 176 (similar); *Klaassen v.*

4    *Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) (Easterbrook, J.) ("Given *Jacobson*[,]

5    . . . there can't be a constitutional problem with vaccination against [COVID-19]."

6    (citations omitted)); *Valdez*, 2021 WL 4145746, at *5 ("[F]ederal courts have consistently

7    held that vaccine mandates do not implicate a fundamental right and that rational basis

8    review therefore applies in determining the constitutionality of such mandates."); *Johnson*,

9    2021 WL 4846060, at *13 ("[T]he right to refuse vaccination is not a fundamental right."

10   (citation omitted)); *Dixon v. De Blasio*, No. 21-cv-05090, — F. Supp. 3d —, 2021 WL

11   4750187, at *8 (E.D.N.Y. Oct. 12, 2021) (same); *Klaassen v. Trs. of Ind. Univ.*, No. 1:21-

12   cv-00238, — F. Supp. 3d. —, 2021 WL 3073926, at *24 (N.D. Ind. July 18, 2021) (similar);

13   *Norris v. Stanley*, No. 1:21-cv-00756, — F. Supp. 3d —, 2021 WL 4738827, at *2 (W.D.

14   Mich. Oct. 8, 2021) (similar).

15         Plaintiffs' objections notwithstanding, *Jacobson* has never been overruled and

16   remains binding on this Court.[23] *See Klaassen*, 7 F.4th at 593 ("Plaintiffs assert that the

17   rational-basis standard used in *Jacobson* does not offer enough protection for their

18   interests[,] . . . but a court of appeals must apply the law established by the Supreme

19   Court."). The Contractor Mandate, then, must pass only rational basis review. *Heller v.*

20   *Doe*, 509 U.S. 312, 319–20 (1993). To do so, the mandate must merely be "rationally

21   related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

22   432, 440 (1985); *see also Heller*, 509 U.S. at 321 (under rational basis review, "a [measure]

23   is presumed constitutional, and the burden is on the one attacking the [measure] to negative

24   every conceivable basis which might support it." (internal citations and quotation marks

---

25

26   [23] Plaintiffs assert that *Jacobson* is inapposite because it only "address[ed] whether *States*
     have the power to impose vaccine mandates" and did not "consider[] the constitutionality
27   of the Federal government imposing such mandates . . . ." (Doc. 34 at 37.) Even if that were
     true, it does not bear on Plaintiffs' substantive due process claim, which involves the
28   question whether *individuals* have a fundamental constitutional right to refuse compulsory
     vaccination, irrespective of which unit of government (local, state, or federal) made the
     vaccination compulsory.

omitted)). It is. As has been mentioned, inhibiting the spread of COVID-19 is a legitimate interest. *See Roman Cath. Diocese*, 141 S. Ct. at 67. And requiring individuals to be vaccinated is rationally related to that interest. *See, e.g.*, *Williams v. Brown*, No. 6:21-cv-01332, — F. Supp. 3d —, 2021 WL 4894264, at *9 (D. Or. Oct. 19, 2021) ("[T]he Court has no trouble concluding that [Oregon's] vaccine mandates [requiring all employees and workers employed by the executive branch of the Oregon state government to be fully vaccinated] are rationally related to a legitimate state interest."); *see also Roman Cath. Diocese*, 141 S. Ct. at 63, 70 (Gorsuch, J., concurring) (describing *Jacobson* as applying rational basis review); *Heller*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept [the government's] generalizations even when there is an imperfect fit between means and ends."). Plaintiffs' substantive due process challenge therefore fails.

### 5.      Claims Against the City of Phoenix

Plaintiffs PLEA and Local 493 assert three claims against Defendant the City of Phoenix: violation of the Procurement Act; violation of the anticommandeering doctrine; and violation of Plaintiffs' due process rights to bodily integrity and to refuse medical treatment. (Doc. 128.) Plaintiffs bring these claims against the City "as a relief defendant only; they do not allege that Phoenix is liable under or has breached the duties alleged in Counts I, IV, or VI." (*Id.* at 2.) The Court will deny Plaintiffs' claims.

Although this action was initially filed on September 14, 2021, the City was not named as a Defendant until November 19, 2021. (Doc. 72.) Then, it was named as a Defendant because, on November 18, 2021, the City, citing the Contractor Mandate, notified its employees that they would be required to receive the COVID-19 vaccine by January 18, 2022 or face discipline, up to and including termination. (Doc. 134 at 34 ¶ 10.) The City has since suspended its vaccine requirement. (Doc. 123-1.) Thus, any claims against it are likely nonjusticiable. But even if the City's vaccination requirement were still in place, Plaintiffs' claims would necessarily fail.

Plaintiffs' claims against the City are based on a misunderstanding of the Declaratory Judgment Act., 28 U.S.C. § 2201. Although Plaintiffs are correct that a federal

court has jurisdiction under the Act where "the declaratory judgment defendant could have brought a coercive action in federal court to enforce its rights," *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997) (quoting *Janakes v. USPS*, 768 F.2d 1091, 1093 (9th Cir. 1985)), jurisdiction to *seek* a declaratory judgment in federal court does not mean that such a judgment will issue. Jurisdiction is necessary, but alone insufficient, for a court to grant declaratory relief. Plaintiffs must also demonstrate that they are entitled to substantive relief.

Plaintiffs have made no such showing here. Indeed, Plaintiffs have conceded that the City is not liable on the claims asserted against it.[24] (Doc. 128 at 2.) Those claims will therefore be denied, and no injunction will issue against the City.

### C.    Irreparable Harm

To obtain an injunction, Plaintiffs must also demonstrate that they have suffered or are likely to suffer irreparable harm in the absence of injunctive relief. *See eBay Inc.*, 547 U.S. at 391. Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Economic harm is not generally considered irreparable, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020), but where a party cannot recover the monetary damages flowing from its injury—as is often the case where the party challenges federal regulatory action—economic harm can be considered irreparable. *Id.* (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)); *see also City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 762 ("There is no dispute that . . . economic harm is sufficient to constitute irreparable harm because of the unavailability of monetary damages."); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and concurring in the judgment) ("[A] regulation later held invalid

---

[24] Even absent Plaintiffs' concession, their claims would fail. The City of Phoenix, obviously, is not a federal actor. It is therefore not subject to the strictures of the Procurement Act, which binds only federal actors, or the anticommandeering doctrine, which prevents the federal government, not local municipalities, from commandeering state governments. Thus, the City played no part in the enactment of the Contractor Mandate and plays no part in its enforcement. And, as described above, there is no due process right to refuse vaccination. *See supra* Section III.B.4.

almost *always* produces the irreparable harm of nonrecoverable compliance costs."). Intangible injuries may also qualify as irreparable harm because such injuries generally lack an adequate legal remedy. *Ariz. Dream Act Coal.*, 757 F.3d at 1068.

Given these principles, Plaintiffs are likely to suffer irreparable harm. First, because many Arizona agencies are federal contractors (as detailed above), Plaintiffs face the loss of significant federal contracts and funds if the Contractor Mandate is not enjoined. *See supra* Section III.A.1.ii. Second, were the State to adhere to the mandate and require its employees to be vaccinated, some employees would resign or be terminated, harming the State's operations through the loss of institutional knowledge and human capital, and requiring the State to incur significant recruitment, on-boarding, and training costs. Third, the State will incur significant compliance and monitoring costs should its agencies be required to adhere to the mandate. While these harms are primarily economic, they are not compensable through damages because Defendants are entitled to sovereign immunity.[25]

Moreover, because the Contractor Mandate conflicts with Arizona law, complying with the mandate would require the State to violate its own laws. *See supra* Section III.B.1. This infringement on Arizona's sovereign interests constitutes irreparable harm. *See Abbott v. Perez*, 585 U.S. —, 138 S. Ct. 2305, 2324 n.17 (2018) (a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm"); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Plaintiffs are therefore likely to suffer irreparable harm, and an injunction may lie.

### D.    Balance of Hardships and Public Interest

For an injunction to issue, Plaintiffs must also show that the balance of equities tips in their favor and that an injunction is in the public interest. *eBay Inc.*, 547 U.S. at 391. When the government is a party to the case, the balance of equities and public interest

---

[25] The APA, 5 U.S.C. § 702, waives sovereign immunity with respect to suits for injunctive relief but not suits for money damages. And, contrary to Defendants' assertions, the CDA does not provide an adequate remedy for Plaintiffs' injuries. *See supra* Section III.A.2.

1    factors merge. *See Doe #1 v. Trump*, 984 F.3d 848, 861–62 (9th Cir. 2020).

2         Defendants contend that enjoining the Contractor Mandate would disserve the

3    public interest because it would increase "the spread of COVID-19 among millions of

4    federal employees, federal contractors, and the members of the public with whom they

5    interact" and would "hamper[] the efficiency of the federal workforce and the contractors

6    on which the federal government depends." (Doc. 52 at 55–56.) These arguments are

7    unpersuasive.

8         Defendants have no legitimate interest in implementing or enforcing an unlawful

9    vaccination policy. The public interest is always served by maintaining our constitutional

10   structure, including through enforcing statutory limitations on the executive's exercise of

11   delegated authority. *See E. Bay Sanctuary Covenant*, 950 F.3d at 1281 ("[T]he public has

12   an interest in ensuring that the statutes enacted by their representatives are not imperiled

13   by executive fiat." (internal citations and quotation marks omitted)); *see also, e.g.*, *Gundy*,

14   139 S. Ct. at 2133 (Gorsuch, J., dissenting) ("[I]t would frustrate 'the system of government

15   ordained by the Constitution' if Congress could merely announce vague aspirations and

16   then assign others the responsibility of adopting legislation to realize its goals." (quoting

17   *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))). Thus, while Defendants are of

18   course correct that slowing the spread of the virus is in the public's interest, achieving that

19   objective through the unlawful means employed here is not. *See E. Bay Sanctuary*

20   *Covenant*, 950 F.3d at 1282 ("[T]he weight we ascribe to this factor depends on the extent

21   to which we agree that the [challenged executive branch policy] overrides plain

22   congressional intent."); *see also Kentucky*, 2021 WL 5587446, at *1 ("This is not a case

23   about whether vaccines are effective. They are. Nor is this a case about whether the

24   government, at some level, and in some circumstances, can require citizens to obtain

25   vaccines. It can."); *In re MCP No. 165*, 21 F.4th 357, 389 (6th Cir. 2021) (Larsen, J.,

26   dissenting) ("[Q]uestions of health science and policy lie beyond the judicial ken. . . . But

27   this case asks a legal question: whether Congress authorized the action the agency took.").

28        Despite Defendants' arguments to the contrary, issuing an injunction here would do

1   them little harm, since they retain the right to recommend vaccination among contractors

2   and to seek contractual remedies in the event a contractor fails to adequately perform on a

3   contract. *See Florida*, slip. op. at 37. Declining to issue an injunction, on the other hand,

4   would substantially harm the State, as it would be forced to either forfeit important

5   federal contracts or violate its own laws and policies. *See supra* Section III.B.1. Moreover,

6   because "the mere specter of the Mandate has contributed to untold economic upheaval in

7   recent months," stemming the "economic uncertainty" and "workplace strife" surrounding

8   the mandate is clearly in the public's interest. *BST Holdings*, 17 F.4th at 618.

9        Thus, the balance of the equities and the public interest weigh in favor of issuing

10  an injunction.

11  **IV.    SCOPE OF RELIEF**

12       Plaintiffs have adequately demonstrated that they are entitled to an injunction on the

13  Contractor Mandate. But before the injunction can issue, the Court must determine its

14  appropriate scope. Plaintiffs seek a nationwide injunction "because of the nationwide

15  scope of the mandates, and because of their systemic impact." (Doc. 72 at 25.) Defendants,

16  on the other hand, contend that any injunction "must be tailored to redress [the State's]

17  particular injury." (Doc. 108 at 27 (quoting *Gill v. Whitford*, 585 U.S. —, 138 S. Ct. 1916,

18  1934 (2018)).)

19       While the reasoning employed herein applies with equal force to the federal

20  government's dealings with contractors throughout the nation, history and prudence

21  counsel in favor of granting only a limited injunction. *See Hawaii*, 138 S. Ct. at 2424–29

22  (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter

23  universal injunctions. These injunctions did not emerge until a century and a half after the

24  founding. And they appear to be inconsistent with longstanding limits on equitable relief

25  and the power of Article III courts."). Universal injunctions "prevent[] legal questions from

26  percolating through the federal courts, encourag[e] forum shopping, and mak[e] every case

27  a national emergency for the courts and for the Executive Branch." *Id.* at 2425; *see also*

28  *DHS v. New York*, U.S. —, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("The

1   traditional system of lower courts issuing interlocutory relief limited to the parties at
2   hand . . . encourages multiple judges and multiple circuits to weigh in only after careful
3   deliberation, a process that permits the airing of competing views that aids this Court's own
4   decisionmaking process.").

5          Equitable remedies should redress only the injuries sustained by a particular plaintiff
6   in a particular case. *See DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring). This narrow
7   understanding of the district courts' equitable power is consistent with the courts'
8   longstanding view that the judicial power is limited to the resolution of individual cases
9   and controversies. *See* U.S. Const. art. III, § 2; *see also Hawaii*, 138 S. Ct. at 2427–28
10  (Thomas, J., concurring) (citing sources).

11         Consistent with these principles, the Court will issue an injunction limited to the
12  geographic boundaries of the State of Arizona.

13  **V.    CONCLUSION**

14         The Court has jurisdiction to adjudicate Plaintiffs' claims challenging the
15  Contractor Mandate but lacks jurisdiction over Plaintiffs' claims challenging the
16  Employee Mandate. The Contractor Mandate exceeds the scope of the President's
17  authority under the Procurement Act. The Court will therefore issue an order enjoining
18  the federal Defendants, but not the City of Phoenix, from enforcing the Contractor
19  Mandate. There being no just reason for delay, *see* Fed. R. Civ. P. 54(b), the Court will
20  enter judgment on the Vaccine Counts upon entering a permanent injunction, in a
21  subsequent order. The Immigration Counts remain pending.

22         Accordingly,

23         **IT IS ORDERED** granting Plaintiffs' Motion to Bifurcate Claims and Consolidate
24  Trial on the Merits (Doc. 73).

25         **IT IS FURTHER ORDERED** granting in part, and denying in part, Plaintiffs'
26  Motion for Preliminary Injunction (Doc. 72), as set forth herein.

27         **IT IS FURTHER ORDERED** that consistent with the terms of this Order,
28  Plaintiffs the State of Arizona and Arizona Attorney General Mark Brnovich shall submit

a proposed form of injunction by no later than **Tuesday, February 1, 2022**. The proposed form of injunction shall detail the individuals and entities that are enjoined, the capacity in which they are enjoined, and the precise activities they are enjoined from engaging in. The proposed injunction must be specific enough to give Defendants notice as to exactly what comes within its scope.

      **IT IS FINALLY ORDERED** that Defendants may submit objections to Plaintiffs' proposed form of injunction by no later than **Monday, February 7, 2022**. The objections shall not repeat merits arguments and shall be limited to arguments that Plaintiffs' proposed form of injunction is inconsistent with the terms of this Order.

      Dated this 27th day of January, 2022.

Michael T. Liburdi
United States District Judge