1  BRIAN M. BOYNTON
   Principal Deputy Assistant Attorney General
2  Civil Division
   WILLIAM C. PEACHEY
3  Director
   Office of Immigration Litigation
4  District Court Section
   EREZ REUVENI
5
   Assistant Director
6  ELISSA FUDIM
7  Trial Attorney
   P.O. Box 868, Ben Franklin Station
8  Washington, D.C. 20044
   Tel.: (202) 598-6073
9  Email: elissa.p.fudim@usdoj.gov
10
11
12 *Attorneys for Defendants*
13
14              **UNITED STATES DISTRICT COURT**
15                **DISTRICT OF ARIZONA**
16     _____
17 MARK BRNOVICH, in his official capacity
   as Attorney General of Arizona, *et. al*,
18
                *Plaintiffs*,
19
20 v.
21
22 JOSEPH R. BIDEN, in his official capacity    Civil Action No. 2:21-CV-1568-MTL
   as President of the United States, *et. al*
23
              *Defendants*.
24
25 _____
26          __REPLY MEMORANDUM IN SUPPORT__
27             __OF DEFENDANTS' MOTION__
              __TO DISMISS THE COMPLAINT__
28

This Court should dismiss Plaintiff's Third Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiff lacks standing, the Immigration and Naturalization Act (INA) bars review, and Plaintiff has failed to state a claim. Plaintiff's opposition fails to sufficiently address these shortcomings.

I.    Arizona's Challenge to the Issuance of Notices to Report is Moot.

Plaintiff's challenge to the issuance of Notices to Report (NTRs) is moot because the policy directing their use has been discontinued and superseded by a new policy (Parole + ATD). *See* Defendants' Motion, ECF No. 146, (Defs' Mot.) at 5. Plaintiff argues, however, that the new Parole + ATD policy has a similar effect as the former policy, such that the challenge to the use of NTRs is not moot. *See* Plaintiff's Opposition, ECF No. 167 (Pl. Opp.) at 3-5. Whether the policies have a similar effect, however, is irrelevant because the policy authorizing the use of NTRs has been superseded. Because there is no relief that this Court can order with regard to the NTR policy, Plaintiff's claims 9-13, to the extent they are based on the use of NTRs, should be dismissed. Alternatively, Plaintiff should amend its complaint to address the current policy.

II.    Plaintiff Lacks Standing.

Plaintiff lacks standing to bring this lawsuit because it cannot articulate any actual or imminent injury. *See* Defs' Mot. at 5-7. Further, it has not established that any alleged injury is traceable to Defendants. *Id*. at 6-7. Plaintiff's arguments to the contrary are unpersuasive.

Plaintiff contends it has identified three bases for standing: (i) increased costs from incarcerating noncitizens, (ii) increased law enforcement costs from the pursuit of noncitizens, and (iii) increased costs of emergency medical services to noncitizens. Pl. Opp. at 13. Plaintiff does not specify, however, which of these alleged injuries derive from Defendants' now-discontinued use of NTRs, and which derive from Defendants' alleged parole policies. *See generally* Pl. Opp. and Plaintiff's Third Amended Complaint ("TAC"). For this reason alone, Plaintiff has not met its burden to establish standing. *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) ("A plaintiff must demonstrate

standing for each claim [it] seeks to press and for each form of relief sought.") (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

Furthermore, standing is substantially more difficult to establish when the challenged government action does not require or forbid any action on the part of the plaintiff. *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1254 (9th Cir. 2010) (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493-94 (2009)); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021)*.* Yet, Plaintiff argues that because its claims are procedural under the APA, and it is entitled, as a state, to "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), the standing inquiry is "double relaxed"—such that the generalized harms it alleges confer standing. Pl. Opp. at 14-15. Not so. Although states sometimes may receive "special solicitude in [the] standing analysis" to assert procedural rights and protect "quasi-sovereign interests," that does not obviate Arizona's burden to establish each element of standing. *Massachusetts*, 549 U.S. at 520; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (holding a plaintiff asserting "procedural injury" could not establish injury-in-fact absent a distinct "concrete injury"); *see also Arizona v. Dep't of Homeland Sec.*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *6 (D. Ariz. June 30, 2021) (noting states subject to "regular inquiry"). Additionally, a "claim of procedural injury does not relieve Plaintiff[] of [its] burden—even if relaxed—to demonstrate causation and redressability," *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021) (citing *Arpaio v. Obama,* 797 F.3d 11, 21 (D.C. Cir. 2015)). Plaintiff does not satisfy that burden here.

### A.  Plaintiff Lacks Standing Because It Alleges a Generalized Injury.

Plaintiff lacks standing because merely alleging that a particular policy increases immigration, in turn requiring the state to spend money on social benefits, does not confer Article III standing. *See* Defs' Mot. at 7 (citing *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (2015) (a state does not suffer a cognizable injury when "a federal government program is anticipated to produce an increase in that state's

population and a concomitant increase in the need for the state's resources."). Plaintiff tries to distinguish *Arpaio* on the grounds that it was relying on an inducement theory, whereas "the State here is alleging that Defendants are directly releasing immigrants into the United States." Pl. Opp. at 15. Plaintiff's argument suffers numerous flaws.

The *Arpaio* plaintiff's standing argument was not based solely on an inducement theory. The plaintiff, the sheriff of Maricopa County, contended that the defendants' Deferred Action for Childhood Arrivals (DACA) and the Deferred Action for Parents of Americans (DAPA) programs caused injury—increased law enforcement costs—both directly because the government was declining to deport individuals who were already present in the county, and indirectly based on an allegation that DACA and DAPA induced illegal immigration. *Arpaio*, 797 F.3d at 167. The district court found that the plaintiff lacked standing because his alleged injury was both speculative, and because it was a generalized grievance. *Arpaio*, 27 F. Supp. 3d at 202. The Court of Appeals affirmed, finding that the plaintiff's alleged injury was speculative without addressing the generalized grievance basis for dismissal. *Arpaio*, 797 F.3d at 167-168. Similarly here— and contrary to Arizona's claim otherwise (Pl. Opp. at 15)—Plaintiff alleges its noncitizen population is increasing both because Defendants are directly paroling noncitizens into the country and because Defendants' policies are encouraging illegal immigration. *See, e.g.,* TAC at ¶ 147 ("Defendants' actions encourage a greater influx of unauthorized aliens into Arizona"), ¶ 148 ("Defendants' [] use of parole to allow hundreds of thousands of aliens to enter the United States, necessarily increases the number of unlawfully present aliens in Arizona"). Thus, contrary to Plaintiff's contention, *Arpaio* is on all fours with this case. Nor does *Arpaio* stand alone. *Lance v. Coffman,* 549 U.S. 437, 439 (2007) (*per curiam*) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree.").

B. *Plaintiff Lacks Standing Because Its Harms Are Speculative And It Cannot Establish Causation.*

Plaintiff's theory of standing depends upon multiple layers of speculation. First, Plaintiff assumes that noncitizens paroled into the country, and noncitizens allegedly

induced to cross the border illegally, are settling in large numbers in Arizona. Plaintiff has not pleaded any facts to support this allegation. In fact, Plaintiff admits it has no data to support this contention. Pl. Opp. at 17 ("Defendants do not break down alien release numbers by state, but there can be little doubt that thousands of aliens are being released into Arizona."). In so doing, Plaintiff fails to meet the burden it bears to establish each link in the causal chain. *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) ("the States must make a clear showing of each element of standing") (cleaned up).

Second, Plaintiff speculates that Defendant' parole practices have caused an increase in law enforcement and incarceration costs in Arizona. That argument also fails. To the extent that Plaintiff's theory of harm with respect to increased law enforcement and incarceration expenses is based *not* on a theory that these noncitizens are violating state criminal laws, but instead on the theory that Arizona is incurring enforcement and incarceration costs associated with "the pursuit of suspected unauthorized aliens" (TAC at ¶ 147)—that claim is problematic in two respects. As an initial matter, a state cannot "arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona v. United States*, 567 U.S. 387, 410 (2012). Next, even if Plaintiff meant to suggest that it pursues suspected unauthorized noncitizens at the behest of the federal government, its claim that it suffers an injury from increased law enforcement and incarceration costs makes no sense. The gravamen of Plaintiff's complaint is that Defendants are paroling too many noncitizens into the country. (Indeed, Plaintiff strangely claims in its opposition that it is not basing its standing argument on the contention that Defendant's policies are increasing illegal immigration). But noncitizens paroled into the country are not deportable on that basis—that is, they would not be subject to arrest and incarceration, at the federal government's behest or otherwise.

To the extent that Plaintiff's argument is that Defendant' parole practices have caused an increase in the immigrant population in Arizona, which in turn has caused an increase in law enforcement and incarceration costs in the state, this speculative argument has been soundly rejected. In *Arpaio*, the Court observed that even if DACA and DAPA

increase unlawful immigration, one cannot infer that the policies increase crime because "crime is notoriously difficult to predict." *Arpaio*, 797 F.3d at 22. "Crime rates are affected by numerous factors, such as the local economy, population density, access to jobs, education, and housing, and public policies that directly and indirectly affect the crime rate." *Id*. Thus, the Court concluded, "it is pure speculation whether an increase in unlawful immigration would result in an increase" in crime, and "where predictions are so uncertain, we are prohibited from finding standing." *Id*.; *see also Whitewater*, 5 F.4d at 1015 ("the attenuation in this chain of reasoning, unsupported by well-pleaded facts, is worthy of Rube Goldberg").

Third, to the extent Plaintiff is alleging that Defendants' parole policies cause illegal immigration (which Plaintiff alleges in the TAC but appears to disavow in its opposition, *see* Pl. Opp. at 15), Plaintiff's contention is entirely speculative. Plaintiff does not set forth any facts in its complaint to support this notion. *See generally* TAC. Instead, in its opposition, Plaintiff makes the more general claim that "[t]he laxer the enforcement, the greater the incentive to illegally immigrate." Pl. Opp. at 14. To support this assertion, Plaintiff cites to the declaration of Mark Lamb, the sheriff in Pinal County, Arizona, filed in another lawsuit pending in this district. *Id*.

Plaintiff's reliance on the declaration is problematic for several reasons. First, although Plaintiff claims it can cite to public materials outside the complaint because Defendants did so (Pl. Opp. at 14, FN 6), Plaintiff overlooks that it bears the burden to plead its allegations in the complaint. *Arpaio*, 797 F.3d at 21 ("[A]ssertions contained only in the briefs may not be used to expand the allegations of the complaint.") (citation omitted). Second, Sheriff Lamb's statement was submitted in a different case and concerned a different policy; it did not concern Defendants' alleged parole policies.[1] *See*

---

[1] Sheriff Lamb, wrote "[I]n my professional opinion, the increase in incidents, and therefore increase in costs, my office is experiencing is at least in part directly related to announced changes in federal border enforcement and alien removal policies. A pause or significant decrease in ICE removals will serve to incentivize individuals to illegally cross the border into Arizona, because among other things it removes one of the chief consequences that deters such action." *Arizona v. DHS*, No. CV-21-00186-PHX-SRB, ECF

*Whitewater*, 5 F.4d at 1015 (holding the plaintiff cannot establish causation sufficient for standing by proffering an expert affidavit that contains conclusions without specific factual support tied to the policy being challenged.) Third, Sheriff Lamb provides only a lay opinion as to the cause of illegal immigration, and has not been proffered as an expert. Further, his opinion, like Sheriff Arpaio's, ignores the "myriad economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States." *Whitewater Draw*, 5 F.4th at 1015 (cleaned up).[2]

Plaintiff's allegation that it suffers injury by incurring the cost of providing medical services to noncitizens similarly fails. The fundamental problem is that Plaintiff has not shown that Defendants' parole policies increase the noncitizen populations in its state. *cf. Arpaio*, 797 F.3d at 15. However, even if it did, Plaintiff's theory rests on an extremely speculative causal chain. Medical expenses, if they occur, would be the result of a series of events wholly unrelated to Defendants' parole policies, including noncitizens needing medical care, not paying for that care, healthcare providers requesting the states pay, and the states in fact paying without federal Medicare or Medicaid reimbursement. Plaintiff argues that a state may assert injuries based on "the predictable effect of Government action on the decisions of third parties." Pl. Opp. at 13 (citing *Dept. of Commerce v. N.Y.*, 139 S. Ct. 2551, 2565–66 (2019)). But because the effect of Defendants' alleged parole policies on noncitizens' decisions to seek medical care is far from predictable, Arizona cannot demonstrate standing. *See Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009) (when injury turns on third parties' actions, a plaintiff must show that the conduct has a "determinative or coercive effect upon the action of someone else").

Plaintiff similarly fails to sufficiently support its contention that Defendants' now-discontinued use of NTRs caused it any injury. Although Plaintiff claims that nearly thirty

---

17, Ex. N ¶ 8 (D. Ariz. March 12, 2021).

[2] And, because a panoply of factors may contribute to unlawful immigration, Plaintiff cannot establish redressability. *Glanton ex. Rel ALCOA Prescrip. Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) ("There is no redressability, and thus no standing, where [] any prospective benefits depend on an ... actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict.")

percent of noncitizens issued NTRs absconded into the country (Pl. Opp. at 22), Plaintiff does not explain how the allegation confers standing. Plaintiff has not alleged facts to show that even if true, any absconders settled in Arizona, committed crimes in Arizona, went to hospitals in Arizona, or refused to pay for their care. Even if Plaintiff had alleged such facts, more critically, Plaintiff has not alleged any facts to show that the use of an NTR, rather than an NTA, meaningfully affected a noncitizen's decision to abscond, or subsequently commit a crime or seek medical care. Where causation and redressability hinge upon the choices of third parties, Plaintiff must adduce facts to show that those choices will be made in such a manner that will produce causation and permit redressability of the harm. "*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562). Plaintiff has not done so here.[3]

Instead, Plaintiff speculates that several actions by Defendants—from defendants' temporary use of NTRs, Defendants' subsequent use of Parole + ATD (which is not even alleged in the complaint), and Defendants' use of parole in lieu of either detention or contiguous territory return authority—cause generalized injuries. This court has already rejected standing based on similar conjecture. *See Arizona v. Mayorkas*, 21-CV-00617, ECF No. 47 (*Arizona II*).

In *Arizona II,* Arizona sued several federal agencies and officials for implementing "the Population Augmentation Program," which it claimed increased Arizona's population via immigration. *Id*. at ECF No. 13, ¶¶ 1-12, 33, 61-65. In a separate cause of action,

---

[3] Plaintiff's reliance upon *Arizona v. DHS*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930 (D. Ariz. June 30, 2021) (*Arizona I*) does not help them. In *Arizona I*, Arizona and Montana sued various federal agencies challenging guidance issued to ICE on the removal priorities. *Id*. at *2. The states claimed they suffered harm in the way of the cost of (1) community supervision of noncitizens released from prison with criminal convictions; (2) providing emergency medical care to noncitizens; and (3) providing education to unremoved noncitizens. *Id*. at *6. Although the Court found that the states had standing to sue based on the costs incurred supervising noncitizens who had committed crimes and were released, or about to be released, into the states instead of detained, *id*., the court did so because of the specificity of the allegations alleged by the states. The states identified individuals who were released instead of deported and quantified the costs of their supervision. *Id*. By contrast, here, Plaintiff has not alleged any facts to take their allegations from speculative to concrete.

Arizona challenged Defendants' termination of work on the border wall, which it claimed resulted in a substantial increase in illegal entries by noncitizens. *Id.*, ECF 13 ¶¶ 78, 85, 89. This court rejected Arizona's argument that its alleged environmental and economic injuries, including emergency health care costs and costs associated with law enforcement, conferred standing. 21-CV-617, ECF 47 at 14. This court held that the APA does not authorize the amalgamation of discrete actions to provide standing to challenge it as a "program." *Id.* at 9. This same logic applies, as Plaintiff here has amassed together several claims, including Defendants' discontinued use of NTRs, Parole + ATD, and the release of noncitizens on parole, to claim generalized injuries without proof of traceability or redressability.

Plaintiff's claim that Defendants' alleged policies induce illegal immigration is similarly speculative. As in *Arizona II*, Plaintiff's "chain of reasoning" is marred by attenuation and ignores other economic, social, and political factors that might influence a noncitizen to risk life and limb and enter the United States illegally. *Id.* at 18. Because Plaintiff's claim of injury is more attenuated than in *Arizona II*, Plaintiff's complaint should be dismissed for lack of standing.

III.   Plaintiff's Claims are Not Reviewable Under the APA.

A. *The Actions Plaintiff Challenge are Subject to Agency Discretion.*

Law enforcement decisions—including the prioritization of scarce resources, deciding when and whether to pursue removal, and whether to release noncitizens on parole—are subject to agency discretion and are thus not reviewable. *See* Defs' Mot. at 8-12; 5 U.S.C. § 701(a)(2). Yet, Plaintiff argues that that the "commands" of sections 1225(b) and 1182(d)(5)(A), "necessarily preclude the existence of agency discretion[.]" Pl. Opp. at 6-7. Plaintiff's argument is without merit. The text of section 1182, and its particular use of "may," is plainly discretionary. Defs. Mot. at 11. Further, both case precedent and section 1225(b)'s legislative history makes clear that section 1225 does not eliminate executive enforcement discretion. *See infra* 14-16.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     *B.  Sections 1225(b) and 1182(d)(5) Provide No Standard Against Which to Judge the Exercise of Discretion.*

Plaintiff alternatively contends that even if the Government retains some law enforcement discretion, sections 1225(b)(2) and 1182(d)(5)(A) provide "meaningful standard[s] against which to judge the agency's exercise of discretion." Pl. Opp. at 6-9 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Plaintiff's reliance on two Supreme Court cases does not advance Plaintiff's claims. *See* Pl. Opp. at 7-8 (citing *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015), and *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018)). As a preliminary matter, neither case concerns a law enforcement statute, and are therefore inapposite to *Town of Castle Rock*, in which the Supreme Court explained that "seemingly mandatory legislative commands" do not displace "the deep-rooted nature of law enforcement discretion." *Id.*, 545 U.S. 748, 761 (2005). Further, the statutes at issue in both referenced cases set forth specific actions the agency must take and certain factors the agency must consider. Section 1182(d)(5), by contrast, does not address what factors constitute "urgent humanitarian reasons" or "significant public interest." And, contrary to Plaintiff's contention, section 1225(b)'s "shall be detained" language cannot provide a standard by which to judge Defendants' parole decisions under section 1182(d)(5), because section 1225(b) does not limit or condition discretionary release on parole. Indeed, Congress *required* that noncitizens first fall within the scope of section 1225(b) in order to qualify for section 1182 parole at all. *See* 8 U.S.C. § 1182(d)(5)(A) (parole only available to "alien[s] applying for admission"). Nor can section 1182(d)(5)(A) provide a meaningful standard based on its requirement that parole be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," because Congress never defined those terms, leaving them to the agency's policy judgments. *Cf. Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (barring "judicial review [of] those controversies which revolve around policy choices and

1  value determinations constitutionally committed for resolution to the halls of Congress or
2  the confines of the Executive Branch").

3      *C. Heckler Applies.*

4      In *Heckler v. Chaney*, 470 U.S. 821 (1985) the Supreme Court set forth the
5  traditional presumption against reviewability for non-enforcement actions. Plaintiff argues
6  *Heckler* does not apply here because it challenges a general policy rather than individual
7  enforcement decisions, and because sections 1225(b) and 1182(d)(5) "provide sufficient
8  'guidelines' for judicial review." Pl. Opp. at 9-13. Plaintiff's argument fails for three
9  separate reasons.

10      First, there are no "broad non-enforcement policies" governing parole at issue here.[4]
11  Plaintiff has not identified any "non-detention policy," but rather a series of individual
12  parole decisions to which it objects as a matter of policy. Indeed, the actual statute and
13  regulation that comprise the *written* "policies" governing parole, authorize releases, case-
14  by-case, without limitations. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. 212.5(b). Further, the
15  Parole + ATD guidance—which Plaintiff does not challenge in the TAC—likewise does
16  not constitute a non-enforcement policy. Rather, it *adds additional enforcement criteria*
17  that must be met prior to a noncitizen's release. In addition to the pre-existing case-by-case
18  statutory requirements, there must be lengthy time in custody and detention near capacity
19  to permit use of Parole + ATD in a sector. *See* Ex. A to Defs' Mot.

20      Second, Plaintiff's gloss on *Heckler* is incorrect. *Heckler* was not confined to a
21  single non-enforcement decision, but rather concerned the FDA's broad programmatic
22  refusal to undertake national enforcement initiatives. *See* 470 U.S. at 824. Under *Heckler*,
23  the non-reviewability presumption applies to aggregated non-enforcement actions as much
24  as single non-enforcement decisions.[5]

---

26  [4] The non-enforcement decisions at issue concern the government's discretion not to
enforce the provisions for removal and detention in section 1225(b). Such discretion is
27  necessitated by the "sheer physical impossibility," among other factors, of detaining all
noncitizens subject to Section 1225(b). *See Castle Rock*, 545 U.S. at 760.

28  [5] Plaintiff's reliance on *ILWU v. Meese*, 891 F.2d 1374, 1378 (9th Cir. 1989), and *Nat'l*

1   Third, contrary to Plaintiff's contention, neither sections 1225(b) nor 1182(d)(5)

2   contain "statutory language which suppl[ies] sufficient standards to rebut the presumption

3   of unreviewability."   The terms "urgent humanitarian reasons" and "significant public

4   interest" are not defined in section 1182(d)(5), and they are inherently subjective terms.

5   *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1214 (D.N.M. 2020) ("[8 U.S.C. §

6   1182(d)(5)(A)] grants the Attorney General the discretion to parole asylum seekers for

7   'significant public benefit.' [] This vague standard conceivably encompasses a wide range

8   of public benefits, such as conserving resources otherwise spent on housing asylum seekers

9   or allowing an individual to carry on their employment in the United States.").[6]

10   Finally, Plaintiff's hypothetical analogy to the Bureau of Prisons refusing to carry

11   out sentences for "federal securities fraud crimes on policy/political grounds" is wholly

12   inapt. Pl. Opp. at 13. There is no refusal to follow a statute based on "policy/political

13   grounds" at issue here. Even if Plaintiff disagrees with the number of noncitizens released

14   on parole, Plaintiff fails to identify any grant of parole not based on urgent humanitarian

15   reasons or significant public interest, in violation of section 1182(d)(5)(A). And while

16   *Wildlife Fed'n v. EPA*, 980 F.2d 765, 773 (D.C. Cir. 1992), is misplaced. The plaintiffs in

17   those cases challenged an "advisory opinion defining" a statutory term and the agency's "declared policy that it lacks jurisdiction over" activities at issue, *ILWU*, 891 F.2d at 1378,

18   and "a regulation promulgated by the" EPA allowing it "discretion to refuse to initiate proceedings to withdraw a state's primary enforcement responsibility" for national drinking water standards, *Nat'l Wildlife Fed'n*, 980 F.2d at 767. Those cases thus found

19   APA review over affirmative agency rulemaking and binding declarations of legal rights and obligations, not, as Plaintiff challenges here, aggregated individual non-enforcement

20   decisions and guidelines for case-by-case application of heightened parole procedures.

21   [6] Additionally, this case is not similar to *Dunlop v. Bachowski* as Plaintiff claims. Pl. Opp. at 11, citing, *Dunlop*, 421 U.S. 560, 560 (1975). In *Dunlop*, the statute at issue required the

22   Secretary of Labor to bring suit if his investigation "find[s] probable cause to believe [that] a violation … has occurred[.]" *Id*. at 562. The Dunlap Court thus concluded, as Plaintiff

23   points out, that "[t]he statute being administered quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." Pl. Opp. at 12,

24   citing *Dunlop*, 421 U.S. at 834. But contrary to Plaintiff's contention, the statute at issue in *Dunlop* is not comparable to the statutes at issue here. The statute at issue in *Dunlop*

25   provided a standard against which to review the Secretary's compliance because "probable cause" is a legal standard with a long-established defined meaning. *See, e.g.*, *Rodis v. City,*

26   *Cty. of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009). By contrast, "humanitarian reasons" and "public interest," 8 U.S.C. § 1182(d)(5)(A) are subjective terms, which

27   Congress never defined.

28

Parole + ATD adds the additional criterion of detention availability into the case-by-case determination to release eligible noncitizens on Parole + ATD, that criterion is not akin to a "policy/political" view, but rather to the considerations of "insufficient resources" and "sheer physical impossibility" that, among other factors, necessitate the availability of non-enforcement discretion co-existent with "shall" charge or detain commands in statutes. *See Castle Rock*, 545 U.S. at 760 (quotation omitted). The parole actions challenged here are committed to agency discretion and unreviewable under the APA.

D. *Section 1252(a)(2)(B)(ii) Precludes Review of Plaintiff's Claims.*

Section 1252(a)(2)(B)(ii) also precludes review of Plaintiff's claims. *See* Defs' Mot. at 15. Plaintiff argues it is not challenging any individual decision to release noncitizens on parole, but rather a "programmatic shift in application of the parole statute." Pl. Opp. at 16 (citing *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 503 (9th Cir. 2018), *rev'd in part on other grounds,* 140 S. Ct. 1891 (2020)). Plaintiff's reliance on *Regents* is misplaced. First, the *Regents* Court did not undertake any analysis under section 1252(a)(2)(B)(ii); it was in the context of section 1252(g) that the Court discussed the Government's "programmatic shift" in policy. Moreover, the question in *Regents* was the reviewability of DHS's termination of the DACA program, which was a "programmatic shift" in policy, affecting all current and future DACA recipients. *Id.* Here, by contrast, Plaintiff challenges an amalgam of individual parole decisions in an attempt to establish a de facto policy.[7] *Regents* is not "exactly this case," as Plaintiff claims. Pl. Opp. at 16.

IV.   Plaintiff Has Failed to State a Claim.

A. *Counts 9 and 12 Should be Dismissed.*

Defendants' parole practices do not violate the detention mandates of section 1225(b) or the parole provisions of section 1182(d)(5)(A). *See* Defs' Mot. at 18-24. In opposition, Plaintiff relies heavily upon the Fifth Circuit's decision in *Texas v. Biden*, 20

---

[7] Because the court lacks jurisdiction to review individual determinations by the Secretary that parole is warranted, the court also lacks jurisdiction over any challenge to a parole policy or procedure. Defs' Mot. at 15.

F.4th 928, 942 (5th Cir. 2021), in support of its argument that Congress created "a de facto mandatory detention regime" when it amended section 1225(b). Pl. Opp. at 20-21. *Texas* does not apply here, however, because Defendants are not releasing noncitizens "en masse." Further, the *Texas* holding was flawed in multiple respects, as are Plaintiff's arguments here.[8]

In support of its argument that section 1225(b) mandates detention for "all noncitizens awaiting adjudication of their asylum claims," Pl. Opp. at 24, Plaintiff relies upon *Jennings v. Rodriguez*. Pl. Opp. at 19. But *Jennings* did not resolve the extent to which section 1225(b)(2)(A) leaves discretion to parole to DHS, as the Court referred to that provision alternatively as both "mandat[ing] detention," *id.* at 842, 844, 845, and "authoriz[ing] detention until the end of applicable proceedings." *See id.* at 835-38. These alternative descriptions are unsurprising given that the question before the Court was whether noncitizens have a statutory right to periodic bond hearings under section 1225, rather than whether section 1225(b)(2)(A) "authorizes" or "mandates" detention. *Id.* at 842. The Court thus had no occasion to consider how DHS should implement section 1225(b)(2)(A) when it cannot detain all inadmissible applicants for admission due to lack of appropriations from Congress.

Beyond *Jennings*, Plaintiff argues that the plain text of section 1225(b)(2)(A) mandates detention of virtually all noncitizens awaiting asylum hearings, as does its legislative history. Pl. Opp. at 24-29. Plaintiff is incorrect. Plaintiff argues that, "[t]he plain text of Section 1225(b) [] creates an unequivocal obligation to detain aliens awaiting adjudication of their asylum claim" and is "impervious to administrative discretion." *Id*. In support of this "plain text" argument, Plaintiff relies upon various dictionary definitions of the word "shall," and two cases, *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389 (2008)[9] and

---

[8] The Supreme Court has granted certiorari. *Biden v. Texas*, No. 21-954, 2022 WL 497412, at *1 (U.S. Feb. 18, 2022).

[9] In *Holowecki*, the Court was tasked with interpreting the meaning of the word "charge" as used in the Age Discrimination and Employment Act. The Court acknowledged that often words mean what they seem—and noted, as an example, in a parenthetical, that

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)[10]. Pl. Opp. at 24. Neither of these cases support Plaintiff's position.

Critically, neither case involved a law enforcement statute, and neither case presented occasion to apply *Town of Castle Rock*—where the Supreme Court held that "seemingly mandatory legislative commands" do not displace "the deep-rooted nature of law enforcement discretion." *Id.*, 545 U.S. at 761. Thus, the Court will not construe a provision stating that law enforcement "shall" take some action as a "true mandate," absent "some stronger indication from the…Legislature." *Id.* (citation omitted). *See* Defs' Mot. at 9-10. Plaintiff ignores *Castle Rock* and the other cases Defendants cites for this proposition. *See generally* Pl. Opp. Instead, Plaintiff argues that even if there were ambiguity in the meaning of the word "shall" as used in section 1225(b), the statute's legislative history establishes that Congress intended "shall" to mean "must". Pl. Opp. at 24. Plaintiff is incorrect.

Plaintiff argues that because Congress, with the passage of IIRIRA in 1996, "replaced language that granted broad discretion about whether to detain with strict, unequivocal commands that aliens 'shall be detained,'" Congress's intent was clear. Pl. Opp. at 27. This argument is unpersuasive. In developing IIRIRA, Congress was well aware of the Executive Branch's lack of capacity to detain every applicant for admission in removal proceedings. *See* Exhibit B to Defs' Mot., Memorandum from Gene McNary, INS Comm'r, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992) at 1 (explaining that INS "has limited detention space" and that by adopting the parole project it would "be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space."); *and compare e.g.*, Senate Report No. 249, 104th Cong.

---

"shall" usually implies the intent to impose discretionless obligations—but nonetheless, courts should not accept the plainest meaning of a word if it "is in considerable tension with the structure and purposes of the [statute]". 552 U.S. at 401.

[10] In *Lexecon*, the Court observed that "shall" normally creates an obligation. 523 U.S. at 35. Even if true, normally is not the same as always.

2d Sess. 3 (Apr. 10, 1996) (Senate Report) (acknowledging more than "one million" immigration "apprehensions" annually every year since 1989), with IIRIRA § 386(a), 110 Stat. 3009-653 (directing an increase in immigration-detention facilities to "at least 9,000 beds" during fiscal year 1997). Yet, Congress declined to appropriate sufficient funds to detain every noncitizen described in Section 1225—then and now. Further, if Congress intended this amendment to compel mandatory detention, it is inexplicable that over the past 25 years, it took no action to clarify its intent, after no presidential administration since IIRIRA's passage has enforced section 1225(b) in the manner suggested by Plaintiff. In short, section 1225(b)(2)(A) is therefore best read not as an "obligatory rule," Pl. Opp. at 19, but instead as an instruction that noncitizens *generally should* be detained pending removal proceedings. *See Gutierrez de Martinez* v. *Lamagno*, 515 U.S. 417, 432 n.9 (1995) (observing that, "[t]hough 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'").

Yet, Plaintiff cites to a trio of Ninth Circuit cases for the proposition that section 1225(b)'s use of the word "shall" compels mandatory detention. Pl. Opp. at 33.[11] But none of these cases stand for this proposition. Rather, in each case, the courts merely referred, in passing, to section 1225(b)'s "mandatory detention" provision, but never engaged in any analysis of whether it is mandatory without exception, particularly where detention capacity is lacking.[12] Indeed, even amongst the out-of-circuit cases that Plaintiff cites (*id.* at 32), the only one that focused upon whether section 1225 compels mandatory detention is *Texas v. Biden*—which, as argued above, was wrongly decided and is currently before the Supreme Court.

The cases, all out-of-circuit, to which Plaintiff cites for the proposition that

---

[11] Citing, *Aleman Gonzalez v. Barr*, 955 F.3d 762, 772, 774 (9th Cir. 2020), cert. granted sub nom. *Garland v. Gonzalez*, 210 L. Ed. 2d 1009 (Aug. 23, 2021); *Thuraissigiam v. DHS*, 917 F.3d 1097, 1101 (9th Cir. 2019), *rev'd and remanded* 140 S. Ct. 1959 (2020); and *Sissoko v. Rocha*, 509 F.3d 947, 949 (9th Cir. 2007).

[12] For example, *Sissoko* was a *Bivens* case that merely mentioned Section 1225(b)'s mandatory detention as it related to a plaintiff's fourth amendment claim. 509 F.3d at 949.

Defendants are paroling "en masse" and thus violating section 1182(d)(5) (Pl. Opp. at 33),[13] suffer the same problem. Merely because Defendants release more noncitizens on parole than Plaintiff would prefer, does not mean that such paroles are "en masse." Further, these cases do not discuss *Castle-Rock* or consider whether detention capacity is a factor that may be considered in determining "urgent humanitarian reasons" and "significant public benefit." Similarly, none of the cases that Plaintiff cites for the proposition that section 1182(d)(5)'s parole authority is limited (Pl. Opp. at 32-33)—other than *Texas v. Biden*— consider the scope of such limits, particularly whether section 1182(d)(5) permits available detention capacity to be considered as a basis for finding "significant public benefit."

Neither does Plaintiff's reliance upon the legislative history of IIRIRA support its claim that Defendants are systematically violating section 1182(d)(5) by paroling "en masse." Pl. Opp. at 25-29. Plaintiff argues that the House Judiciary Committee Report on IIRIRA "makes clear that Congress intended the amendment to Section 1182(d)(5) to limit the parole authority" because the report itself explained that amendment to Section 1182(d)(5) was necessary because "in recent years, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." Pl. Opp. at 29 (citing H.R. REP. 104-469, 140). However, Plaintiff has quoted a report on proposed legislative language that never made it into law. The material Plaintiff quotes is from a policy statement of the House Judiciary Committee that Congress as a whole explicitly chose not to adopt, as evidenced by rejecting the provision it supports.[14]

---

[13] Citing *Cruz-Miguel v. Holder*, 650 F.3d 189 (2d Cir. 2011); *Delgado-Sobalvarro v. Att'y Gen.*, 625 F.3d 782 (3d Cir. 2010); *Tineo v. Ashcroft*, 350 F.3d 382, 387 (3d Cir. 2003); and *Texas v. Biden*.

[14] Plaintiff's quoted language is from House Report 104-469, reporting H.R. 2202. Section 523 of H.R. 2202 would have sharply limited the parole authority to only certain specified humanitarian or public interest situations. *See* https://www.congress.gov/104/crec/1996/09/24/CREC-1996-09-24-pt1-PgH10841-2.pdf at 77-78. However, Congress did not enact this provision into law. Rather, in the conference committee that resulted in the 1996 IIRIRA legislation, the House generally receded to the much more limited changes to INA section 212(d)(5) found in the Senate bill, S. 1664, including the case by case requirement. *See*

DHS's parole regulations provide for parole "only on "only on a case-by-case basis," for "urgent humanitarian reasons or significant public benefit," and after determining that the noncitizen "present[s] neither a security risk nor a risk of absconding." 8 C.F.R. 212.5(b). Those regulations adhere to the statutory text. *See* 8 U.S.C. 1182(d)(5)(A).[15] In making those determinations, DHS must of course account for its actual ability to physically detain. But that does not make its decisions any less case-by-case. Indeed, every presidential administration since IIRIRA was passed has construed Section 1182(d)(5)(A) to permit parole based in part on available detention resources, which Plaintiff fails to address. *See* Defs' Mot. at 20-22, Exhibits A-F. Nor does Plaintiff address the fact that numerous courts, post IIRIRA, have acknowledged and upheld the practice of considering detention capacity when making parole decisions. *See* Defs' Mot. at 22 (citing *Padilla v. ICE*, 953 F.3d 1134, 1145 (9th Cir.2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003)). Plaintiff cannot address this because there is no workable solution for how Congress could possibly have intended sections 1225(b) and 1182(d)(5) to compel detention for all but a few select noncitizens encountered at the border, when Congress has never appropriated sufficient funds to realize this alleged intention.

Plaintiff attempts to reconcile this reality by arguing that Congress created section 1225(b)(2)(C)—the contiguous return authority—to act as a safety valve of sorts, allowing the federal government to require noncitizens arriving on land at the Southern border to be returned to  Mexico while their removal proceedings are pending. Pl. Opp. at 20. But the contiguous-territory authority is not an alternative option for many individuals potentially subject to detention under section 1225, as it is limited to noncitizens who *arrive by land*

---

https://www.congress.gov/104/crec/1996/09/24/CREC-1996-09-24-pt1-PgH10841-2.pdf at pg. H10882.

[15] Similarly, the policy document providing for Parole + ATD—which Plaintiff challenges despite the fact that it is not part of the operative complaint (Pl. Opp. at 21)— provides that whether to use Parole Plus must be assessed "on a case-by-case basis." Ex. A at 1-2.

via Mexico or Canada, and not those who arrive by boat or plane. Yet, under Plaintiff's reasoning, all such individuals must be detained, and cannot be paroled, even if DHS lacks any means of detaining them. *See* Defs' Mot. at 24. Plaintiff tellingly fails to address this problem. *See generally* Pl. Opp. In short, Defendants' parole practices are consistent with the discretionary authority vested in DHS by the statute under longstanding interpretation by the agency and courts.

### B. *Count 10 Should be Dismissed.*

Plaintiff has failed to state a claim under the APA because it has not identified any ongoing, specific policy that it is challenging. *See* Defs' Mot. at 24-25. In its opposition, Plaintiff responds by arguing that is "has validly alleged a 'plausible' claim that an actual policy of increasing use of parole exists," Pl. Opp. at 1, and at the same time, "[w]hether the Policies exist [] is a factual question." Pl. Opp. at 34. In support of this argument, Plaintiff cites to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Warth v. Seldin*, 422 U.S. 490, 501 (1975), for the unremarkable proposition that on a motion to dismiss courts must accept as true all allegations in the complaint. Pl. Opp. at 1, 34. But, Plaintiff ignores the critical holding of *Iqbal* that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*, 556 U.S. at 678. That is all that Plaintiff has done here. Plaintiff argues that because there was supposedly a three-thousand-fold increase in the number of noncitizens paroled between the last month of the Trump administration and December 2021 (Pl. Opp. at 1, 35)—figures that appear nowhere in the TAC—*ipso facto*, the government must have a specific parole policy in place, and it must be abdicating a case-by-case consideration of parole. *Id.*[16] But as explained in Defendants moving papers, that reasoning fails. *See* Defs' Mot. at 25.

---

[16] *See* TAC at ¶ 137 ("Releasing this many arriving aliens into the interior necessarily means that the government is violating Congress's commands in the INA.").

1

2
        *C.  Plaintiff's Eleventh Cause of Action Fails Because Notice and Comment Was
            Not Required.*

3       Plaintiff's eleventh cause of action, in which Plaintiff claims Defendants violated

4    the APA by not subjecting their alleged parole policies to notice and comment, fails for

5    two reasons. First, Plaintiffs have not identified any "rule" that they challenge, but merely

6    call-out what they view as unlawful parole decisions in aggregate. *See* Defs' Mot. at 12-

7    13, 26. Second, to the extent there is any such "rule," it is nothing more than a general

8    statement of policy. *See id.* at 26-27. As to the first argument, Plaintiff responds by arguing

9    that the "[t]he November Memo announces a drastic expansion of the government's use of

10   its parole authority." Pl. Opp. at 34. But, even if that were true, Plaintiff does not challenge

11   the November Memo in the TAC. *See generally* TAC. Instead, it challenges the use of

12   NTRs, which practice was discontinued as a result of the November Memo. But as noted

13   above, a plaintiff cannot augment its complaint via a brief. *Arpaio*, 797 F.3d at 11, 21.

14       As for the second argument, Plaintiff claims "Defendants are talking out of both

15   sides of their mouth." Pl. Opp. at 35. Plaintiff questions how Defendants can both deny the

16   existence of a particular parole policy and claim that it is a general policy. *Id*. Plaintiff

17   ignores that Defendants' argument is tied to Plaintiff's allegations in the TAC and is

18   confined to the motion to dismiss. Thus, Defendants characterized the alleged parole policy

19   as a "general statement of policy" rather than a concrete rule, because *Plaintiff* described

20   it as such in the TAC. *See e.g.* TAC at ¶ 117 (describing Defendants' parole "*[g]uidance*

21   sent to border"), ¶ 127 (complaining about interim *guidance* issued by DHS on February

22   18, 2021, permanent *guidance* issued on September 30, 2021, the termination of MPP, and

23   the abandonment of the construction of the border wall), ¶ 137 (complaining about DHS's

24   alleged "open-border policies"). More to the point, however, Plaintiff's alleged harms do

25   not stem from any challenged policy, but from the existence of the parole statute and

26   regulations. As such, it could be addressed only by eliminating the Secretary's

27   discretionary authority to parole or otherwise release noncitizens into Arizona. But any

28   such challenge to the legality of the parole statute and regulation, implemented in 1996, is

                                                19

1    long since time-barred, so no order of this court can set aside either provision. *See* 28

2    U.S.C. § 2401(a); *Wind River Min. Corp. v. United States*, 946 F.2d 710, 712 (9th Cir.

3    1991) (applying six year statute of limitations to civil suits against the United States).

4              *D.  Plaintiff Does Not Dispute that Count 13 Should Be Dismissed*.

5              Plaintiff does not dispute that count 13 should be dismissed. *Jenkins v. Cnty. of*

6    *Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (dismissing causes of action as

7    abandoned where plaintiff did not oppose dismissal in her opposition).

8                                    <u>**CONCLUSION**</u>

9              For all these reasons and those set forth in Defendants' moving papers, Plaintiff's

10   Third Amended Complaint should be dismissed.

11

12   Date: March 15, 2022                    Respectfully submitted,

13                                           BRIAN M. BOYNTON
14                                           Principal Deputy Assistant Attorney General

15                                           WILLIAM C. PEACHEY
16                                           Director

17                                           EREZ REUVENI
18                                           Assistant Director

19                                           */s/ Elissa Fudim*
20                                           ELISSA FUDIM
                                             Trial Attorney
21                                           U.S. Department of Justice, Civil Division
22                                           Office of Immigration Litigation,
                                             District Court Section
23                                           P.O. Box 868, Ben Franklin Station
24                                           Washington, D.C. 20044
25                                           Tel: (202) 598-6073
                                             Email: elissa.p.fudim@usdoj.gov
26

27                                           *Counsel for Defendants*

28

                                            20