BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
EREZ REUVENI
Assistant Director
ELISSA FUDIM
Trial Attorney
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brnovich, in his official capacity as Attorney General of Arizona, *et al.*, <br> *Plaintiffs*, <br> v. <br> Joseph R. Biden in his official capacity as President of the United States, *et al.* <br> *Defendants*. | Civil Action No. 2:21-CV-1568-MTL |

**DEEFENDANTS' RESPONSE TO PLAINTIFF'S<br>AUGUST 12, 2022 NOTICE OF SUPPLEMENTAL AUTHORITY**

At the Court's invitation (Dkt. 206), Defendants submit this response to Plaintiff's August 12, 2022 Notice of Supplemental Authority (Dkt. 203).

****

First, pointing to certain parole metrics that were filed in the *Texas v. Biden* litigation, Plaintiff argues—again—that the number of individuals paroled into the United States establishes, on its own, "that the federal government is exercising its parole powers on a programmatic, not case-by-case, basis." Pl. Supp. at 1. This contention is without merit. 8 U.S.C. § 1182(d)(5) permits the Secretary to parole noncitizens into the country on a case-by-case basis; it places no limit on the *number* of individuals the Secretary may parole. Plaintiff has not proffered one shred of evidence, let alone plausibly plead such evidence, to suggest that the number of individuals paroled into the country is attributable to a programmatic policy directing immigration officers to ignore the statutory directive to assess parole decisions on a case-by-case. On the contrary, parole decisions are discretionary—and they become no less discretionary when individual decisions are aggregated.

Second, Plaintiff alerts the Court to a decision out of the Northern District of Florida, whereby that court denied Defendants' motion to dismiss the complaint in an action asserting substantially similar claims as those raised here. Pl. Supp. at 2-3. That decision, issued before the Supreme Court's decision in *Texas v. Biden*, 142 S.Ct. 2528, 2022 WL 2347211 (2022), was wrongly decided, and is incongruous with persuasive Ninth Circuit precedent, *see e.g. Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021), cert. denied, 142 S. Ct. 713 (2021), as well as persuasive authority from the Sixth Circuit, *see e.g. Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), and within this district, *see, e.g. Arizona v. Mayorkas*, 21-CV-617, Dkt. 64. Those errors should not be repeated here.

Principally, Plaintiff notes that the Florida district court found Florida had standing to assert its claims under *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), which purportedly gives States, like Florida, and Arizona here, "special solicitude" in the standing

analysis. The Florida district court was wrong. In *Massachusetts v. EPA*, Massachusetts sued the Environmental Protection Agency (EPA) for denying its rulemaking petition asking the Agency to regulate greenhouse gases. 549 U.S. at 505. In concluding that Massachusetts had standing, the Supreme Court explained that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests … can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 517-518 (internal citations omitted). The Court observed that Congress had granted States a procedural right to challenge the EPA's denial of its petition for rulemaking. *Id.* at 519-520. "Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth [wa]s entitled to special solicitude in [the] standing analysis." *Id.* at 520 (emphasis added). Thus, the phrase "special solicitude" is best understood to invoke the existing doctrine that a litigant "who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered." *Id*. at 518 (citation omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Here, Congress did not provide the States with a procedural right in the administration of immigration law, in general, or discretionary parole, in particular. And, the Supreme Court did not create a new doctrine in *Massachusetts* that States are favored litigants for purposes of Article III, who can circumvent traditional notions of causation. *See Whitewater Draw*, 5 F.4th at 1015 (a "claim of procedural injury does not relieve Plaintiff[] of [its] burden—even if relaxed—to demonstrate causation and redressability."); *Arizona*, 40 F.4th at 385 ("[Massachusetts] does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability."). Another judge in this district found:

> [The] question here isn't whether Arizona is, in general, entitled to special solicitude in the standing analysis…the issue is that it is unclear whether the special solicitude doctrine goes to the causation prong of the standing inquiry…. Ninth Circuit decisions do not suggest that states have special solicitude when it comes to demonstrating causation…Whatever its

> contours, the special solicitude doctrine cannot be some sort of magic wand that a state can wave over an otherwise inadequate record to automatically cure standing defects that would be fatal to a private litigant.

*Arizona*, 21-CV-617, Dkt. 64, at 12-13.

Moreover, even if States were entitled to favored treatment in some circumstances, Arizona would not be entitled to such treatment here. *Massachusetts* involved a "uniquely sovereign harm," *Arizona*, 40 F.4th at 386, the threatened loss of its physical territory. This case, by contrast, involves "indirect fiscal burdens allegedly flowing" from a federal policy—a harm that not only is not "uniquely sovereign," but is entirely "humdrum." *Id*. This case also involves immigration. "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id*.

Arizona is not entitled to circumvent standing to assert its claims in this litigation. On the contrary, Arizona's claim to standing in this case ignores bedrock principles of Article III. Initially, and fundamentally, a plaintiff ordinarily lacks standing to challenge the government's decisions and policies concerning enforcement actions against third parties. *Linda R. S. v. Richard D*., 410 U.S. 614 (1973); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (a plaintiff has "no judicially cognizable interest in procuring enforcement of the immigration laws.").

In addition, States lack standing to sue the federal government based on the incidental effects of federal policies. Rather, a State may sue the United States only if it has suffered a "*direct* injury" at the hands of the federal government. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (emphasis added). In *Florida v. Mellon*, the Supreme Court held that Florida lacked standing to challenge the constitutionality of a federal inheritance tax. *Id*. at 14. Florida argued that the tax would likely cause the State financial harm by prompting the "withdrawal of property" from the State and diminishing the state tax base. *Id*. at 16. But the Court rejected that theory of standing, explaining that Florida was required to show a "*direct* injury" and that any harm caused by the tax was, "at most, only remote and indirect." *Id*. at 18; *cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) ("Courts of

Appeals have denied standing to States where the claim was that actions taken by the United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues.").

The Supreme Court has applied an analogous rule to interstate suits: one State may sue another only if it has suffered a "direct injury" at the hands of the other State. *Wyoming*, 502 U.S. at 448; see, *e.g.*, *Louisiana v. Texas*, 176 U.S. 1, 18 (1900). That doctrinal rule rests on the same logic as the parallel rule applicable to suits against the United States: In a federal system, each sovereign's policies will routinely have downstream effects on many other sovereigns, but those derivative effects do not suffice for Article III standing. *See, e.g., Whitewater Draw*, 5 F.4th at 1015; *Arizona*, 40 F.4th at 385-86; *Arpaio v. Obama,* 797 F.3d 11, 21 (D.C. Cir. 2015); *Arizona*, 21-CV-617, Dkt. 64, at 12-13—all of which counsel against adopting the Florida district's court's view of standing here.

Third (and fourth)[1], Plaintiff argues that the Texas district court and Fifth Circuit's decision in *Texas v. United States*, __ F.Supp.3d __, No. 6:21-CV-00016, 2022 WL 2109204 (S.D. Tex. June 10, 2022), *stay denied* 40 F.4th 205 (5th Cir. 2022), *stay denied and cert. granted before judgment*, No. 22A17, 2022 WL 2841804 (U.S. July 21, 2022), are instructive on the merits of the meaning of the word "shall" as used in 8 U.S.C. § 1225(b) at issue in this case. Pl. Supp. at 3, 4. Not so.

The statutes at issue in *Texas* are 8 U.S.C. §§ 1226(c)(1) and 1231(a)(2). Section 1226(c)(1) provides that DHS "shall take into custody" noncitizens convicted of certain offenses when they are released from criminal custody, *id*., and "may release" such noncitizens "only" in limited circumstances, 8 U.S.C. § 1226(c)(2). Section 1231(a)(2) provides that DHS "shall detain" noncitizens after a final order of removal and "under no circumstance" shall DHS release a noncitizen who is removable on certain criminal or terrorist grounds. 8 U.S.C. § 1231(a)(2).

---

[1] Plaintiff discusses the district court's decision in what it refers to as *Texas I*, and the Fifth Circuit's denial of the motion to stay in what it refers to as *Texas II*, separately. Defendants address them together.

In holding that the "Guidelines for the Enforcement of Civil Immigration Law" (the September Guidance)[2] violates sections 1226(c) and 1231(a)(2), the district court and Court of Appeals in *Texas* construed the issue in the lawsuit as a dispute about whether the federal government must detain criminal noncitizens (section 1226(c)) and noncitizens with final orders of removal (section 1231(a)(2)). That framing of the issue was incorrect. The *Texas* case is instead a dispute about guidance for the *apprehension* of noncitizens not yet in DHS's custody. Notwithstanding, the district court concluded, that because section 1226(c)(1) provides that the Secretary "shall" take criminal noncitizens into custody, it displaces any discretion that the Secretary may have had not to take those individuals into custody. *Texas*, 2022 WL 2109204, at *26. That reading of the statute is incorrect. Section 1226 applies only during the pendency of removal proceedings. *See* 8 U.S.C. § 1226(a). It follows that paragraph (c)(1)'s "shall take into custody" language comes into play only if DHS decides to institute or maintain removal proceedings in the first place. *See Arizona*, 40 F.4th at 391. And, even when DHS does decide to initiate removal proceedings against a particular noncitizen, section 1226(c) does not displace the Executive's traditional discretion over decisions to apprehend individuals not yet in its custody. *Town of Castle Rock* v. *Gonzales*, 545 U.S. 748, 761 (2005).[3] As for section 1231(a)(2), regardless of whether the first sentence requires detention—an issue that was not properly before either the *Texas* district court or Court of Appeals—it does not require the apprehension of noncitizens not yet in DHS's custody. Thus, the *Texas* court's interpretation of the "shall" mandate in those sections was incorrect.

---

[2] The September Guidance set forth a prioritization scheme for the apprehension and removal of certain removable noncitizens who fit within three categories: those who pose a threat to national security, public safety, and border security. *See* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf at 2–3.

[3] To be clear, the government submits that it has discretion as to whether to commence removal proceedings against individuals who fall within section 1226(c)(1) and whether to detain such individuals, *see Town of Castle Rock, 545 U.S. at 761*; the government agrees that once the DHS has taken noncitizens subject to section 1226(c) into its custody, continued detention is mandatory unless one of the exceptions in section 1226(c)(2) applies.

More to the point, however, the mandatory detention language used in sections 1226(c)(1) (as it applies to those noncitizens DHS chooses to take into custody, *see* FN 3 supra) and the second sentence of section1231(a) differ in an important way from the language used in section 1225(b), at issue here. Section 1226(c)(1) provides that DHS "shall take into custody" noncitizens convicted of certain offenses, and section 1226(c)(2) provides that it "may release" such noncitizens "only in" limited circumstances. The first sentence of section 1231(a)(2) states that DHS "shall detain" the noncitizen during a 90-day removal period (which is subject to law enforcement discretion), but the second sentence provides that "[u]nder no circumstance" shall DHS release a noncitizen who is removable on certain criminal or terrorist grounds. The use of the words "only in" (in section 1226(c)(2)) and "under no circumstances" (in the second sentence of section 1231(a)(2)) as used in the statutes at issue in *Texas*, stand in contrast to section 1225(b), which contains nothing more than the word "shall" on its own. As briefed by Defendants, "shall" does not convey an absolute mandate, particularly when used on its own, and in the law enforcement context. *See* Motion to Dismiss, Dkt. 146, at 9-10; Reply, Dkt. 174, at 9-10. Furthermore, section 1182(d)(5) is a permissive mechanism to release noncitizens subject to mandatory detention, *see Biden v. Texas*, 142 S. Ct. at 2544 (recognizing "the availability of [] parole" as an alternative to mandatory detention under section 1225(b)), further demonstrating that Congress did not intend for detention under section 1225 to be mandatory in all circumstances.

Plaintiff also notes that the district court and Fifth Circuit found that the States had standing. Pl. Supp. at 3. But while a Texas district court and the Fifth Circuit found standing in *Texas*, in a virtually identical case, the Sixth Circuit, did not. *See Arizona*, 40 F.4th at 385-86. As explained above, the Fifth Circuit in *Texas* was wrong, and Ninth Circuit law more closely comports with the findings of the Sixth Circuit in *Arizona*. *See, e.g., Whitewater Draw*, 5 F.4th at1015.

Plaintiff also notes that the Texas district court found that the September Guidance

6

constituted final agency action, and therefore, presumably, this Court should find that the policies that Plaintiff challenges here are likewise final agency action. This argument fails. Plaintiff challenges two alleged policies in the Third Amended Complaint (TAC)—the government's now discontinued use of Notices to Report (NTRs), and the government's alleged "en masse" parole policy. The former has been discontinued and is therefore moot. *See* Motion to Dismiss, Dkt. 146, at 5. And, even if it were not moot, it still would not constitute final agency action because the policy did not compel anyone to do or refrain from doing anything. The latter "policy" is illusory, and is nothing more than the amalgamation of individual, discretionary, parole decisions. *Id*. at 13-14. As set forth above, and in prior filings, this Court cannot postulate the existence of a policy from individual parole decisions absent any guiding document or other evidence of the existence of such a policy. Moreover, the Sixth Circuit came to the opposite conclusion of the Fifth Circuit, recognizing that the Guidance neither compelled anyone to act, nor created rights or obligations. *Arizona*, 40 F.4th at 387-88. Similarly, here, Plaintiff has not identified any policy that creates rights or obligations or prevents or compels a U.S. Custom and Border Protection officer or agent from using parole in any particular case.

Plaintiff also notes that the district court in *Texas* stated that at "the same time DHS was claiming resource limitations as a justification for why it could not comply with the INA's detention mandate, it was also affirmatively cutting detention capacity," a soundbite that Plaintiff echoed at oral argument on the motion to dismiss. To be clear, Plaintiff's TAC does not make this allegation, and therefore responding in substance to it, is unnecessary. Notwithstanding, the Executive retains authority to allocate its limited resources to those noncitizens who are higher priorities for apprehension, and DHS has the discretion to use this authority to reallocate resources towards border security efforts. *See* 6 U.S.C. § 202(5). Congress has never appropriated anywhere near sufficient funds to permit the detention and removal of every removable noncitizen, making clear Congress's understanding that the Executive must exercise its discretion regarding how best to use a limited universe of

resources to enforce the INA.

Plaintiff, pointing to the Fifth Circuit's decision in *Texas*, renews its argument that it is entitled to special solicitude. Pl. Supp. at 4. For the same reasons that the Florida district court was wrong about this issue, so too is the Fifth Circuit.

Finally, Plaintiff points out that the Fifth Circuit in *Texas* held that *Heckler v. Chaney*, 470 U.S. 821 (1985) did not apply to shield the September Guidance from review because the States challenged a general policy rather than individual enforcement decisions, and that therefore, presumably, *Heckler* should not prohibit this Court from invoking jurisdiction for the same reasons. Pl. Supp. at 4. This argument is wrong. *Heckler* was not confined to a single non-enforcement decision, but rather concerned the FDA's broad programmatic refusal to undertake national enforcement initiatives. *See* 470 U.S. at 824. Moreover, here, there are no "broad non-enforcement policies" governing parole, nor has Plaintiff pleaded what the illusory "en masse" parole policy looks like or how it allegedly works. On the contrary, even Plaintiff would have to concede that some (in fact, many) applicants for admission are detained; others are paroled. Plaintiff simply objects to the *number* of individuals paroled. But *Heckler* does not suggest that the non-reviewability presumption ceases to apply to aggregated non-enforcement actions. *See State of Cal. v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997) (*Heckler* precludes State's claims that the federal government's immigration practices—including allegedly failing to (i) commence deportation proceedings immediately following the conviction of noncitizens eligible for deportation, (ii) take into custody noncitizens convicted of aggravated felonies upon their release from state incarceration, (iii) prosecute deported noncitizens who illegally reenter the country, and (iv) effectively execute final orders of deportation, all of which allegedly caused downstream financial burdens on California via law enforcement and medical costs—violate various statutes and are arbitrary and capricious under the APA.)

\*\*\*

For all these reasons, and those set forth in Defendants' prior filings, Plaintiff's claims 9-13 in the TAC should be dismissed.

Dated: August 31, 2022

        Respectfully submitted,

        BRIAN M. BOYNTON
        Principal Deputy Assistant Attorney General

        WILLIAM C. PEACHEY
        Director

        EREZ REUVENI
        Assistant Director

        */s/ Elissa Fudim*
        ELISSA FUDIM
        Trial Attorney
        U.S. Department of Justice, Civil Division
        Office of Immigration Litigation,
        District Court Section
        P.O. Box 868, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 598-6073
        Email: elissa.p.fudim@usdoj.gov

        *Counsel for Defendants*