**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Mark Brnovich, et al.,

               Plaintiffs,

v.

Joseph R Biden, et al.,

               Defendants.

No. CV-21-01568-PHX-MTL

**ORDER**

This case involves a challenge brought by Plaintiffs the State of Arizona and Arizona Attorney General Mark Brnovich against Defendants the United States and various federal officials and entities for alleged regulatory, statutory, and constitutional violations arising out of Defendants' immigration policies. Presently before the Court is Defendants' motion to dismiss all of Plaintiffs' immigration claims. (Doc. 146.) The Motion will be granted in part and denied in part.

## I.    BACKGROUND

The federal government possesses broad authority to determine the United States' immigration policy. In the exercise of that authority, Congress has enacted statutes regarding the detention and parole of noncitizens. At issue in this case are two provisions of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. §§ 1182(d) and 1225(b).

Under § 1225, a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings*

*v. Rodriguez*, 583 U.S. ---, 138 S. Ct. 830, 836 (2018) (quoting 8 U.S.C. § 1225(a)(1)). Such applicants fall into one of two general categories. Section 1225(b)(1) applies to noncitizens initially determined to be inadmissible due to fraud, misrepresentation, or a lack of valid documentation, *see* 8 U.S.C. § 1225(b)(1)(A)(i), whereas § 1225(b)(2) applies generally to all applicants not covered by § 1225(b)(1), *see id.* § 1225(b)(2)(A). The INA's detention and removal procedures differ for these two categories of noncitizens. Those covered by § 1225(b)(1) are ordered removed "without further hearing or review" unless they indicate "an intention to apply for asylum" or "a fear of persecution." *Id.* § 1225(b)(1)(A)(i). In that case, the alien is referred for "an interview with an asylum officer." *Id.* § 1225(b)(1)(A)(ii). If the officer determines after the interview that the alien has a credible fear of persecution, "the alien *shall be detained* for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii) (emphasis added).

The procedure for those who are covered by § 1225(b)(2) is somewhat simpler. Aside from a few narrow exceptions, these noncitizens "*shall be detained* for a [removal] proceeding" unless an immigration officer decides they are "clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A) (emphasis added). The statute also sets forth an alternative to detention: "In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the [Secretary] may return the alien to that territory pending a [removal] proceeding." *Id.* § 1225(b)(2)(C).

Regardless of whether § 1225(b)(1) or (b)(2) authorizes their detention, § 1182(d)(5)(A) provides that "applicants for admission may be temporarily released on parole '[only on a case-by-case basis] for urgent humanitarian reasons or significant public benefit.'" *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1182(d)(5)(A)).

Plaintiffs' claims are based on these statutory provisions. Plaintiffs argue that § 1225(b)(1) and (b)(2) impose "an unequivocal, non-discretionary mandate to either detain unauthorized aliens, return them to Mexico, or grant parole in limited circumstances." (Doc. 167 at 9.) Plaintiffs allege that Defendants have violated that

mandate by summarily releasing undocumented aliens and by granting aliens parole en masse rather than case-by-case.

Plaintiffs allege that Defendants have released over 225,000 undocumented noncitizens into the United States' interior since President Biden took office, including roughly 50,000 whom Defendants released without initiating removal proceedings. (Doc. 134, ¶ 117.) Those individuals, Plaintiffs allege, were served with "notices to report" ("NTR") rather than "notices to appear" ("NTA"). Whereas an NTA is a legally recognized document that initiates removal proceedings, an NTR is a creation of the current administration, unmentioned in the immigration laws, that directs an alien to voluntarily report to an Immigration and Customs Enforcement office within 60 days. (Doc. 134 ¶¶, 133–34.) Plaintiffs allege that because approximately 80% of the aliens served with NTRs do not do so, Defendants are essentially "giving tens-of-thousands of aliens per month . . . license to disappear into the interior of the United States." (Doc. 134, ¶ 136.)

This action commenced on September 14, 2021. (Doc. 1.) In the complaint, Plaintiffs brought claims based on both Defendants' vaccination policies and their immigration policies. In January 2022, the Court granted Plaintiffs' motion to bifurcate Counts I–VIII (the "Vaccine Counts") and Counts IX–XIII (the "Immigration Counts") and entered final judgment on the Vaccine Counts. (Doc. 156.) That decision is now pending on appeal. (Docs. 179, 181.)

Defendants filed the instant motion to dismiss in January 2022. (Doc. 146.) Defendants seek to dismiss all of the Immigration Counts for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(1), (6).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Issues of standing are properly raised in a motion to dismiss under Rule 12(b)(1). *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "When the motion to dismiss attacks the allegations of the

1  complaint as insufficient to confer subject matter jurisdiction, all allegations of material

2  fact are taken as true and construed in the light most favorable to the nonmoving party."

3  *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Fed'n of Afr.*

4  *Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996)).

5        Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*

6  *of Am.*, 511 U.S. 375, 377 (1994). "It is to be presumed that a cause lies outside this limited

7  jurisdiction, and the burden of establishing the contrary rests upon the party asserting

8  jurisdiction." *Id.* (citations omitted). Thus, on a motion to dismiss based on lack of

9  standing, the party invoking federal jurisdiction bears the burden of establishing the

10  elements of Article III standing. *See Spokeo v. Robins*, 578 U.S. 330, 338 (2016). "Where,

11  as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts

12  demonstrating' each element." *Id.* (alteration in original) (quoting *Warth v. Seldin*, 422

13  U.S. 490, 518 (1975)).

14        A complaint must contain a "short and plain statement of the claim showing that

15  the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss,

16  a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

17  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

18  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the

19  plaintiff pleads factual content that allows the court to draw the reasonable inference that

20  the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

21  *Twombly*, 550 U.S. at 556). The pleader's obligation to provide the grounds for relief

22  requires "more than labels and conclusions, and a formulaic recitation of the elements of

23  a cause of action will not do." *Twombly*, 550 U.S. at 555. In deciding a Rule 12(b)(6)

24  motion, the Court must construe all allegations of material fact in the light most favorable

25  to the nonmoving party. *Marcus v. Holder*, 574 F.3d 1182, 1184 (9th Cir. 2009). The

26  Court, however, is "not bound to accept as true a legal conclusion couched as a factual

27  allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

28

## III.   DISCUSSION

Defendants move to dismiss Plaintiffs' claims as nonjusticiable, contending that Plaintiffs do not have standing and some of their claims are moot. In addition, Defendants argue the Court lacks subject matter jurisdiction over Plaintiffs' claims because the government actions they challenge are committed to agency discretion by law, are not final agency action, and are precluded from review by statute.

### A.   Justiciability

Article III authorizes federal courts to resolve only "cases" and "controversies." U.S. Const. art. III, § 2. This constitutional limitation on federal jurisdiction is today enforced through various justiciability doctrines, including the doctrines of standing and mootness.

### 1.   Standing

Article III standing consists of three components. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction must establish that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61).

Defendants assert that Plaintiffs lack standing because they "cannot demonstrate any actual or imminent injury caused by the challenged policies" and, in addition, "none of the harms alleged is [sic] fairly traceable to challenged policies, nor are they capable of being remedied by an order by this Court." (Doc. 146 at 6–7.) Plaintiffs allege that Defendants' challenged policies inflict direct injury upon Arizona in the form of increased costs from (1) the incarceration of aliens; (2) law enforcement activities, including the pursuit of suspected unauthorized aliens; and (3) emergency medical services provided to

aliens. (Doc. 134, ¶¶ 145–49.) The Court will begin with the third of these cost categories.

Federal law requires Arizona to provide emergency medical services to all individuals regardless of their immigration status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255(c). Consistent with that requirement, Arizona delivers millions of dollars in medical services to unlawfully present noncitizens each year. Plaintiffs argue that Defendants' refusal to detain or remove aliens, coupled with their expansive use of the parole authority, "increases the number of unlawfully present aliens in Arizona who are subject to receiving [] medical care at the expense of Arizona's healthcare institutions." (Doc. 134, ¶ 148.) Accordingly, Defendants' lax immigration policies have increased, and will continue to increase, Arizona's healthcare costs. This argument comports with common sense. If Plaintiffs are right that Defendants' detention and parole policies are inconsistent with federal statutes, and the government should accordingly detain noncitizens rather than release them into the United States' interior, then those policies injure Arizona because they lead to releasing more undocumented aliens into the state than if Defendants followed the law.

To illustrate Arizona's burden, Plaintiffs highlight one medical facility on the Arizona border, the Yuma Regional Medical Center, which provided care to more than a hundred noncitizens in United States Immigration and Customs Enforcement ("ICE") custody during February, March, and April of 2021—the months immediately following Defendants' implementation of the challenged policies. Plaintiffs allege that in February 2021 alone, the cost to provide care to noncitizens was $591,602, more than double the average monthly cost of care for the preceding nine months. (*See* Doc. 167 at 17.) Plaintiffs further contend that because these costs are not fully reimbursable by either the federal government or the noncitizens themselves, such costs are borne, in large part, by Arizona. *Cf. Arizona v. DHS*, No. CV-21-00186-PHX-SRB, 2021 WL 2787930, at *7 (D. Ariz. June 30, 2021) ("Arizona, as a border state, 'bears many of the consequences of unlawful immigration.'" (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012))).

Plaintiffs have met their burden to show they have suffered a concrete and

particularized injury. The increased cost to Arizona of providing medical services to individuals who would otherwise be removed or detained constitutes actual injury cognizable under Article III. *See City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 754 (9th Cir. 2020) ("There is no question that to have Article III standing to bring this action, the plaintiffs must allege that they have suffered, or will imminently suffer, a 'concrete and particularized' injury in fact. There is also no question that an increased demand for aid supplied by the state and local entities would be such an injury.").

Plaintiffs' alleged injury is also traceable to Defendants' conduct and redressable. First, traceability. As discussed above, Plaintiffs have sufficiently articulated the connection between Defendants' policies and the increased medical costs incurred by Arizona. In short, if Defendants were to detain or remove, rather than release, more undocumented noncitizens, Arizona's medical care costs would be lower. This chain of causation is direct and unattenuated, and satisfies the requirements of Article III. The redressability inquiry is similarly straightforward. Plaintiffs ask the Court to preclude Defendants from releasing noncitizens who are subject to mandatory detention and from paroling them en masse. (Doc. 134 at 69–70.) An order to that effect would give Plaintiffs relief. *See Arizona v. DHS*, 2021 WL 2787930, at *8. Accordingly, Plaintiffs have Article III standing to proceed on their claims.

### 2.    Mootness

Mootness doctrine requires a controversy to remain justiciable throughout the course of litigation. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) ("[A]n 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009))). Even when a case satisfies standing and ripeness requirements at its inception, the case may become moot based on a change in circumstances. "A case becomes moot when interim relief or events have deprived the court of the ability to redress the party's injuries." *United States v. Alder Creek Water Co.*, 823 F.2d 343, 345 (9th Cir. 1987); *see also Powell v. McCormack*, 395 U.S. 486, 496 (1969) ("Simply stated, a case is moot

when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.").

Defendants claim Plaintiffs' challenge to the use of NTRs is moot because, on November 2, 2021, United States Customs and Border Protection ("CBP") issued a memorandum "ceasing the use of NTRs" "effective immediately." (Doc. 167-1 at 2.) The November memorandum "establishe[d] conditions for the implementation of parole plus Alternative to Detention (Parole + ATD), a processing pathway that will replace the use of NTR." (*Id.*) Parole + ATD, like Defendants' NTR policy, requires that certain noncitizens be released rather than detained.

> In circumstances where an alternate path is necessary to address urgent crowding and excessive [time in custody] in USBP facilities, Border Patrol has developed an alternative processing pathway: the use of Parole + ATD . . . . Parole + ATD is a rigorous enforcement process that is effective and includes accountability measures to require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

(*Id.* at 2–3.) Defendants assert that Plaintiffs' claims challenging the use of NTRs are "moot because the policy directing their use has been discontinued and superseded by a new policy." (Doc. 174 at 2.) Defendants further argue, in a supplemental notice, that the NTR policy is moot because the November memorandum was superseded by a July 18, 2022 memorandum "specifying the circumstances under which the use of Parole + ATD may now be used." (Doc. 198 at 2.)

In response, Plaintiffs contend that "the November [memorandum] . . . does not make this case moot, because it continues the same policies of not detaining unauthorized aliens and of paroling aliens en masse" in violation of "Congress's mandatory detention requirements" and the limits on the executive's parole authority under § 1182(d)(5). (Doc. 167 at 6–7.) In Plaintiffs' view, therefore, the November memorandum is nothing more than "a transparent attempt by Defendants to avoid responsibility for their unlawful behavior by presenting the courts [with] ever-moving targets." (*Id.* at 7.) Plaintiffs did not respond to Defendants' supplemental notice regarding the July memorandum.

- 8 -

The Court holds that Plaintiffs' claims relating to Defendants' use of NTRs are not moot because CBP's revocation of the NTR policy satisfies the mootness exception for voluntary cessation of a challenged activity. The CBP issued a revocation of the NTR policy on November 2, 2021, seemingly on its own accord. Although the NTR policy was replaced with the Parole + ATD pathway, Defendants do not represent that they cannot simply reinstate the NTR policy at a later time, as a substitute to the Parole + ATD pathway or otherwise. Indeed, the November memorandum reserves the right to continue the NTR policy if "explicitly authorized by the U.S. Border Patrol (USBP) Chief." (Doc. 167-1 at 2.) It also appears by CBP's issuance of the November memorandum that CBP has at least some authority to issue memorandums at will to change its immigration policies and approaches to detention and parole without approval, process, or examination. Defendants' motion notes that Congress's passing of the INA "demonstrates Congress's intent to allow the Executive to exercise its enforcement discretion in deciding what removal proceedings to initiate and whom to detain for those proceedings." (Doc. 146 at 2.) "A case *might* become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. No such clarity exists here." *Indigenous Enviro. Network v. Trump*, 541 F.Supp.3d 1152, 1158 (D. Mont. 2021) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (quotations omitted)).

The March memorandum setting forth the NTR policy was expressly superseded by the November memorandum and Defendants' policy of issuing NTRs is therefore no longer in place. (*See* Doc. 167-1 at 2.) Plaintiffs' claims relating to that policy, however, meet the mootness exception for voluntary cessation of a challenged activity because no barriers prevent CBP from reinstating the NTP policy. *See Friends of the Earth*, 528 U.S. at 189; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, --- U.S. ---, 137 S. Ct. 2012, 2019 (2017). Moreover, Plaintiffs plausibly allege that the November memorandum "continues the same policies of not detaining unauthorized aliens and of paroling aliens en masse," such that dismissal is not warranted at this stage. (*See* Doc. 167 at 7.) "DHS cannot

moot this case by reaffirming and perpetuating the very same injury that brought the States into Court." *Texas v. Biden*, 20 F.4th 928, 960 (5th Cir. 2021), *rev'd on other grounds by Biden v. Texas*, --- U.S. ---, 142 S. Ct. 2528 (2022).

**B.    Section 1252(f)**

In light of the recent United States Supreme Court's decision in *Biden v. Texas*, the Court must consider whether 8 U.S.C. § 1252(f)(1) deprives the Court of jurisdiction to enter injunctive relief on Plaintiffs' claims. That section reads:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated.

As the Supreme Court has explained, § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. ---, 142 S. Ct. 2057, 2065 (2022). This prohibition applies to claims brought state by litigants. *See Texas*, --- U.S. ---, 142 S. Ct. at 2538 (concluding, in a case involving only states as plaintiffs, that the District Court's injunction violated section 1252(f)(1)).

The parties agree § 1252(f) mandates dismissal of Plaintiffs' claims for injunctive relief regarding Defendants' detention policies under § 1225. (Doc. 196 at 6–7; Doc. 199 at 5.) The parties disagree, however, over whether § 1252(f) similarly mandates dismissal of Plaintiffs' claims for injunctive relief arising out of Defendants' parole policies. At this stage, the Court declines to decide whether § 1252(f) mandates dismissal of Plaintiffs' request for injunctive relief under § 1182(d)(5) or any other relevant statutory provisions falling outside of § 1252(f)(1)'s express mandate. Neither *Biden v. Texas* nor the text of § 1252(f)(1) addresses this question and Plaintiffs plead sufficient factual allegations to

evade dismissal of its § 1182(d)(5) claims. The Court notes, however, that another U.S. District Court recently held that § 1252(f)(1) "would not preclude an order retraining or enjoining the use of parole under §1182" because it is not part of the subchapter referenced by the statute and because the court "was not persuaded by [the defendants'] statutory interpretation arguments" similar to those Defendants make here. *Florida. v. United States*, No. 21-CV-1066, 2022 WL 2431414, at *11–13 (N.D. Fla. May 4, 2022). Similarly, the Court need not address whether § 1252(f) precludes this Court from awarding Plaintiffs' other remedy in the form of vacatur under the Administrative Procedure Act ("APA") because that issue is not fully briefed at this stage of the litigation and not clearly addressed by the Supreme Court. *See Texas*, --- U.S. ---, 142 S. Ct. at 2562 (Barrett, J., dissenting) ("[The majority] avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the [APA].").

Finally, the Court retains authority to issue a declaratory judgment on Plaintiffs' claims despite § 1252(f)(1). The Ninth Circuit considered the question in 2010 and held that "[i]t is simply not the case that [s]ection 1252(f) bars . . . declaratory relief." *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010). The Circuit's decision remains good law and binding on this Court, despite the Supreme Court's intervening decisions. [1]

## C.   Review Under the APA

While Plaintiffs' claims are justiciable under Article III, the question remains

---

[1] And, the Supreme Court's recent decisions appear to suggest, albeit implicitly, that § 1252(f)(1) does *not* bar a district court from issuing a declaratory judgment addressed to §§ 1221–32 or any other provision of the INA. *See Texas*, --- U.S. ---, 142 S. Ct. at 2540 (describing how, in *Nielson v. Preap*, 586 U.S. ---, 139 S. Ct. 954 (2019), the Court "proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that '[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief.'" (alterations in original) (quoting *Preap*, 586 U.S. ---, 139 S. Ct. at 962)); *Aleman Gonzalez*, 596 U.S. ---, 142 S. Ct. at 2077 n.9 (Sotomayor, J., concurring in part and dissenting in part) ("[I]t is difficult to square the Government's claim [that section 1252(f)(1) bars declaratory relief] with the statute Congress enacted. Section 1252(f)(1) limits lower courts' authority to 'enjoin or restrain,' whereas a declaratory judgment (unlike an injunction) 'is not ultimately coercive.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 471 (1974))); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms, and even by its title, [section 1252(f)(1)] is nothing more or less than a limit on injunctive relief."); *Jennings*, 138 S. Ct. at 875 (Breyer, J., dissenting) ("Regardless [of § 1252(f)(1)], a court could order declaratory relief.").

whether they are reviewable under the APA. Defendants give three reasons why they are not: (1) Defendants' challenged conduct is committed to agency discretion by law; (2) the memoranda setting forth the challenged policies are not final agency action; and (3) the INA precludes judicial review.

### 1.    Action Committed to Agency Discretion

Agency action is presumptively reviewable under the APA. *Dep't of Commerce v. New York*, 588 U.S. ---, 139 S. Ct. 2551, 2567 (2019). Section 701(a)(2) of the APA, however, precludes review in cases where the "agency action is committed to agency discretion by law." 5 U.S.C. § 702(a)(2). In such cases, the presumption is that judicial review is not available. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* "Discretionary decisions not to enforce a law, may, however, be reviewable 'where it could justifiably be found that the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *United States v. Arizona*, CV-10-1413-PHX-SRB, 2011 WL 13137062, at *9 (D. Ariz. Oct. 21, 2011) (quoting *Mont. Air Chapter No. 29, Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 898 F.2d 753, 756 (9th Cir. 1990) and *Heckler*, 470 U.S. at 833 n.4). Another exception to the *Heckler* presumption of non-reviewability is "if Congress has provided guidelines for the agency to follow in exercising its enforcement powers." *Arizona v. U.S. Dep't Sec.*, CV-21-00186-PHX-SRB, 2021 U.S. Dist. LEXIS 125687, *25 (D. Ariz. Jun. 30, 2021) (quoting *Heckler*, 470 U.S. at 832–33). Plaintiffs' claims meet both exceptions here.

Defendants argue that the decision whether to commence a removal proceeding against a noncitizen or to release the noncitizen through Parole + ATD is committed to agency discretion. Plaintiffs disagree. They argue that since § 1225(b) "places an unequivocal mandate on Defendants to detain unauthorized aliens arriving at the southern border or return them to Mexico," and because § 1182(d)(5)(A) "prohibits generalized programs for the grant of parole," no discretion exists with respect to the challenged

detention and parole policies. (Doc. 167 at 9–10.) Alternatively, Plaintiffs argue that even if the statutes permit agency discretion, any conferred discretion is explicitly bounded by statutory requirements that provide a "meaningful standard" for this Court's review. (*Id.* at 10–12).

The Court need not decide whether §§ 1225 and 1182 expressly grant Defendants discretionary enforcement authority such that review is permitted under the APA because Plaintiffs have plausibly alleged that, even if the statutes confer discretion, Defendants have abdicated their statutory responsibilities through their mass paroling policies. And, although Defendants rely on *United States v. Arizona*, 2011 WL 13137062, and *California v. United States*, 104 F.3d 1086 (9th Cir. 1997), the Court finds Plaintiffs' TAC to be distinguishable from the deficient pleadings in those cases. In both of those cases, the court determined that the state's allegations did not rise to the level of abdication of statutory responsibilities because the pleaded facts only indicated a disagreement with DHS's enforcement priorities, not DHS's blanket nonenforcement of the immigration laws. *United States v. Arizona*, 2011 WL 13137062, at *9; *California v. United States*, 104 F.3d at 1094.

Plaintiffs allege that Defendants' NTR enforcement policies contravene §§ 1225(b) and 1182(d)(5)(A) by summarily releasing undocumented aliens and by granting aliens parole en masse rather than on a case-by-case basis. (Doc. 134, ¶¶ 115–20.) Plaintiffs further allege that pursuant to those policies, Defendants have released over 225,000 undocumented aliens into the United States' interior since President Biden took office, including roughly 50,000 of whom Defendants released without initiating removal proceedings. (*Id.*, ¶ 117.) Plaintiffs compare the Biden Administration's numbers with that of the Trump Administration, alleging that "[f]or the entire month of December 2020—President Trump's last full month in office—the Border Patrol released into the interior only 17 aliens after arresting them crossing the Southwest border and serving them with a notice to appear." (*Id.*, ¶ 131.) According to Plaintiffs, Defendants are "systematically violating the detention and removal requirements of [§] 1225," essentially "giving tens-of-thousands of aliens per month . . . license to disappear into the interior of

the United States." (Doc. 134, ¶¶ 131, 136.)

The Court further finds that the statutes provide guidelines for DHS's parole authority such that there is a meaningful standard for this Court's review. *See Texas*, --- U.S. ---, 142 S. Ct. at 2543 ("Importantly, the [parole] authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' [8 U.S.C. § 1182(d)(5)(A).] And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."). Thus, at the pleading stage, the Court finds that Plaintiffs have sufficiently stated a plausible claim that Defendants' enforcement actions illustrate an abdication of their statutory responsibilities and flout clearly established guidelines such that judicial review is appropriate under the APA. *See United States v. Arizona*, 2011 WL 13137062 at *9; *see also Arizona v. U.S. Dep't Sec.*, 2021 U.S. Dist. LEXIS 125687, *30–31 ("This distinguishes the Interim Guidance from . . . the January 20 Memo, which arguably did present a scenario where the Government abdicated its responsibility to remove noncitizens with final orders of removal.").

### 2.      Final Agency Action

The APA allows any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review. 5 U.S.C. § 702. The federal courts, however, may review only *final* agency action. *Id.* § 704. Courts will deem agency action final if the action (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). Courts should not, and indeed cannot, review broad, generalized agency policies in the abstract. Nor can they separate an agency's decision from the statement intended to implement that decision. *See Texas*, --- U.S. ---, 142 S. Ct. at 2545 (courts

1    cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency

2    statement of general or particular applicability . . . designed to implement' that decision"

3    (quoting 5 U.S.C. § 551(4))).

4        Plaintiffs' TAC identifies specific agency action in the "guidance relating to

5    prosecutorial discretion and issuances of Notices to Report (NTR), as issued in March

6    2021." (Doc. 167-1 at 2.)[2] Defendants argue that the NTR guidance does not "create legal

7    rights [or] impose[] legal obligations" because "the agency retains discretion to alter or

8    revoke the guidance at will," and the officers retained enforcement discretion under the

9    guidance. (Doc. 146 at 13–15.) The Court disagrees.

10       The November memorandum explains the NTR policy as follows:

11           This memorandum supersedes previous guidance relating to
12           prosecutorial discretion and issuance of Notices to Report
             (NTR), as issued in March 2021, and establishes conditions for
13           the implementation of parole plus Alternative to Detention
14           (Parole + ATD), a processing pathway that will replace the use
             of NTR unless that pathway is explicitly authorized by the U.S.
15           Border Patrol (USBP) Chief . . . . Earlier this year . . ., USBP
16           began issuing NTRs . . . for certain noncitizens . . . . The use of
             this processing pathway enabled USBP to relieve
17           overcrowding in congregate settings, thus better protecting
18           both the workforce and noncitizens in our custody.
             Importantly, use of an NTR decreased processing times
19           significantly compared with . . . a Notice to Appear (NTA)
20           . . . . Those released with NTRs, however, were directed to
             report to ICE for further processing, including for an NTA, as
21           appropriate. . . . Effective immediately, USBP is ceasing the
             use of NTRs.
22

23   (Doc. 167-1 at 2.) The November memorandum also explains that the new Parole + ATD

24   policy was created "to ensure individuals are accounted for after release from USBP

25   facilities," implying that the prior NTR policy did not do so. (*Id.*)

26

27   _____

[2] The parties did not attach the March 2021 guidance detailing the NTR policies to their
28   briefing, so the Court relies on Plaintiffs' TAC and the November memorandum for its
     analysis. (*See* Doc. 134, ¶ 117 ("This practice was apparently authorized by guidance sent
     to border patrol from agency leadership, which has not been made public.") (quotations
     omitted).)

The Court finds that the NTR policy constitutes a final agency action because "where an agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as a final agency action under the APA." *Texas v. Biden*, 20 F.4th at 960, *rev'd on other grounds by Texas*, --- U.S. ---, 142 S. Ct. 2528 (2022). The NTR policy, as described in the November memorandum, clearly revoked some of CBP officers' existing discretion to issue NTAs for "certain noncitizens," instead requiring the issuance of an NTR to "decrease[] processing times." And Plaintiffs' allegations that CBP released at least some of those noncitizens without "initiating immigration court proceedings as required by law," taken as true, illustrate that the NTR policy did determine rights "from which legal consequences" flowed. *See Bennett*, 520 U.S. at 177–78. Indeed, Plaintiffs allege that CBP documents from October 2021 "show that Defendants have released at least 160,000 illegal immigrants into the U.S. since March 2021, often with little to no supervision." (Doc. 134, ¶ 134 (quotations omitted).) Although Defendants now claim that the NTR policy was not final because they had the power to revoke it at will, the Court is unpersuaded because Defendants also implicitly concede that there is some "expectation that rank-and-file officers will comply with the guidance while it is in effect." (Doc. 146 at 13.)

To the extent Plaintiffs contend their claims are directed at Defendants' "mass-parole and non-detention" policies in general, however, rather than any specific agency decision or document, they misunderstand the scope of judicial review under the APA. Courts should not, and indeed cannot, review broad, generalized agency policies in the abstract. Nor can they separate an agency's decision from the statement intended to implement that decision. *See Texas*, --- U.S. ---, 142 S. Ct. at 2545 (courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision" (quoting 5 U.S.C. § 551(4))). That is because an agency's statement is in fact the "action" that the APA permits courts to review.  The Supreme Court's recent *Texas* decision illustrates this principle:

> The various rationales offered by respondents and the Court of Appeals in support of the . . . conclusion [that the memorandum was not final agency action] lack merit. First, the Court of Appeals framed the question by postulating the existence of an agency decision wholly apart from any "agency statement of general or particular applicability . . . designed to implement" that decision. To the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error. It was not the case that the [June and October memoranda] "simply *explained* DHS's decision," while only the decision itself "had legal effect." To the contrary, the [memoranda] were themselves the operative agency actions, each of them an "agency statement . . . designed to implement, interpret, or prescribe law or policy."

*Texas*, --- U.S. ---, 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4); *Texas*, 20 F.4th at 950–51).

The Supreme Court's language applies with equal force in this case. Here, as in *Texas*, Plaintiffs seek review of "not only Defendants' policy of issuing NTRs, but also specifically challenge Defendants' policy of programmatically mass-granting parole to unauthorized aliens." (Doc. 167 at 7.) Outside of the NTR policy, then, Plaintiffs do not challenge a particular, discrete agency action, but rather some generalized and amorphous conception of Defendants' detention and parole policies. Defendants' broad decisions not to detain all undocumented aliens, and to parole a large number of undocumented aliens, are not challengeable under the APA absent additional allegations. Accordingly, Plaintiffs' APA claims related to the NTR policy are reviewable, but to the extent Plaintiffs attempt to challenge amorphous parole policies, those APA claims must be dismissed.

### 3.     Sections 1252(g) and 1252(a)(2)(b)(ii)

Defendants argue that § 1252 bars this Court's review of Plaintiffs' claims. Specifically, Defendants first argue that § 1252(g) precludes this Court's "jurisdiction over any claim 'arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders against any alien.'" (Doc. 146 at 15 (quoting 8 U.S.C. § 1252(g).) The Court agrees with Plaintiffs, however, that § 1252(g) does not apply here because it only bars jurisdiction over "any cause or claim by or on behalf of any alien," which is not applicable to Plaintiffs' claims. 8 U.S.C. § 1252(g). Notably,

Defendants do not address this point in their Reply Brief.

Defendants also argue that § 1252(a)(2)(b)(ii) similarly bars review of Plaintiffs' "challenges to Defendants' individual decisions to release noncitizens on parole" because those decisions are within the Secretary's discretion. (Doc. 146 at 16.) Plaintiffs respond that their claims do not challenge individual parole decisions, "but rather Defendants' programmatic shift in application of the parole statute." (Doc. 167 at 19.) Defendants disagree, arguing that "Plaintiff[s] challenge[] an amalgam of individual parole decisions in an attempt to establish a de facto policy." (Doc. 174 at 13.) Given Plaintiffs' allegations that Defendants are not paroling noncitizens on a case-by-case basis, but instead are doing so en masse pursuant to their official policies as documented in the NTR policy, the Court disagrees with Defendants. The Court finds that based on Plaintiffs' claims in the TAC, § 1252(a)(2)(b)(ii) does not bar this Court's review.

### 4.    Zone of Interests

Defendants argue that Plaintiffs' claims are unreviewable under the APA because they do not fall within the zone of interests of §§ 1225(b) and 1182(d)(5). (Doc. 146 at 16.) To bring challenges under the APA, plaintiffs alleged injuries must fall within the zone of interests protected by the relevant statute. *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667 (9th Cir. 2021); *see also Bennett*, 520 U.S. at 176. The zone of interests test is "not especially demanding" for APA claims, asking only whether "this particular class of persons has a right to sue under this substantive statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 130, 134 (2014). "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 n.16 (1987) (footnote omitted). "Under this 'lenient' test, 'the benefit of any doubt goes to the plaintiff,' and 'the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue.'" *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022) (quoting *Lexmark*, 572 U.S. at 130). "[Courts] are not limited to considering the

[specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress'[s] overall purposes in the [INA]." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 n.9 (9th Cir. 2018) (alterations in original) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987)). "Thus, it is sufficient that the [Plaintiffs'] asserted interests are consistent with and more than marginally related to the purposes of the INA." *Id.* at 768.

Plaintiffs' relevant injuries here are their increased costs due to their provision of law enforcement and emergency medical services to noncitizens improperly paroled into Arizona. (Doc. 134, ¶¶ 145–49.) Section 1225 of the INA set forth requirements for DHS's detention and removal of noncitizens arriving in the United States. Similarly, § 1182(d)(5) allows DHS to temporarily parole noncitizens seeking admission, subject to narrow restrictions on a case-by-case basis. It can be fairly said that the purpose of these sections, then, is to prevent an influx of noncitizens into the United States before processing their admission applications. And "the INA more broadly [was] enacted to protect Americans from the costs that illegal aliens impose." *Texas v. United States*, 524 F.Supp.3d 598, 663 (S.D. Tex. 2021) (citing *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015)). Thus, "at the very least, the [Plaintiffs'] interests are 'marginally related to' and 'arguably within' the scope of the statute." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)); *see also East Bay Sanctuary Covenant*, 932 F.3d at 769 (citations and quotations omitted); *see also Arizona v. United States*, 567 U.S. at 397 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration.").

### D.   Failure to State a Claim for Relief

#### 1.   Extra-Pleading Evidence

Defendants attach six exhibits to their motion and request the Court to consider them as evidence under Federal Rule of Civil Procedure 12(b)(6). (Doc. 146 at 18 n.8.) Defendants argue that the Court can properly consider them without converting their

- 19 -

1    motion to one for summary judgment because each are government documents and at least

2    Exhibit A to Defendants' motion, the November memorandum, is incorporated by

3    reference into the TAC. (*Id.*) Plaintiffs also attach exhibits to their response brief, including

4    the November memorandum. (Doc. 167-1 at 1–4.)

5    The Ninth Circuit allows its courts to discretionarily consider extra-pleading

6    evidence contained in documents referenced in a complaint that are essential to the

7    underlying claims via the doctrine of incorporation by reference. *Stewart v. Screen*

8    *Gems-EMI Music, Inc.*, 81 F.Supp.3d 938, 951 (N.D. Cal. 2015) (citing *Steckman v. Hart*

9    *Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998)). A court may also take judicial notice

10   "of undisputed matters of public record, including documents on file in federal or state

11   courts." *Harris v. County of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012) (citation

12   omitted).

13   Plaintiffs' TAC does not specifically reference the November memorandum (or any

14   of the other documents the parties attach to their briefing). In response to Defendants'

15   motion    to    dismiss,    however,    Plaintiffs    contend    that    "the    November

16   [memorandum] . . . continues the same policies of not detaining unauthorized aliens and of

17   paroling aliens en masse" that are alleged in the TAC. (Doc. 167 at 6–7.) Additionally,

18   Plaintiffs do not object to the Court's consideration of the November memorandum, instead

19   discussing it at length in response to Defendants' Rule 12(b)(6) arguments. (*See* Doc. 167

20   at 21–25, 36.) Accordingly, the Court will consider the November memorandum and

21   "assume that its contents are true" in deciding Defendants' motion under Rule 12(b)(6).

22   *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (quotations omitted).

23   The Court will not exercise its discretion to consider the remainder of the parties'

24   exhibits. Even though such documents are public records, the Court does not find they aid

25   the Court's decisional process where the parties assert conflicting interpretations of the

26   underlying law and the facts therein are contradicted by the pleaded facts in the TAC. *See*

27   *Lowthorp v. Mesa Air Grp. Inc.*, No. CV-20-00648-PHX-MTL, 2021 WL 3089118, at *3

28   (D. Ariz. July 22, 2021) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999

(9th Cir. 2018) ("Courts, however, cannot take judicial notice of disputed facts contained in documents susceptible to judicial notice.")).

### 2.   Substantive APA Claims (Counts 9 and 12)

In Count 9, Plaintiffs assert a claim under APA §§ 702, 704 and 706 based on Defendants' mass parole policy without detention, alleging that such a policy is not in accordance with the law and is in excess of Defendants' statutory authority under §§ 1225 and 1182. (Doc. 134, ¶¶ 216–21.) In Count 12, Plaintiffs assert a claim under the same APA sections, alleging that Defendants' "near-blanket refusal to comply with the mandatory-detention provisions" and "limits on their parole authority . . . qualifies as agency action unlawfully withheld or unreasonably delayed." (*Id.*, ¶ 232.)

Defendants argue that Plaintiffs fail to state a claim on both counts because "the cited statutes do not support Plaintiffs' theory." (Doc. 146 at 19.) Specifically, Defendants assert several overlapping arguments that the statutes vest DHS with unreviewable discretion to detain noncitizens and initiate removal proceedings based on many factors, including resource constraints. (*Id.* at 19–21.) For the reasons discussed in Parts III.C.1 and 2, *supra*, however, the Court disagrees and finds that Plaintiffs' have sufficiently pleaded plausible substantive claims reviewable under the APA. Claims challenging agency enforcement actions are reviewable if there are sufficient facts to establish a plausible inference that "the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," as Plaintiffs have done here. *See United States v. Arizona*, 2011 WL 13137062, at *9; *see also Mont. Air Chapter*, 898 F.2d at 756; *Heckler*, 470 U.S. at 833 n.4.

### 3.   Arbitrary and Capricious Claim (Count 10)

Plaintiffs claim that Defendants' mass parole policy is arbitrary and capricious under the APA because "it ignores the costs to the States" and fails to account for "Arizona's reliance interests [and] lesser alternatives [to parole]." (Doc. 134, ¶¶ 224, 226.) Plaintiffs also assert that Defendants' failure "to explain their extreme departure from prior practice" violates the APA. (*Id.*, ¶ 225 (quotations omitted).) Plaintiffs further allege that

"insofar as Defendants claim their policy is justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity." (*Id.*, ¶ 227.)

Defendants argue that, considering the NTR policy was mooted by the November memorandum, Plaintiffs "fail to allege a cognizable 'agency action' that could even be scrutinized under the APA for arbitrary and capricious reasoning." (Doc. 146 at 26–27.) Because the Court determined that Plaintiffs' reliance on the NTR policy is not moot, *supra*, the Court disagrees.

> A court may reverse an agency's decision as arbitrary or capricious only if the agency: 1) relied on factors Congress did not intend it to consider; 2) entirely failed to consider an important aspect of the problem; 3) offered an explanation that ran counter to the evidence before the agency; or 4) offered an explanation that is so implausible that it could not be ascribed to either a difference in view or agency expertise.

*Tucson Rod and Gun Club v. McGee*, 25 F.Supp.2d 1025, 1028 (D. Ariz. 1998) (citing *Western Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir.), *cert. denied*, 519 U.S. 822 (1996)).

Plaintiffs have sufficiently alleged facts that, if true, state a claim under the APA. Plaintiffs allege that Defendants acted arbitrarily and capriciously in issuing NTR and mass paroling noncitizens without regard for Arizona's costs or reliance interests. (Doc. 134, ¶¶ 224, 226.) As noted above, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. at 397. Additionally, Plaintiffs have alleged that Defendants' proffered reasoning for its NTR and mass paroling policy, insufficient agency resources, is pretextual. (*Id.*, ¶ 227.) Plaintiffs support this assertion with additional allegations that Defendants have actively sought to decrease the resources available to enforce the immigration laws, including asking for reduced "immigration detention beds" and "eliminating programs designed reduce the

taxing of immigration resources and detention space." (Doc. 134, ¶¶ 139–43.) These allegations are sufficient to survive a motion to dismiss because they relate to the relevant factors for this Court's consideration of arbitrary and capricious agency action under the APA.

Defendants also argue that the remainder of Plaintiffs' allegations attempt to find a policy based on "an amalgam of individual release decisions" which the Court does not have jurisdiction to review. (Doc. 146 at 26–27.) As noted in Part III.C.2, *supra*, to the extent Plaintiffs assert general policy claims untethered to a specific agency statement, the Court agrees with Defendants that those claims must be dismissed for lack of jurisdiction to review under the APA.

### 4.    Notice and Comment Claim (Count 11)

Plaintiffs bring a claim for Defendants' failure to comply with APA notice-and-comment requirements, alleging that Defendants' departure from their previous detention and parole policies was of sufficient magnitude to require notice and comment. (Doc. 134, ¶¶ 229–30.) Defendants argue notice and comment is only required for rulemaking, and that Plaintiffs have failed to identify a rule other than alleged "unlawful decisions in aggregate of individual discretionary determinations." (Doc. 146 at 27.) Defendants also contend that "the NTR guidance and Defendants' alleged general parole policy" are both "general statements of policy," not rules subject to notice and comment. (*Id.*) Rules subject to notice and comment procedures are those that "create rights, impose obligations, or effect change in existing law pursuant to authority delegated by Congress." *Yesler Terrace Comty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994). As discussed in Parts III.C.1 and 2, *supra*, Plaintiffs have sufficiently alleged that Defendants' NTR policy led to the unsupervised release of over 50,000 noncitizens without initiation of removal proceedings, (Doc. 134, ¶¶ 117, 134), and the Court finds that such a policy alter legal rights and impose obligations on CBP officers.[3] Moreover, Plaintiffs have sufficiently

---

[3] In Part III.C.2, the Court found that Plaintiffs sufficiently established that the NTR policy constituted a final agency action, but failed to establish final agency action based on its general "mass-parole and non-detention" policy allegations.

1    articulated a cognizable theory that such a policy "effect[ed] a change in existing

2    [immigration] law" as delegated by Congress under §§ 1182(d)(5) and 1225(b). At this

3    stage, the Court finds that Plaintiffs have stated a plausible claim that Defendants did not

4    comply with notice and comment requirements in issuing the NTR policy.

5               **5.       INA and Constitution Claims (Count 13)**

6           Plaintiffs assert a claim for violation of the INA and the Constitution, alleging that

7    "the federal government cannot ignore federal statutes, and the Constitution—including

8    the separation of powers doctrine and the Take Care Clause—provides a separate cause of

9    action to challenge the conduct described in Count VII."[4] (Doc. 134, ¶¶ 233–34.)

10   Defendants first argue that Plaintiffs "one-sentence, conclusory legal assertion is

11   insufficient to plead a claim for relief." (Doc. 146 at 28.) Elsewhere in the TAC, however,

12   Plaintiffs allege that the "Biden Administration is ignoring [the] requirements" for

13   mandatory detention and "case-by-case" temporary parole authority established by

14   §§ 1225(b) and 1182(d) by releasing "at least 225,000 illegal border crossers since taking

15   office." (Doc. 134, ¶¶ 115–17, 122–23.) Plaintiffs further allege that 50,000 noncitizens

16   "were released without even being served with a notice to appear." (*Id.*, ¶ 133.) Plaintiffs

17   further allege that Defendants have taken active steps to reduce the resources available to

18   police immigration laws, including "ask[ing] Congress to reduce the number of

19   immigration detention beds," "eliminat[ing] programs designed to reduce the taxing of

20   immigration resources and detention space," and revoking Executive Order 13767 "which

21   directed DHS to terminate the practice of commonly known as 'catch and release,' whereby

22   aliens are routinely released into the United States shortly after their apprehension for

23   violations of immigration laws." (*Id.*, ¶¶ 140–42 (quotations omitted).) The Court finds

24   these allegations to rise above "conclusory legal assertions" that Defendants have violated

25   their duties under the INA.

26          Defendants next argue that Plaintiffs fail to state a claim because §§ 1225(b) and

27

28   [4] Count VII asserted constitutional claims against Defendants regarding their COVID-19 vaccine mandate policies. (*See* Doc. 134, ¶¶ 186–91.) On February 10, 2022, judgment with prejudice was entered against Plaintiffs on Count VII. (Doc. 166 at 2.)

1182(d) "do not override the government's discretion" to enforce immigration laws. (Doc.

146 at 28–29.) As discussed above, however, even if Defendants have discretion to enforce

the immigration laws, Plaintiffs have sufficiently pleaded facts alleging that Defendants

abdicated their statutory responsibilities through their NTR policy to parole noncitizens en

masse without initiating removal proceedings. *See United States v. Arizona*, 2011 WL

13137062 at *9. Moreover, Plaintiffs assert a plausible interpretation of §§ 1225(b) and

1182(d): that those sections mandate Defendants to take certain actions to carry out the

immigration laws. The Court finds Plaintiffs' allegations under the INA sufficient to

survive a motion to dismiss on this basis.

Defendants next argue that Plaintiffs constitutional claims fail because "authority

over decisions regarding detention and removal of noncitizens" is solely vested in the

Executive branch by the Constitution and the INA, and there is no private right of action

under the Take Care Clause. (Doc. 146 at 29.) Plaintiffs does not respond to these

arguments. Other than the one-sentence conclusion that "the Constitution—including the

separation of powers doctrine and the Take Care Clause—provides a separate cause of

action to challenge the conduct described in Count VII," Plaintiffs' TAC does not address

its constitutional claims or how President Biden himself failed to "take care that the laws

be faithfully executed." U.S. Const. art. II, § 3.

The Court agrees that separation of powers principles and the Take Care Clause do

not provide Plaintiffs with causes of action. First, Plaintiffs fail to explain how Defendants

could violate separation of powers principles when the Constitution and the INA vest the

Executive with authority to carry out the immigration laws. *See United States v. Velasquez*,

524 F.3d 1248, 1253 (11th Cir. 2008) (holding that the Executive, not judiciary, has the

authority to decide to detain noncitizens). Next, the justiciability of a Take Care Clause

claim is an open question, and neither the United States Supreme Court nor any "circuit

court has definitively found a private right of action stemming from the Clause." *Las*

*Americas Immigrant Advoc. Ctr. v. Biden*, No. 3:19-cv-02051-IM, 2021 U.S. Dist. LEXIS

226730, at *8 (D. Or. Nov. 24, 2021) (collecting cases). Because the Supreme Court has

1    cautioned courts against "creat[ing] new causes of action" under the Constitution, the Court

2    declines to create them here. *See Hernandez v. Mesa*, --- U.S. ---, 140 S. Ct. 735, 742

3    (2020). Thus, the Court grants Defendants' motion on Plaintiffs' constitutional claims

4    under Count XIII with prejudice.

5                          **6.      Proper Defendants**

6             Defendants summarily argue, albeit in a footnote, that "all defendants except CBP

7    should be dismissed because claims 9 to 13 do not raise allegations against any of the other

8    components of DHS, which are not involved in making admission and release

9    determinations of noncitizens apprehended and inspected at or near the border. (Doc. 146

10   at 6 n.5.) The Court finds that Plaintiffs' TAC pleads allegations against DHS generally

11   and the Secretary of DHS himself, who is explicitly charged with carrying out immigration

12   laws under the INA. (*See* Doc. 134, ¶¶ 118, 127–30, 137.) Plaintiffs' allegations also point

13   to the federal government's, the Biden Administration's, and President Biden's roles in the

14   relaxed enforcement policies. (*Id.*, ¶¶ 114, 117, 120, 136–43, 220.) Additionally,

15   Defendants Miller, Johnson, and Jaddou are sued in their official capacities as department

16   leaders of CPB, ICE, and United States Citizenship and Immigration Services, all

17   organizations within DHS tasked with carrying out the immigration laws. (*Id.*, ¶¶ 15–20,

18   119, 131, 133.) Thus, the Court finds that Plaintiffs' claims against these Defendants are

19   sufficient to survive Rule 12(b)(6)'s pleading standards. *Iqbal*, 556 U.S. at 678.

20            Regarding the remaining 19 Defendants, including various other government

21   agencies and individuals employed by those agencies, it is not clear to the Court whether

22   Plaintiffs' allegations in Counts 9-13 pertain to them. The TAC clearly alleges that these

23   19 Defendants were involved in the events underlying Plaintiffs' challenges to the federal

24   government's vaccine mandate. (Doc. 134, ¶¶ 64–113.) The factual allegations underlying

25   Plaintiffs' immigration claims, however, do not reference any of these 19 defendants.

26   Instead, the TAC only pleads facts pertaining to these Defendants in the context of their

27   vaccine mandate claims (Counts 1-8) no longer pending in this case. Therefore, the Court

28   grants Defendants' motion to dismiss those 19 Defendants for failure to state a claim

                                   - 26 -

against them in Counts 9-13.[5]

###### E.   Leave to Amend

Rule 15 makes clear that the Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The policy in favor of allowing leave to amend must not only be heeded by the Court, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), it must also be applied with extreme liberality, *see Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 880 (9th Cir. 2001). Plaintiffs' do not request leave to amend, so the Court declines to *sua sponte* grant leave to amend where neither party argues for or against it.

## IV.   CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** granting in part and denying in part Defendants' Motion to Dismiss (Doc. 146) as follows:

1.      the APA claims challenging a general mass parole policy asserted in Counts IX through XII are dismissed;

2.      the constitutional claims asserted in Count XIII are dismissed with prejudice;

3.      the vaccine Defendants are dismissed as to Counts IX through XIII; and

4.      the Motion is denied in all other respects.

Dated this 23rd day of September, 2022.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge

---

[5] The dismissed Defendants are: United States Office of Personnel Management; Kiran Ahuja; General Services Administration; Robin Carnahan; Office of Management and Budget; Shalanda Young; Safer Federal Workforce Task Force; Jeffery Zients; L. Eric Patterson; James M. Murray; Deanne Criswell; Rochelle Walensky; Centers for Disease Control and Prevention; Federal Acquisition Regulatory Council; Mathew C. Blum; Lesley A. Field; Karla S. Jackson; Jeffery A. Koses; and John M. Tenaglia.