1  **MARK BRNOVICH**
   **ATTORNEY GENERAL**
2  (Firm State Bar No. 14000)
3
   Joseph A. Kanefield (No. 15838)
4  Drew C. Ensign (No. 25463)
   James K. Rogers (No. 27287)
5  2005 N. Central Ave
   Phoenix, AZ 85004-1592
6  Phone: (602) 542-8540
7  Joseph.Kanefield@azag.gov
   Drew.Ensign@azag.gov
8  James.Rogers@azag.gov
   *Attorneys for Plaintiffs Mark Brnovich and*
9  *the State of Arizona*

10
11              **UNITED STATES DISTRICT COURT**
                      **DISTRICT OF ARIZONA**
12
   Mark Brnovich, in his official capacity as      No. 2:21-cv-01568-MTL
13 Attorney General of Arizona; the State of
   Arizona,
14                                                 **PLAINTIFFS' SUPPLEMENTAL**
                    Plaintiffs,                    **PLEADING**
15
            v.
16
   Joseph R. Biden in his official capacity as
17 President of the United States; Alejandro
   Mayorkas in his official capacity as
18 Secretary of Homeland Security; United
   States Department of Homeland Security;
19 Troy Miller in his official capacity as
   Senior Official Performing the Duties of
20 the Commissioner of U.S. Customs and
   Border Protection; Tae Johnson in his
21 official capacity as Senior Official
   Performing the Duties of Director of U.S.
22 Immigration and Customs Enforcement;
   Ur M. Jaddou in her official capacity as
23 Director of U.S. Citizenship and
24 Immigration Services; the United States
   of America
25
26                  Defendants.
27
28

## INTRODUCTION

1. The Southwest border is in crisis, with record numbers of migrants illegally entering our country. In President Trump's last full month in office, Border Patrol released 17 migrants caught at the border into the interior of the United States. In September 2022, President Biden's Border Patrol released 104,957. Every month, the Biden Administration has consistently been releasing through parole—unlawfully—tens of thousands of aliens into the United States. And the volume of these illegal parole grants is accelerating rather than abating.[1]

2. Between January and November 2021, Defendants were not only unlawfully releasing aliens, but further were frequently refusing to initiate immigration court proceedings as required by law.[2] Instead of issuing charging documents to aliens before (unlawfully) releasing them, DHS was issuing something called a "notice to report," essentially a bare entreaty for the alien to turn himself in at a later date. This practice—which is not authorized by any statute or regulation—was described in "[g]uidance sent to border patrol . . . from agency leadership," and was based on an unprecedented assertion of "prosecutorial discretion" to flout the requirements of the immigration laws.[3]

---

[1] Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021# . The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[2] Stef W. Kight, *Scoop: 50,000 migrants released; few report to ICE*, AXIOS (July 27, 2021), https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419- 418d-abe8-2a8b60e3c070.html.

[3] Stef W. Kight, *Rio Grande Valley border patrol releasing migrants without court date*, AXIOS (Mar. 22, 2021), https://www.axios.com/border-patrol-rio-grande-valley-release-migrant- families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

3.  After Arizona filed this suit and Florida filed a similar suit, DHS realized it could not defend that practice. On November 2, 2021, the government issued a new memo (the "November Memo"), the existence of which it only made public, reluctantly, to defend this and other similar litigation. (*See* Doc. 146 at 4 (Defendants' Motion to Dismiss citing memo as reason for dismissal, but not attaching memo as exhibit) and Doc. 167-1 (Plaintiffs' Response, attaching memo as exhibit, which is designated as "law enforcement sensitive"). The memo states that, "[e]ffective immediately, [Border Patrol] is ceasing the use of" notices to report. (Doc. 167-1 at 2.)

4.  The November Memo, however, does little more than effect changes in nomenclature. The government has replaced notices to report with a policy called "Parole+ATD" or "Parole and Alternative to Detention." *Id*. The Parole+ATD policy still involves releasing aliens subject to mandatory detention without initiating removal proceedings as mandated by federal law. But unlike with the notice to report policy, where DHS could point to no supporting statutory authority whatsoever, the government now relies on an untenable reading of its parole authority in 8 U.S.C. § 1182.

5.  Parole "authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022) (quoting 8 U.S.C. §1182(d)(5)(A)). DHS "cannot use that power to parole aliens *en masse*,"[4] which is *precisely* what the Parole+ATD policy amounts to. While the memo implies that this "alternative path" will be used sparingly, (Doc. 167-1 at 2), implementation data shows

---

[4] *Texas v. Biden*, 20 F.4th 928, 997 (5th Cir. 2021) *rev'd in part on other grounds Biden*, 142 S.Ct. at 2528.

otherwise: DHS paroled 18,191[5] migrants in December 2021 using the Parole+ATD policy. That amount constituted more than *three quarters* of all parole grants by DHS that month, which totaled 23,098 in all.[6]

6.  This pattern has held for every subsequent month: the vast majority of aliens that Defendants parole into the United States are through the Parole+ATD program. According to the federal government's own reports, DHS paroled 321,888 aliens between November 2021 and June 2022.[7] That number has been growing. In September 2022, the federal government released 95,191 aliens into the United States through Parole+ATD, and released another 9,766 with Notices to Appear on their own recognizance (upon information and belief, most of these aliens were also paroled into the United States).[8]

7.  As part of litigation in Texas, the federal government produced monthly reports from August 2021 through June 2022 that disclosed the number of alien parolees, which show these enormous increases in parole grants. Similarly, somewhat-less-precise public statistics from Customs and Border Protection indicate that the number of aliens paroled into the United States since Arizona filed its First Amended Complaint is now more than *half a million*.

8.  Taking the challenged policies together, the government is violating clear congressional commands tens of thousands of times per month—and more than 100,000 times in September 2022. It has claimed that it lacks the resources and detention capacity to process and detain the surge of migrants arriving at the border. But if that is true, it is only because the Biden Administration has tied its own hands behind its back.

---

[5] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics

[6] *Texas v. Biden* ("*Texas MPP*"), No. 21-cv-00067, ECF. 124 (N.D. Tex. Jan. 14, 2022)

[7] *See Texas MPP*, ECF Nos. 119, 124, 129, 133, 136, 139, 140, and 143

[8] *Id*.

9. For example, the government has flatly refused to use its power under § 1225(b)(2)(C) to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. As the Fifth Circuit recently held, Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention. *Texas v. Biden*, 20 F.4th at 996. They have instead terminated the program under that provision—known as the "Migrant Protection Protocols" or the "wait in Mexico policy"—even though that program was "effective[]" and an "indispensable tool." *See Texas v. Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of that program, in which the government found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border").

10. Even more astonishingly, at the same time that the Administration was claiming that it lacked sufficient detention capacity for aliens, and thus that it had no alternative but to parole aliens into the country *en masse*, Federal Defendants submitted a budget request to Congress that would decrease DHS's alien detention capacity by 25%.[9] The federal government further affirmatively degraded its own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities.[10]

11. In addition, even where DHS has capacity, it has often failed to utilize it. For example, an April 12, 2022 DHS Inspector General Report explains how DHS acquired detention capacity from hotels through no-bid contracts and then inexplicably failed to use it: indeed, DHS "spent approximately $17 million for hotel space and services at six hotels

---

[9] Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES (Mar. 25, 2022), https://nyti.ms/3vOI00F.

[10] *Id.*; Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol.

that went largely unused between April and June 2021" and "did not adequately justify the need for the sole source contract to house migrant families."[11] Moreover, DHS has entered into settlement agreements with ideologically aligned groups to hobble its detention capacity further.[12]

12. Thus, while DHS's Parole+ATD policy is premised on a putative shortage in detention capacity, that rationale "calls to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan." *Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring).

13. To top it off, this Administration's misguided—and frequently *unlawful*—policies are the cause of the surge at the border in the first place. The actions of the President, Secretary Mayorkas, and other Administration officials have made clear that the intent of the Administration's immigration policies is to incentivize illegal immigration. In 2019, then-candidate Biden committed to providing free government-provided health care to aliens unlawfully present in the United States.[13] Indeed, that the Administration's immigration policies incentivize high amounts of illegal immigration is widely recognized

---

[11] DHS Off. of Inspector Gen., *ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels* at 3, 5 (April 12, 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-37-Apr22.pdf.

[12] *See, e.g.*, Rae Ann Varona, *ICE Agrees To Restrictions In COVID-19 Hot Spot Settlement*, LAW360 (July 7, 2022), https://www.law360.com/articles/1509393/ice-agrees-to-restrictions-in-covid-19-hot-spot-settlement.

[13] Alexander Bolton, "All candidates raise hands on giving health care to undocumented immigrants," The Hill (Jun. 27, 2019), https://thehill.com/homenews/campaign/450797-all-candidates-raise-hands-on-giving-health-care-to-undocumented-immigrants/; Washington Post, "Where Democrats Stand: Do you believe all undocumented immigrants should be covered under a government-run health plan?", https://www.washingtonpost.com/graphics/politics/policy-2020/medicare-for-all/undocumented-immigrant-health-care/

internationally. For example, the President of Mexico called President Biden the "migrant president" and observed that the Biden Administration's policies and rhetoric greatly incentivize illegal immigration.[14] Human traffickers have recognized this as well. Internal Mexican government assessments "state that gangs are diversifying methods of smuggling and winning clients as they eye U.S. measures that will 'incentivize migration.'"[15]

14.   The Biden Administration continues to publicly tout its lax border policies. As Defendant Secretary Mayorkas recently boasted, "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action."[16] The Biden Administration is not *unable* to control the border; it is *unwilling* to do so.

15.   With respect to the Non-Detention Policy, the government insists that "no such 'policy' exists." (Doc. 146 at 25.) Discovery will show the opposite. In any event, the government does not deny that it is releasing and paroling arriving migrants by the tens of thousands, and the government cannot avoid judicial review of its widespread and unlawful practices by refusing to put them in writing (or, alternatively, committing them to writing but keeping them secret). *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities establishing that unwritten policies are subject to APA review); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (reasoning that a court may infer the existence of an immigration policy where the facts suggest that one exists).

---

[14] Dave Graham, "Exclusive: 'Migrant president' Biden stirs Mexican angst over boom time for gangs," Reuters, Mar. 10, 2021, https://www.reuters.com/article/us-usa-immigration-mexico-exclusive-idUSKBN2B21D8.

[15] *Id.*

[16] *Secretary Mayorkas Delivers Remarks at the U.S. Conference of Mayors, U.S. Dep't of Homeland Security* (Jan. 20, 2022), https://www.dhs.gov/news/2022/01/20/secretary-mayorkas-delivers-remarks-us-conference-mayors, but it has since been removed.

**The Scott Memo**

16. In approximately June 2021, then-Chief Rodney S. Scott of the U.S. Border Patrol wrote a memo (the "Scott Memo") to Defendant Troy A. Miller, who is the Senior Official Performing the Duties of the Commissioner U.S. Customs and Border Protection. The subject line of the Scott Memo was "Notice to Report." The Scott Memo was produced to the State of Florida on September 30, 2022 pursuant to a FOIA request.

17. The Scott Memo sets forth DHS's position that Border Patrol agents putatively "retain discretion" regarding whether to "place . . . migrants in [removal] proceedings." The document also states that "persons will be *released* in accordance with local sector protocols to the fullest extent possible." (emphasis added).

18. In other words, the document contemplates and authorizes the commission of the very violations of 8 U.S.C. § 1225 that Arizona has long alleged are taking place. Belying the government's claims that the Non-Detention and Parole Policies are subject to officer discretion and case-by-case review, the Scott Memo affirms that "USBP *will* issue a[n] NTR when at least one of the following triggers are met" (emphasis added). DHS, however, redacted the list of triggers that compel mandatory issuance of an NTR.

19. The Scott Memo proves that at the same time Defendants were implementing their Non-Detention and Parole Policies, the Chief of Border Patrol believed there was a preference to release migrants in a manner identically consistent with Plaintiffs' allegations about the Policies, and that DHS was willing to break the law to implement those preferences.

**The November Memo**

20. The November Memo claims to rescind the government's notice to report policy and replace it with the Parole+ATD policy. That policy still involves releasing aliens in violation of the mandatory detention requirements and without initiating removal

proceedings, but now doubles down on the government's misuse of its parole authority in § 1182. November Memo at 2 (expressly invoking that authority).

21. According to the November memo, § 1182's "urgent humanitarian reasons or significant public benefit" condition is satisfied by the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." *Id.* at 2.

22. In other words, the government is claiming that any time "capacity constraints or conditions in custody warrant . . . more expeditious" processing, it can ignore the requirements of the immigration laws because those conditions present either "urgent humanitarian reasons" or a "significant public benefit" justifying parole. *Id.*; 8 U.S.C. § 1182(d)(5)(A).

**DHS Alters Parole+ATD Through Unwritten Policies, then Issues the July Memo After-the-Fact Once it Gets Caught**

23. After issuing the November memo, the government began using the Parole+ATD policy in manners inconsistent with the November memo. For example, the November Memo authorizes Parole+ATD only for family units ("FMUs"): "USBP may consider use of Parole+ ATD on a case-by-case basis for FMUs when certain conditions, laid out below, exist." November Memo at 2.

24. Discovery has commenced in a case raising claims similar to those here, in *Florida. v. United States*, No. 21-CV-1066 (N.D. Fla. 2021). During the July 13, 2022 deposition of U.S. Border Patrol's Acting Chief of Operations, Tony Barker, it was revealed that the actual policy was different than the written one. Chief Barker disclosed during his deposition that the Parole+ATD policy had been expanded to apply to single adults as well, and that this change had been implemented a "couple months" earlier. Five days after this major departure from the July Memo change came to light—in other words, five days after DHS had been caught red-handed violating its own policy—DHS issued a

second Parole+ATD memo on July 18, 2022 (the "July Memo") expanding Parole+ATD to apply also to individuals. (Doc. 216-2.)

**The Non-Detention and Parole Policies Include Unwritten Elements**

25. During Florida's July 28, 2022 deposition of U.S. Border Patrol Chief Raul Ortiz—just ten days after DHS issued the July Memo—Chief Ortiz made a number of admissions in his deposition that provide concrete evidence confirming the State's allegations about the existence of the Parole and Non-Detention Policies, and that the Policies were often not committed to formal memos, or even to writing at all. *See id*, ECF No. 78-3 (Deposition of Raul Ortiz, Chief of the U.S. Border Patrol, "Ortiz Depo.")

26. Chief Ortiz confirmed that, under the Trump Administration, agents' ability to release aliens or to parole them was only allowed in "very exigent circumstances," such as for medical or humanitarian reasons. *Id*. at 173:13-174:7.

27. Chief Ortiz also confirmed that when the Biden Administration took office, the new Parole Policy was initially communicated "telephonically or through e-mail coordination between Border Patrol headquarters and the sector." *Id.* at 174:9-176:10.

28. He went on to explain that when the Parole Policy was expanded beyond the first sector where it had been imposed, there were two ways it was communicated: "Every Tuesday we have a chiefs' call where we coordinate directly with the sector chiefs and the deputy chiefs. And then the operations directorate would also communicate with the sectors if there were specific issues centered around coordination, operational coordination that had to happen." *Id.* at 176:20-177:8. He also admitted that, even after DHS had issued its formal Parole+ATD memo, changes to the policy were communicated by email. *Id*. at 224:22-225:11.

29. Under the first iteration of the Parole and Non-Detention Policy, when DHS was issuing Notices to Report ("NTRs"), Chief Ortiz testified that guidance about NTRs "was sent out and distributed through multiple platforms. Initially we had a telephonic call

with all the associate chiefs. We also asked that the operations directorate send out a[n] e-mail to the sector points of contact, which would have been an assistant chief at those sectors, to include the sector chiefs." *Id.* at 198:5-15. He also claimed that he believed a memorandum had been issued as well, but admitted that he had been unable to find a copy of it, and counsel for Florida affirmed that no such memorandum had been produced to Florida. *Id.* at 198:15-20.

30. Most importantly, Chief Ortiz affirmed that the Parole+ATD policy was a programmatic policy such that, once numerical thresholds for illegal border crossings had been reached, the policy required categorical grant of parole to *all* aliens covered by the policy: "Q. Okay. So if the Rio Grande Valley or Del Rio hit the thresholds that are laid out in the second page of this document ... *all* family units would be paroled plus ATD, correct? ... A. *All* family units minus Central Americans and Mexican family units." *Id.* at 212:4-10 (emphasis added).

31. Chief Ortiz's deposition testimony confirms the central elements of the State's allegations in this case: the Parole and Non-Detention Policies exist; they were not necessarily memorialized in formal memos, or even in writing at all; and the Policy imposed mandatory requirements on DHS agents, removing their discretion to grant parole on a "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), and instead requiring that *all* aliens in certain categories be paroled.

## The Challenged Policies Harm the State

32. The Non-Detention and Parole Policies harm Arizona. The Biden Administration is releasing tens of thousands of migrants at the border every month. Many of these migrants are arriving or will arrive in Arizona, harming the State's sovereign and proprietary interests and forcing it to incur millions of dollars in expenses.

33. Despite all this, in its motion to dismiss, the government argues that any harm

10

to Arizona from the challenged policies is based only on "speculating." (Doc. 146 at 6.) That is a remarkable statement. Arizona spends millions per year just on incarcerating aliens unlawfully present in the U.S. generally (and the State specifically), who commit crimes within Arizona's borders. And Arizona spends millions of dollars providing public services and benefits to immigrants unlawfully present in the United States, including education and healthcare services.

34. During discovery in *Florida*, the federal government produced information about aliens released into the United States who listed Florida addresses as their intended place of residence, including statistics about how many aliens had failed to check in with DHS for further processing. *See* Ortiz Depo. at 146:9-148:21. DHS's own statistics show that the number of Florida-bound aliens who have absconded after being issued a Notice to Report or allowed into the United States under Parole+ATD currently stands at close to 50,000. During Florida's deposition of U.S. Border Patrol Chief Raul Ortiz, Chief Ortiz admitted that this was "a large number" that was "concerning." *Id.* at 148:11-14.

35. The State fully expects that further discovery in this case will show a similar—or larger—number for Arizona. (Federal Defendants would of course know now but are not forthcoming with that data.) Furthermore, under federal law, aliens who have been paroled into the United States become eligible for a variety of State benefits after five years.[17] These State benefits, which impose significant costs on the State, include

---

[17] *See* 8 U.S.C.A. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States").

AHCCS/Medicaid[18]; Nutrition Assistance/SNAP (commonly referred to as "food stamps")[19]; and Cash Assistance/TANF (commonly referred to as welfare payments).[20]

36.  The number of parolees in Arizona will cause quantifiable financial harm to the State, and the exact magnitude of those harms will become clear in discovery, when the federal government produces statistics about the number of aliens settling in Arizona. For present purposes, however, that matters little as even "a dollar or two" of injury satisfies Article III. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).

37.  Discovery from *Florida* provides additional evidence of the State's harm. At his deposition, Border Patrol Chief Ortiz admitted that "the southern border is currently in crisis" and that "the crisis that is currently ongoing at the southern border [is] making the border less safe for Americans and aliens alike." Ortiz Depo. at 40:18-21, 53:9-13. This decrease in safety causes harm to Arizona, including increased law enforcement costs.

---

[18] *See also* Arizona Health Care Cost Containment System ("AHCCCS"), Medical Assistance Eligibility Policy Manual §§ 524A and 524B (defining "qualified noncitizen" to include "[p]arolee[s] for at least one year" and making such parolees eligible for benefits after the alien "[h]as been a qualified noncitizen for at least five years")

https://azahcccs.gov/Resources/guidesmanualspolicies/eligibilitypolicy/eligibilitypolicymanual/#t=Policy%2FChapter_500_Non-Financial_Conditions_of_Eligibility%2F524_NonCitizen_Status%2FA_Overview.htm and
https://azahcccs.gov/Resources/guidesmanualspolicies/eligibilitypolicy/eligibilitypolicymanual/#t=Policy%2FChapter_500_Non-Financial_Conditions_of_Eligibility%2F524_NonCitizen_Status%2F524B.htm.

[19] Ariz. Dep't of Econ. Sec., Cash and Nutrition Assistance Policy Manual, § FAA3.D(04)(B), https://dbmefaapolicy.azdes.gov/#page/FAA3/Qualified_Noncitizens.html ("To be potentially eligible for [Nutrition Assistance]" sliens are required" to have been in parole status "for at least one year" and have been granted parole under 8 U.S.C. § 1182(d)5(A)).

[20] Ariz. Admin. Code § R6-12-305 (making eligible for Cash Assistance (TANF) "a noncitizen legal alien who satisfies the requirements of [8 U.S.C. § 1641]").

38. Chief Ortiz also admitted that since President Biden's election, the number of aliens attempting illegally to enter the United States has increased, and that internal Customs and Border Patrol documents state that "since President Biden was elected ... aliens illegally entering the United States perceive that they will be able to enter and remain in the United States." *Id.* at 59:12-60:5. Chief Ortiz agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what actually is happening in the United States." *Id.* at 67:22-68:5.

39. Chief Ortiz also explained that it is important to detain and remove aliens who illegally enter the United States, because when there are no consequences, the number of illegal crossings increases; that "if migrant populations are told that there's a potential that they may be released, that yes, you can see increases [in illegal crossings]"; and that if DHS is not detaining and removing aliens who cross illegally, the flow of illegal crossers "will increase." *Id.* at 171:13-172:9, 173:7-12.

40. Chief Ortiz confirmed that the Biden Administration has affirmatively and intentionally decreased ICE's detention capacity and also eliminated other processing pathways for aliens. *Id.* at 233:9-17. He further agreed with the statement that "each one of those decisions [to degrade detention capacity and eliminate processing pathways] in the midst of a historic flood of aliens to the southern border increased the pressure on Border Patrol and its limited capacity" and that "as that pressure buil[t], there's no other choice other than to release [aliens]." *Id.* at 233:18-234:5. Ortiz affirmed that the decrease in ICE's detention capacity impacts Border Patrol. *Id.* at 33:3-16. He also admitted that, if ICE had not degraded its detention capacity, it would have taken pressure off of Border Patrol, allowing it to transfer more aliens to ICE for detention, rather than paroling them into the United States. *Id.* at 231:17-232:19.

41. Chief Ortiz went on to admit that criminal trafficking organizations incentivized by the Parole and Non-Detention Policy "are putting … border communities

13

in danger," such as by locating "stash houses in neighborhoods" and causing "damage to property [of] ranchers and farmers," including damage to "fences" and "livestock that are lost when these smugglers drive through their property," and that they "have little regard for the safety of the community out there." *Id.* at 241:6-242:3.

42. All of these admissions confirm the extensive injuries to Arizona and to its sovereign, quasi-sovereign, and proprietary interests that Defendants' challenged policies are inflicting.

43. Chief Ortiz further admitted that criminal trafficking organizations "continue to flood the border area with ... narcotics… We've had more agents assaulted this year than we ever have, and we continue to see increase in firearm seizures." *Id.* at 243:7-9, 15-17. Chief Ortiz disclosed that these policies disproportionately harm Arizona specifically, expressly stating that the Tucson Border Patrol sector is one of the two sectors "where we see the criminal organizations, smuggling organizations operating at a higher level." Ortiz Depo. at 83:10-13. The Parole and Non-Detention Policy is thus causing increased crime in Arizona, and causing increased law-enforcement costs to the State.

**The Parole+ATD Policy Violates Counts IX-XIII of the Third Amended Complaint**

44. Parole+ATD is a new name for the same prior Non-Detention and Parole Policies that Defendants first instantiated through their unlawful policy of issuing "Notices to Report." The Parole+ATD policy thus violates Counts IX-XIII of the Third Amended Complaint ("TAC") for the same reasons articulated in the TAC. (Doc. 134 ¶¶ 216-234.)[21]

45. More specifically, the Parole+ATD policy is unlawful because the government cannot parole aliens *en masse*, and none of its rationales satisfy the exceedingly high standards in 8 U.S.C. § 1182. Because this policy is not a valid exercise

---

[21] On September 22, 2022 this court dismissed Count XIII of the TAC. (*See* Doc. at 24-27.) Plaintiffs do not seek reconsideration of that ruling and include allegations about Count XIII in this supplemental pleading solely for the purpose of preserving their rights on appeal.

14

of the government's § 1182 power, it violates the mandatory detention provisions in § 1225.

46. The government insists that "no such 'policy' exists." (Doc. 146 at 26.) But the facts overwhelmingly suggest otherwise, which means that the government is either withholding the written policy in bad faith, or it has not reduced it to writing. If it is the latter, that means the government has implemented this policy without offering any reasoning in support of it, which is per se arbitrary and capricious.

47. In implementing the policy, Defendants not only ignored the State's reliance interests, but also ignored an important aspect of the problem because they did not consider the high rate at which those who are released abscond and do not show up to their immigration proceedings.

48. And insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's intentional actions to reduce immigration resources and detention capacity. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019). And the government's reliance on the COVID-19 pandemic is farfetched, given that it simultaneously claims the power to exclude immigrants wholesale to guard public health against the same pandemic. (*See infra* ¶ 55.)

49. The November Memo and the July Memos are arbitrary and capricious and should be set aside for many reasons, including that they ignore costs to the State, *Michigan v. EPA*, 576 U.S. 743, 752-53 (2015), and neither accounts for reliance interests nor considers lesser alternatives, *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

50. The November Memo and the July Memo also fail to provide any reasoned explanation for their policy change, a per se violation of administrative law's reason-giving requirements. *See New York*, 139 S. Ct. at 2575–76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important

15

decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

51.     DHS also did not consider the degree to which those subject to Parole+ATD will not report to an ICE facility as they are directed to do; it did not consider whether to increase detention capacity or reopen family detention centers; and it did not consider whether the Parole+ATD policy is creating a perception among potential migrants that traveling to the border will result in release into the interior and therefore whether the policy is exacerbating the border crisis.

52.     Further, the memo's claim that overcrowding and lack of resources satisfy the "urgent humanitarian reasons or significant public benefit" requirement violates 8 U.S.C. § 1182(d)(5)(A) or, alternatively, is an unreasonable construction of it.

53.     Even if the government's understanding of "urgent humanitarian reasons" or "significant public benefit" were accurate (it is not), Parole+ATD fails to satisfy the "case-by-case" requirement. See 8 U.S.C. § 1182(d)(5)(A). For example, the Biden Administration released 95,191 aliens in September 2022 using Parole+ATD. Granting parole 3,173 times every day is not what Congress had in mind when it amended that provision to add the case-by-case requirement. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

54.     Moreover, the Parole+ATD policy is a clear attempt to continue the notice to report policy of declining to issue charging documents. Specifically, "as a condition of their parole," individuals processed using Parole+ATD are "required to report to ICE within 15 days to be processed for" a notice to appear. November Memo at 2.

55. DHS's rationale regarding the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities," November Memo at 2, is an implausible basis for the Parole+ATD policy given the CDC's Title 42 Order, which addresses those concerns and which this Administration has not taken full advantage of. *See* Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 13, 2020) (exercising the CDC's power under 42 U.S.C. §§ 265, 268 to suspend the introduction of migrants into the United States to protect public health).

56. DHS insists that it lacks the resources to control the surge of migrants at the border. But, as explained in ¶¶ 7-10 *supra*, these circumstances are of Defendants' own making.

57. Indeed, one district court has already found expressly that DHS acted in bad faith by affirmatively degrading its detention capacity while at the same time claiming that resource constraints justified lax immigration policies that violate the clear commands of statute: "on this point about insufficient resources and limited detention capacity, the Court finds that the Government has not acted in good faith. Throughout this case, the Government has trumpeted the fact that it does not have enough resources to detain those aliens it is required by law to detain. The Government blames Congress for this deficiency. At the same time, however, the Government has submitted two budget requests in which it asks Congress to cut those very resources and capacity by 26%. Additionally, the Government has persistently underutilized existing detention facilities. To say that this is incongruous is to say the least." *Texas v. United States*, --- F.Supp.3d ----, 2022 WL 2109204, at *30 (S.D. Tex. June 10, 2022), *cert. granted before judgment*, No. 22A17 (22-58), 2022 WL 2841804 (U.S. July 21, 2022) (citations omitted).

58. The November Memo announced a drastic expansion of DHS's use of its parole authority and the July Memo continued and accelerated that expansion.

59. The government granted parole to 95,191 migrants in September 2022 alone under this policy.

60. The November and July Memos violate 8 U.S.C. § 1182.

61. In addition, those memos significantly affected rights and obligations and at a minimum required notice and comment. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172–73, (2007); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979).

62. Furthermore, Arizona has a non-statutory cause of action to challenge the government's unlawful, ultra vires conduct, which does indeed "survive[] displacement by the APA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)).

RESPECTFULLY SUBMITTED this 15th of November, 2022.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By: /s/ *James K. Rogers*
　　Joseph A. Kanefield (No. 15838)
　　Drew C. Ensign (No. 25463)
　　James K. Rogers (No. 27287)

*Attorneys for Plaintiffs Mark Brnovich and the State of Arizona*

# CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all Defendants, who have appeared, are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

/s/ *James K. Rogers*
*Attorney for Plaintiffs Mark Brnovich, in his official capacity as Attorney General of Arizona; and the State of Arizona*